UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

COMMODITY FUTURES TRADING
COMMISSION,

        Plaintiff,

v.                                       Case No. 8:19-cv-886-T-33SPF

OASIS INTERNATIONAL GROUP,
LIMITED, ET AL.,

        Defendants,

and

MAINSTREAM FUND SERVICES,
INC., ET AL.,

        Relief Defendants.
_____/

**DEFENDANT RAYMOND P. MONTIE, III's RESPONSE IN
OPPOSITION TO THE INTERVENOR'S MOTION FOR TEMPORARY
STAY OF ALL PROCEEDINGS, INCLUDING STAYING ENTRY OF A
CASE MANAGEMENT AND SCHEDULING ORDER, TO PREVENT HARM
TO FEDERAL CRIMINAL INVESTIGATION, AND MEMORANDUM OF LAW**

      Raymond P. Montie III, a named defendant in this action and victim of the Ponzi

scheme inaccurately outlined in the First Amended Complaint, by and through his

undersigned attorney, files this memorandum in opposition to the intervenor's, the U.S.

Attorney, motion for temporary stay of all proceedings, including staying entry of a case

management and scheduling order, to prevent harm to the federal criminal investigation. The

intervenor's proposed stay further victimizes Mr. Montie because it permits the receiver to

continue to gather and freeze Mr. Montie's assets. The Court maintains continuing authority

to revise an injunction, but the proposed stay prohibits Mr. Montie from conducting discovery to develop the facts necessary to demonstrate that he was wrongly named as a defendant and included in the asset freeze. Modifying the intervenor's request to lift the asset freeze can meet the needs of the intervenor and Mr. Montie, and is in the interests of justice.

A.  PROCEDURAL HISTORY

1.      On April 15, 2019, the plaintiff filed a complaint. Doc. 1.

2.      That same day, the plaintiff filed an *ex parte* motion seeking a statutory restraining order and preliminary injunction ("SRO motion"), which incorporated the allegations in the complaint. Doc. 4.

3.      On April 15, 2019, the Court entered a statutory restraining order ("SRO"), freezing Mr. Montie's assets and placing them in a receivership. Doc. 7.

4.       On April 17, 2019, the U.S. government filed a verified complaint for forfeiture *in rem*, in case number 8:19-cv-908-T-02AEP. The government filed an amended verified complaint the following day ("verified forfeiture complaint"), which can be found at docket entry 12 in that case. The verified forfeiture complaint is related to this case. Doc. 54.

5.      The plaintiff served Mr. Montie with the complaint and SRO on April 18, 2019. Doc. 23.

6.      On April 18, 2019, the intervenor also served Mr. Montie with a Grand Jury subpoena, which was signed by counsel for the intervenor. Mr. Montie has started to respond to the subpoena.

7.      On April 18, 2019, before retaining counsel, Mr. Montie made several controlled calls for the Federal Bureau of Investigation ("FBI"), which was working on the

intervenor's behalf.

8.      The intervenor has not provided any discovery to Mr. Montie, including items that would constitute Brady and Giglio material if he was charged.

9.      Mr. Montie filed a motion to dismiss the complaint. Doc. 58.

10.     The plaintiff filed a first amended complaint ("FAC") on June 10, 2019.[1] Doc. 110.

11.     Mr. Montie is listed on the board of directors for Oasis International Group ("OIG"), which is one of business defendants Michael J. DaCorta, Joseph S. Anile, II, and others used to perpetrate the Ponzi scheme that is described in the FAC, albeit inaccurately.[2]

12.     The receiver has submitted to this Court a request to pay for certain services, including for a vendor that imaged electronic data at OIG. Doc. 114. In Doc. 114-8, the vendor listed all email accounts that OIG hosted. Mr. Montie does not have an account listed.

13.     The receiver also has possession of the OIG bank accounts. Mr. Montie is not listed as someone authorized to access the funds in the accounts, or cause the funds in those accounts to be transferred or withdrawn. On June 6, 2019, the receiver advised the Court that he would make records in his possession available to counsel. On June 25, 2019, the undersigned requested the receiver to provide access to the Oasis financial records. The receiver has yet to respond to that request. According to Mr. Montie's bank records, Mr.

---

[1] The FAC also suffers from legal deficiencies, and Mr. Montie intends to file a motion to dismiss it.

[2] The plaintiff alleges in the FAC that Mr. Montie had other roles at OIG. While the FAC does not attribute the good faith basis to make that allegation, the undersigned is aware that information is posted on Bloomberg.com. https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=114340473 (last visited June 28, 2019). The site notes, "The information and data displayed in this profile are created and managed by S&P Global Market Intelligence, a division of S&P Global. Bloomberg.com does not create or control the content."

Montie invested more than $1.3 million dollars into the various Oasis entities. Defendant DaCorta sent Mr. Montie what defendant DaCorta represented as dividend and interest payments from 2011 to 2019. Ultimately, Mr. Montie's net gain was less than $150,000 more than his investment.[3]

14.     In sum, defendants DaCorta, Anile, and others conned Montie and others to "loan" money to various entities, all of which used variations of the name Oasis. According to defendant DaCorta's convincing fraudulent inducements, the entities would invest in foreign currency ("forex") trading and were guaranteed to make a profit.

15.     Mr. Montie does not admit that his actions violated the law or that he had engaged in any commodity-related activities. Mr. Montie was never involved in forex trading before meeting defendant DaCorta, and is not currently involved in forex trading. Further, Mr. Montie will not engage in forex trading in the future.

16.     Defendant DaCorta already admitted to federal law enforcement that he and others committed the fraud, and hid the fraud from Mr. Montie and others. Doc. 142-1.

17.     The FBI concluded that defendant DaCorta began defrauding Mr. Montie as soon as Mr. Montie invested with defendant DaCorta. "Within months of creating [OM], [Mr. Montie] invested a large sum of money. [Defendant DaCorta] almost immediately started using a portion of this money for personal expenses." Doc. 142-2 at 6.

18.     The intervenor's motion to stay lists the lavish homes, cars, and valuables that defendant DaCorta and defendant Anile acquired using fraud proceeds, but no filing has

---

[3] The undersigned reviewed bank records from 2011 through 2019. While a few months of 2011 could not be analyzed prior to this filing, the undersigned are confident that Mr. Montie's net gain will not exceed $150,000.

indicated they invested any money into the various Oasis entities, unlike their victim, Mr. Montie.

**B. STATEMENT OF FACTS[4]**

1. Plaintiff Conflated Events and Acts to Confuse the Court About Mr. Montie

The plaintiff's vague allegations in the complaint, FAC, and SRO motion are disingenuous. The plaintiff intertwined vague allegations with evidence of fraudulent activity committed by defendants DaCorta, Anile, and others, in order to portray Mr. Montie as equally culpable. The artful pleadings improperly paint Mr. Montie guilty by association with the defendants DaCorta, Anile, and others.

Simply put, Mr. Montie is a victim of the fraud defendants DaCorta, Anile, and others perpetrated. Mr. Montie is the classic early Ponzi scheme investor. He believed OIG's operations were legitimate and successful up to the point where the scheme crashed on April 18, 2019. The plaintiff has further victimized Mr. Montie in this case.

2. Mr. Montie and Ambit, a Legally Unrelated Business to the Oasis Ponzi Scheme

Since 2007, Mr. Montie successfully worked as a consultant for Ambit Energy ("Ambit"), which "provides electricity and natural gas services in deregulated markets across the United States, primarily marketed through a direct sales channel of more than 250,000 Independent Consultants." https://www.ambitenergy.com/about-ambit-energy (last visited May 17, 2019). For Ambit, Mr. Montie recruits independent consultants, produces training videos, aids his independent consultants with selling Ambit's products and recruiting new

---

[4] Much of this section is taken from Mr. Montie's response to the plaintiff's motion from a preliminary injunction. Doc. 142.

independent consultants, and manages his team of consultants. From 2007 until April 18, 2019, Mr. Montie earned in excess of $10,000,000.[5] Ambit is a business operation that is completely unrelated to the Oasis Ponzi scheme.

On or about Monday, June 13, 2011, Mr. Montie hosted a conference for approximately 50 people, who were interested in joining Ambit as independent consultants. Defendant DaCorta was there and introduced himself to Mr. Montie before Mr. Montie commenced his presentation. Defendant DaCorta told Mr. Montie that he wanted to meet Mr. Montie, but did not intend to stay for the presentation. On June 17, 2011, defendant DaCorta joined Mr. Montie's team of Ambit independent consultants. Mr. Montie began introducing defendant DaCorta to the independent consultants on Mr. Montie's team.

In October 2011, after lulling Mr. Montie into a false sense of security, defendant DaCorta convinced Mr. Montie to give defendant DaCorta $25,000 to invest. Defendant DaCorta did not inform Mr. Montie that plaintiff CFTC had barred defendant DaCorta from trading, and Mr. Montie did not discover this fact himself.[6] By the end of the year, defendant DaCorta told Mr. Montie that he had invested the money in forex trading and made a

---

[5] Since the SRO was entered, Ambit has continued to pay Mr. Montie for the work he has done to date, but the receiver has directed those funds to an account Mr. Montie does not control.

[6] For inexcusable reasons, the plaintiff did not make defendant DaCorta's debarment from the NFA readily accessible to the public. Several Oasis victims formerly held jobs in the legal professional and law enforcement and could not find defendant DaCorta's debarment while conducting a background check on him before investing in Oasis. Mr. Montie was also not aware that defendant Anile was also involved with defendant DaCorta in the business that resulted in defendant DaCorta's debarment from the NFA. https://opencorporates.com/companies/us_fl/F06000001807 (last visited May 19, 2019); *see also* *http://search.sunbiz.org/Inquiry/corporationsearch/SearchResultDetail?inquirytype=EntityName&directionTyp e=PreviousList&searchNameOrder=ICT%20F060000018070&aggregateId=forp-f06000001807-01fb244d-c97e-4768-9319-72bd3d8cad20&searchTerm=ICSUNSHINE%20LLC&listNameOrder=ICSUNSHINE%20L100000541690* (last visited May 19, 2019).

substantial profit.  Encouraged by this development, Mr. Montie invested an additional $50,000 with defendant DaCorta.  Thereafter, defendant DaCorta began encouraging Ambit consultants to invest with him in a business defendant DaCorta named Oasis Management, LLC ("OM").[7] Defendant DaCorta told Mr. Montie and several Ambit independent consultants that they would invest money into OM, and defendant DaCorta would use the funds to invest in forex and make a profit for the investors.

　　3.　Defendants DaCorta and Anile Defrauded Mr. Montie and Others

With all the building blocks in place to allow defendant DaCorta to repeat the fraud he'd perpetrated in the past (the fraud that caused his debarment from the NFA), defendant DaCorta commenced his fraud. Defendant DaCorta convinced Mr. Montie to invest in OM and to urge his Ambit independent consultants to invest in OM. Given the financial success the Ambit independent consultants enjoyed, none of them questioned defendant DaCorta's business model. Further, defendant DaCorta brought defendant Anile, an attorney licensed to practice law in New York and self-proclaimed securities law expert, into OM's management. Defendant Anile assured Ponzi scheme victims that, as a lawyer, he ensured Oasis operated legally.

Despite the outward appearance that OM was legitimate, the FBI concluded that defendant DaCorta began defrauding Mr. Montie as soon as Mr. Montie invested with defendant DaCorta. "Within months of creating [OM], [Mr. Montie] invested a large sum of money. [Defendant DaCorta] almost immediately started using a portion of this money for

---

[7] Defendants DaCorta and Anile went on to create a number of entities to perpetuate the fraud using the Oasis brand, Mr. Montie was only on the board of directors for OIG. He served in no capacity for any other entity, other than as a fraud victim.

personal expenses." Doc. 142-2 at 6.[8] On the same day the FBI caused the verified forfeiture complaint to be filed, defendant DaCorta confirmed what was set forth in the verified forfeiture complaint.

In mid-2013, defendants DaCorta and Anile created Oasis International Group, Limited ("OIG"). To ensure Mr. Montie did not withdraw his funds from OM, defendant DaCorta told Mr. Montie that he would be an owner of OIG. Defendants DaCorta and Anile led Mr. Montie to believe he would earn a significant sum when they sold the company or issued stock. Mr. Montie agreed to a position on the board of directors, but in reality had only the title. In 2017, defendant DaCorta told Oasis investors that defendant Anile said all investors had to "loan" funds to OIG, which defendant DaCorta would invest in forex trading and "market making."

On April 18, 2019, defendant DaCorta spoke with Internal Revenue Service Criminal Investigation Special Agent ("SA") Shawn Batsch and FBI SA Ric Volp.[9] The discussion was memorialized in an official government record called a Memorandum of Interview. In sum, defendant DaCorta explained the fraud he committed against Oasis investors and inculpated several others, including defendant Anile. Defendant DaCorta told agents "things got out of control too quickly and I didn't know how to handle it." Defendant DaCorta used investor funds "to purchase his houses, fund his kid's college education, purchase

---

[8] Page numbers refer to the page number the Court's electronic filing system assigned it when filed in this case.

[9] The receiver billed 11 hours for meeting and communicating with the CFTC, FBI, and law enforcement on April 18, 2019. That time included meeting with defendant DaCorta at his residence. The receiver billed additional hours on subsequent days for conferring with the CFTC, the U.S. Attorney's Office, and law enforcement. Doc. 114-3. The receiver's lawyers also billed for several communications with government lawyers and law enforcement on and after April 18, 2019.

automobiles for himself, his wife, and his daughter, go on vacations, and other personal

expenses. DaCorta agreed he spent a lot of money going out to eat and money he used was

investor fund." Doc. 142-1 at 3-4.

> Regarding Mr. Montie, defendant DaCorta said:
>
> DaCorta started OIG after getting involved with Ambit with Ray Montie.
> Montie gave DaCorta money to trade in FOREX market and it blew up from
> there. Montie brought in people from Ambit and the company grew. <u>Montie
> doesn't know there are trading losses and probably thinks the assets are an
> influx of revenues from the trading platform.</u>

Doc. 142-1 at 4 (*emphasis added*). On more than one occasion defendant DaCorta confirmed

that Mr. Montie did not know about the trading losses and that Mr. Montie "had nothing to

do with the fraud." Doc. 142-1 at 7.

> To perpetrate the fraud, defendant DaCorta and others maintained a web portal, called

"the back office," which investors, including Mr. Montie, used to view account balances.

Doc. 142-1 at 6. The back office did not report trading losses. Defendant DaCorta admitted

that the information presented to an investor viewing the back office was "misleading

because each investor believes they are earning money and the company is earning money."

*Id*. In addition to lying to investors, defendant DaCorta told investigators that he hid the fraud

from OIG employees, like Deb Cheslow and Vinny Raia. Doc. 142-1 at 4. These statements

to law enforcement corroborate recorded statements defendant DaCorta made and text

messages he sent during the fraud, all designed to conceal the fraud from Mr. Montie and

others.

> Defendant's DaCorta's confession to investigators is corroborated by the affidavits

filed contemporaneously with this memorandum, and the verified forfeiture complaint. The

FBI explained in the verified forfeiture complaint that defendants DaCorta, Anile, and others, used a large portion of funds invested into OIG "for large personal houses, multiple luxury vehicles such as a Porsche and Ferrari, and maintaining a very lavish lifestyle." Doc. 142-2 at 7. The verified forfeiture complaint also asserts that defendants DaCorta and Anile "created a network of people to help recruit new investors," but the FBI conspicuously failed to allege facts showing that the "network of people" knew the statements they made to recruit new investors were false, should have known were false, or made with reckless disregard as to the truth. *Id.* at 7.

The plaintiff's own investigator, Elise Robinson, prepared an affidavit that fails to support the claims in the FAC and SRO motion that Mr. Montie was involved in a fraud, much less should have been subject to a SRO. Doc. 4-1. Ms. Robinson identified several entities defendants DaCorta, Anile, and others used to commit fraud, but conspicuously included no facts that Mr. Montie created any of those entities, or served in any capacity in any of them, except OIG. Ms. Robinson found no proof that Mr. Montie made any assertions that Mr. Montie knew were false, should have known were false, or made with reckless disregard as to the truth. None could be made, under oath, because Mr. Montie made statements that he believed to be true. Like other investors, Mr. Montie believed what defendants DaCorta and Anile told him. Defendant DaCorta conned Mr. Montie into investing in Oasis in order to gain access to Mr. Montie's Ambit independent consultants. Defendant DaCorta's skillful lies and deceitful actions convinced many people, including Mr. Montie, to not only invest with defendant DaCorta, but to bring family members and loved ones to Oasis. For example, Mr. Montie convinced his own parents to invest with

defendant DaCorta.

Ms. Robinson's flawed financial analysis, doc. 4-9, misleads the Court to conclude that Mr. Montie is similarly situated to the other defendants. For example, Mr. Montie is alleged to have been paid funds from Oasis that were used for "personal payments." Doc. 4-9. Several Oasis investors withdrew funds or were paid interest, and used the funds to make personal payments. Those other investors were not included on doc 4-9, leaving the Court to conclude Mr. Montie's payments were nefarious. Upon a closer examination, the financial analysis shows that only defendants DaCorta and Anile used funds withdrawn from Oasis to pay for chartered jets, luxury hotels, repayment of loans, acquisition of real properties and vehicles, and starting up businesses unrelated to Oasis. Doc. 4-9. Ms. Robinson repeats the same misleading analysis in both doc. 4-11 and doc. 4-12.

In sum, the purported financial analyses in doc. 4-9, 4-11 and 4-12, do not provide evidence that Mr. Montie knowingly engaged in a scheme to defraud. Review of the flawed financial analyses clearly shows that Mr. Montie did not spend money on the lavish lifestyle defendants DaCorta and Anile enjoyed from the fruits of their scheme. This material observation is conspicuously omitted from the plaintiff's FAC, the SRO, and Ms. Robinson's affidavit.

Perhaps the most glaring example of vague allegations intertwined with facts about other defendants to paint Mr. Montie with a broad brush is found at page 23 in Ms. Robinson's affidavit. Doc. 4-1. "The following is a detailed summary of the deposit activity in OM account 9302 during the time period above:…(b)…$30,000 from Montie that may have been funds given to [him] by others for investment in the Oasis Pools…" Said another

11

way, Mr. Montie may have invested his own money, but we are not sure. In other words, the statements about Mr. Montie amount to no more than a guess. "May have" is not proof that Mr. Montie collected money from pool participants and engaged in a scheme to defraud. On April 18, 2019, Mr. Montie cooperated with FBI agents and confirmed that he only invested his own money. Mr. Montie is an Oasis Ponzi scheme victim.

Ms. Robinson also included an OIG organizational chart, doc. 4-3 at 33. Mr. Montie is listed on the board of directors, but no other place on the chart. *See id*.[10] Defendant DaCorta is listed as an OIG director, chief executive officer, chief investment officer, and in charge of marketing & creditor relations. Doc. 4-3. Defendant Anile is listed as an OIG director and president. Ms. Robinson included a .pdf version of the Oasis website, which lists defendants DaCorta and Anile as the leaders of Oasis, but the website conspicuously omits Mr. Montie. Doc. 4-13 at 11, 33-34. The plaintiff and Ms. Robinson leave the Court conclude on its own that Mr. Montie is not as culpable, if culpable at all, rather than candidly admit the factual weakness of the case. Finally, Ms. Robinson attached a chart of the various Oasis entities defendants DaCorta and Anile used to engage in a scheme to defraud. Mr. Montie is only on the board of directors for OIG, and serves no role in entities named as defendants or relief defendants. Defendants DaCorta and Anile never put Mr. Montie in any position where he could have perceived the pervasive fraud the defendant DaCorta, defendant Anile, and others undertook.

---

[10] The FAC alleges Mr. Montie is, among other things, a "vice president of OIG [and] executive director of sales." The plaintiff included no basis for the allegation and it is inconsistent with doc. 4-3 at 33.

**C. MEMORANDUM OF LAW**

1. The Court's Continuing Jurisdiction to Modify the SRO Militates Against a Stay

This Court has continuing jurisdiction to modify the SRO. *See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 578 (5th Cir. 1974) ("A district court has continuing jurisdiction over a preliminary injunction [and in] the exercise of the jurisdiction, the court is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason"); *Polaris Pool Sys., Inc. v. Great Am. Waterfall Co.*, 2006 WL 289118 at *4 (M.D. Fla. 2006). Modification is proper "when there has been a change of circumstances between entry of the injunction and the filing of the motion that would render the continuance of the injunction in its original from inequitable." *Favia v. Indiana University of Pennsylvania*, 7 F.3d 332, 337 (3d Cir. 1993). "While changes in fact or law afford the clearest bases for altering an injunction, the power of equity has repeatedly been recognized as extending also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes." *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31, 35 (2d Cir. 1969). If Mr. Montie is deprived of civil discovery tools, it will be impossible for him to develop the facts sufficiently to show the Court that the injunction is unwarranted. Accordingly, the stay while permitting the receiver to continue will violate Mr. Montie's due process rights.

2. Staying Civil Discovery Is Unwarranted

"[A] court must stay a civil proceeding pending resolution of a related criminal prosecution only when 'special circumstances' so require in the 'interest of justice.'" *United*

*States v. Lot 5, Fox Grove, Alachua County, Fla.*, 23 F.3d 359, 364 (11th Cir. 1994) (citing

*United States v. Kordel*, 397 U.S. 1, 12 & n. 27 (1970)). When determining whether special

circumstances exist, this Court must consider the competing interests of the parties and

balance any prejudice resulting from such a stay. *United States v. Pinnacle Quest Int'l*, No.

3:08–cv–136, 2008 WL 4274498 at * 2 (N.D. Fla. Sept. 11, 2008).

The Ninth Circuit and district courts within the Eleventh Circuit have found the

following determinative of whether special circumstances exist to warrant a stay in the

interests of justice:

> (1) the extent to which the defendant's Fifth Amendment rights are
> implicated; (2) the interest of the non-movants in proceeding expeditiously
> with the litigation or any particular aspect of it, and the potential prejudice
> to them as a result of delay; (3) the burden which any particular aspect of
> the proceedings may impose on movants; (4) the convenience of the court
> in the management of its cases and the efficient use of judicial resources;
> (5) the interests of persons not parties to the civil litigation; (6) the
> interests of the public in the pending civil and criminal litigation; and (7)
> the extent to which issues in the criminal and civil cases overlap.

*Pinnacle Quest*, 2008 WL 4274498 at *2 (citing *Keating v. Office of Thrift Supervision*, 45

F.3d 322, 324–25 (9th Cir. 1995); *Scheuerman v. City of Huntsville, AL*, 373 F. Supp. 2d

1251, 1257 (N.D. Ala. 2005); *S.E.C. v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 1326 (N.D.

Ala. 2003)). Every decision to stay using these factors must be made on a case-by-case basis.

*See FTC v. Mail Tree Inc.*, No. 15–61034, 2016 WL 3950034 (S.D. Fla. Feb. 29, 2016).

As to the first factor, Mr. Montie's Fifth Amendment rights are heavily implicated,

though they have not yet been violated.  If a stay is granted, the receiver will be able to

continue to deprive Mr. Montie of his assets, without a hearing.  If the stay is granted until

the criminal investigation is concluded, that deprivation will continue indefinitely--possibly

for years.  This factor weighs against imposing a stay. While Mr. Montie previously

cooperated with law enforcement and has begun responding to a Grand Jury subpoena, if a

stay is granted it may be appropriate for Mr. Montie to invoke his Fifth Amendment in

response to the receiver until the criminal investigation is concluded. This factor weighs

against imposing a stay.

As to the second factor, Mr. Montie will be severely prejudiced if the stay is granted.

As noted above, Mr. Montie, wrongly, is the subject of an extremely restrictive asset freeze.

Mr. Montie denies the allegations made in the FAC and wishes to clear his name as soon as

possible. Mr. Montie also needs to be exempted from the asset freeze in order to avoid

financial ruin. The only way for Mr. Montie to accomplish these things is through civil

discovery.  Mr. Montie has a strong interest in obtaining exculpatory evidence and testimony

from the plaintiff's witnesses before memories fade. Indeed, discovery has not yet

commenced, and Mr. Montie has already uncovered the existence of exculpatory information

in the form of defendant DaCorta's confession to law enforcement. Mr. Montie believes that

additional exculpatory information and evidence will come to light once discovery is

underway. The requested stay only increases the likelihood that witnesses will not recall

critical information, that witnesses will be unavailable, and that documents might be lost or

destroyed as the intervenor's primary concern is not defending Mr. Montie. The plaintiff has

had the benefit of a lengthy investigation and working with the receiver before the Court

created the receivership, before the filing of the complaint. The plaintiff usually consults the

intervenor to obtain the name of a receiver in advance of filing a complaint. In contrast, Mr.

Montie had no opportunity to conduct a pre-suit investigation before the asset freeze was

imposed. Civil discovery is the only mechanism available to Mr. Montie.

In *SEC v. Fraser*, No. CV–09–443, 2009 WL 1531854, at *3 (D. Ariz. Jun 1., 2009), the court addressed a situation similar to the one at issue here.  The government requested a stay in a related civil case where the SEC alleged securities laws violations against the defendants in a civil matter. *See id.* The *Fraser* Court ultimately held as follows:

> In light of the significant interest Defendants have in resolving this issue as soon as possible, the Government's generalized argument that civil discovery is broader than criminal discovery is not sufficient to establish the 'substantial prejudice' necessary to warrant a stay of the entire civil proceeding. . . . The preferred course of action in these circumstances is for the Court to evaluate the Government's specific objections to discovery requests as they arise. . . .

*Id.* at *4 (citations omitted).  Here, the plaintiff alleges Mr. Montie engaged in serious violations of commodities laws. He has a significant interested in resolving the issues raised in the FAC as soon as possible. The intervenor's general argument that civil discovery is broader is not sufficient to establish the substantial prejudice required for the granting of the stay. Courts can tailor and limit to discovery to avoid prejudice as needed. *See Milton Pollack, Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201, 211 (1990) ("I should stress that a general stay of all civil discovery is not by any means the best option available to the court or to the litigants. Stays can and should be tailored to avoid undue prejudice. By limiting both the time and subject matter covered in temporary deferrals of particular discovery, a Court can allow civil proceedings to progress as much as possible without prejudicing the relative interests of the litigants."). If the Court is inclined to stay discovery, this Court should address the intervenor's objections to discovery requests as the need arises rather than issue a blanket stay.

Turning to the third factor, the burden on the intervenor that *might* occur should the

civil proceeding continue is speculative, at best. The intervenor's investigation appears to be well underway. The subpoena issued to Mr. Montie was the 69th as of April 17, 2019.[11] The intervenor assisted defendant DaCorta in obtaining the services of the Federal Public Defender. The intervenor failed to assert to the Court that the limited discovery to date has prevented it from entering into plea negotiations with culpable parties who are willing to waive indictment and proceed upon the filing of an information, often typical if not expected in fraud cases. The intervenor's fears that individuals will use civil discovery material to alter their testimony in grand jury or proffer sessions, and attempt to evade prosecution or thwart the prosecution are too general to warrant weight being afforded to them. Most, if not all, the concerns the intervenor raised exist in virtually every criminal investigation. In fact, even if there was not a civil case running parallel to the intervenor's investigation, the same concerns would be present, as the intervenor has not sought to conduct its investigation covertly and has, instead, elected to investigate overtly by using the grand jury process.

As to the fourth factor, it will not be convenient to the Court to permit the receiver continue, but stay the litigants ability to discover additional evidence that the asset freeze should be lifted. The requested stay will force the litigants to consider whether each action the receiver takes should be subject to a motion to quash the process for violating the defendants' due process rights.[12]

---

[11] The intervenor's complaint about civil defendants engaging in asymmetrical discovery are unfounded. The intervenor is currently engaged in asymmetrical discovery using the grand jury and, in reality, asks this Court to preserve the intervenor's asymmetrical, tactical advantage of being the only party permitted to engage in discovery.

[12] The intervenor's claim the receivership should continue is dubious. The intervenor can seize property to preserve assets, as it already did in this case. "Federal and state laws don't set deadlines for trustees to make a distribution to investors in Ponzi schemes. In rare cases, trustees have prioritized payouts based on need...

The sixth factor weighs against the intervenor. "Although courts have been receptive to Government stay requests in civil cases brought by parties other than the Government, results in recent years have been markedly different when the Government itself brings a civil lawsuit simultaneous with a criminal proceeding." *SEC v. Sandifur*, No. C05–1631, 2006 WL 3692611, at *2 (W.D. Wash. Dec. 11, 2006).  Further, courts have frequently denied Government requests to stay parallel civil proceedings where the only claim of prejudice is based on the fear that civil litigants might gain an advantage they otherwise would not in a putative criminal case.  *See e.g. United States v. Fin. Indus. Regulatory Auth.*, 607 F. Supp. 2d 391, 393 (E.D.N.Y. 2009) ("In sum, the only 'prejudice' the Court can discern is that allowing the [civil proceeding] to go forward will result in the criminal defendants having more information than they would otherwise be entitled to at this stage under the Federal Rules of Criminal Procedure. This loss of the government's usual tactical advantage is insufficient to justify enjoining the [civil proceeding]."); *United States v. All Funds on Deposit*, 767 F. Supp. 36, 42 (E.D.N.Y. 1991) (denying the Government's motion for a stay, despite its generalized arguments, because it "faile[d] to point to any specific discovery request or abuse that has taken place or any other compelling reason why the [civil] action should be stayed at [that] time."); *SEC v. Oakford Corp.*, 181 F.R.D. 269, 272–73 (S.D.N.Y. 1998) ("[T]o the extent that the defendants' discovery requests simply result in the happenstance that in defending themselves against the serious civil charges that another government agency has chosen to file against them they obtain certain ordinary discovery

Trustees say they often wait to repay investors for fear that distributing too much too early can leave them without money to keep crucial recovery lawsuits going." Stech, Katherine, "For Ponzi Victims, the Aftermath is Long," *Markets, The Wall Street Journal*, June 22, 2019, attached as Exhibit A.

that will also be helpful in the defense of their criminal case, there is no cognizable harm to the government in providing such discovery beyond its desire to maintain a tactical advantage."); *SEC v. Cioffi*, No. 08–CV–2457, 2008 WL 4693320, at *1–2 (E.D.N.Y. Oct. 23, 2008) (explaining that "[c]ourts are justifiably skeptical of blanket claims of prejudice by the government where—as here—the government is responsible for the simultaneous proceedings in the first place" and holding that "[t]he far more sensible approach is to allow discovery to go forward, but to allow the U.S. Attorney to object to particular requests"); *Sandifur*, 2006 WL 3692611, at *3 (rejecting the government's motion for a stay in circumstances similar to this case because it "failed to show any real prejudice that would result from the simultaneous progression of both civil discovery and the criminal case").

"[C]ourts have looked with disfavor to the Government's request for a stay when a branch of the Government, and not private parties, has brought the civil lawsuit that a U.S. Attorney's office is then seeking to stay." *S.E.C. v. Mazzo*, No. SACV 12–1327, 2013 WL 812503, at *2 n.3 (C.D. Cal. Feb. 25, 2013).  In fact, some courts have found that "a stay is improper absent a specific showing of prejudice that cannot be remedied by anything other than a complete stay of the civil proceeding." *Fraser*, 2009 WL 1531854, at *3; *see also S.E.C. v. O'Neill*, 98 F. Supp. 3d 219, 221 (D. Mass. 2015); *Sandifur*, 2006 WL 3692611.

The fifth factor does not apply and the seventh factor has been well covered already. While not a factor, a significant issue is the current asset freeze of Mr. Montie's income from Ambit, a legal business completely unrelated to the Oasis Ponzi scheme, as argued in Mr. Montie's response in opposition to the motion for preliminary injunction. Doc. 142. The past, present, and future income from Ambit are improperly frozen and should be excluded from

the asset freeze. The current asset freeze has resulted in lost income and is destroying Mr. Montie's valuable business relationships, which took years to build.

### D. CONCLUSION

Wherefore, Mr. Montie request this Court to:

1. Deny the intervenor's motion to stay;

2. Grant the intervenor's motion to stay and dissolve the receivership and asset freeze as it applies to Mr. Montie; or,

3. Deny the intervenor's motion but permit the intervenor to object to specific discovery as it arises during the litigation.

Respectfully submitted on July 1, 2019.

**LAW OFFICES OF
HORWITZ & CITRO, P.A.**

By:      *s/ Mark L. Horwitz*
                **Mark L. Horwitz**
                Florida Bar Number 0147442
                Mark@horwitzcitrolaw.com

                *s/ Vincent A. Citro*
                **Vincent A. Citro**
                Florida Bar Number 0468657
                vince@horwitzcitrolaw.com
                17 East Pine Street
                Orlando, Florida 32801
                Telephone: (407) 843-7733
                Facsimile: (407) 849-1321
                Attorney for Raymond P. Montie, III

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 1, 2019, I electronically filed the foregoing with

20

the Clerk of the Court by using the CM/ECF system which will send a notice of electronic

filing to all parties of record who are equipped to receive service of documents via the

CM/ECF system.

I hereby further certify that on July 1, 2019, I provided service of the foregoing via

electronic mail to

| | |
|---|---|
| Gerard Marrone | Adam Allen, Assistant Federal Defender |
| Law Office of Gerard Marrone P.C. | Federal Defender's Office |
| 66-85 73rd Place | 400 North Tampa Street |
| Second Floor | Suite 2700 |
| Middle Village, NY 11379 | Tampa, FL 33602 |
| gmarronelaw@gmail.com | adam_allen@fd.org |
| Counsel for Defendant Joseph S. Anile, II | Counsel for Defendant Michael DaCorta |

*s/ Vincent A. Citro*
**Vincent A. Citro**
Florida Bar Number 0147442