IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

COMMODITY FUTURES TRADING
COMMISSION,

          Plaintiff,

v.                                      Case No. 8:19-cv-00886-VMC-SPF

OASIS INTERNATIONAL GROUP,
LIMITED, ET AL.,

          Defendants,

and

MAINSTREAM FUND SERVICES,
INC., ET AL.,

          Relief Defendants.

_____/

**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION**

For its reply in further support of its Motion for a Preliminary Injunction against Defendants Raymond P. Montie, III ("Montie"), John J. Haas ("Haas") and Satellite Holdings Company ("SHC") (collectively, "Defendants"), Plaintiff Commodity Futures Trading Commission ("CFTC") submits the following memorandum of law, along with two attached declarations and exhibits, which are incorporated by reference herein.[1]  Among other things, this reply is submitted to rebut the unsubstantiated factual allegations made by Defendants in their briefs (Doc. ##142 and 143) and to supplement the record with additional, relevant evidence obtained since April 15, 2019, which will assist the Court in determining whether a preliminary injunction should be entered against Defendants.[2]

As has already been and will further be demonstrated below, this Court should enter a preliminary injunction against Montie, Haas, and SHC because the CFTC has made a prima facie case that (1) they engaged in violations of the Commodity Exchange Act (the "Act") and Commission Regulations ("Regulations") and (2) there is a reasonable likelihood of future violations.

## I.  SUPPLEMENTAL STATEMENT OF FACTS

### A.  Additional Evidence that Oasis Was a Fraud.

There is abundant evidence that the defendants, including Montie and Haas, were operating a fraudulent investment scheme through at least three companies, Defendants Oasis International Group ("OIG"), Oasis Management, LLC ("OM"), and Defendant SHC (collectively, operating as a common enterprise, "Oasis").  Doc. #113 at 9.  To date, it

---

[1] This reply also incorporates by reference the CFTC's April 15, 2019 Motion for Preliminary Injunction and all of the exhibits thereto.  Doc. ##4 through 4-15.

[2] Due to space limitations, this is only a representative sampling of newly-developed evidence, which is voluminous.  *See* Doc. #113.

appears that there are in excess of 800 Oasis victims ("pool participants") who were

fraudulently solicited for a pooled investment opportunity involving forex trading (the "Oasis

Pools"). Declaration of Burton W. Wiand, **Exhibit 1** hereto, at ¶12, (hereinafter, "Ex. 1").

Preliminary analysis indicates that around $80 million was raised from pool participants.

Doc. #113 at 11. No profits were generated from forex trading. Doc. #113 at 10.

OIG lacks documentation that one would expect to see at a normally functioning

company. Ex. 1 at ¶11. It has no policies or procedures and no regular system of accounting

that would record OIG's assets, liabilities, or profits and losses. *Id.* The few records that did

exist indicated that Oasis's pool participants were owed over $120 million yet Oasis had

assets of only around $10 million at the time the CFTC stopped the scheme. *Id.* ¶23. The

actual pool participant losses and the projected amount of claims is yet to be determined, but

will likely exceed $45 million. Doc. #113 at 11. These facts, taken together, are indicative

of a Ponzi scheme. *Id.*

**B.      Additional Evidence of Montie's Participation in the Oasis Fraud.**

Montie was a Co-Founder, Director, Vice President, and Executive Director of Sales

for OIG. Ex. 1-A at 28. This information was included in a Confidential Private Placement

Memorandum ("PPM") that OIG used in 2013 to solicit investors for preferred shares of

OIG.[3]  Ex. 1-A at 28. Montie was a principal stockholder of OIG, along with DaCorta and

Anile, with each owning 30.6% of OIG. Ex. 1-A at 28-29, 34.

Oasis staff considered Montie a "recruiter of investors." Doc. #142-5 at ¶8. And

---

[3] The PPM refers to Montie as "Raymond P. Montie, Jr.," who is presumably Defendant Montie's father.
However, it also lists his age, as of 2013, as 45, which corresponds to Defendant's age, so the CFTC submits
that the PPM refers to Defendant Montie.

Montie was the person primarily responsible for recruiting pool participants for the Oasis Pools. Ex. 1 at ¶ 20. Montie drew on his extensive network of consultants, who he met and developed through his work with a company called Ambit Energy ("Ambit") to solicit on behalf of Oasis. *Id.* As many as one-half of Oasis pool participants were also associated with Ambit. *Id.* Thirty-seven of seventy-one pool participants who have been interviewed by the CFTC since April 15 indicated that they were introduced or referred to Oasis through Ambit and were well-acquainted with Montie. Declaration of Elsie Robinson, **Exhibit 2** hereto, at ¶8 (hereinafter, "Ex. 2"). Nine pool participants indicated that they were introduced to Oasis specifically through Montie and six indicated that they were introduced through both Montie and Haas. Ex. 2 at ¶8.

Montie directly solicited pool participants. He organized and spoke on conference calls promoting the Oasis Pools—some with over 100 prospective pool participants present—and, at times, hosted several calls a week. Ex. 1 at ¶¶14-16. He jointly organized an Oasis sales contest with Haas in late 2018, complete with prizes for top salespeople, to bring $20 million into Oasis by the end of 2018. Ex. 1 at ¶16, Ex. 1-E. During a conference call about this contest, Montie spoke of Oasis's returns and encouraged others to use these returns as a rallying point to get prospective pool participants to participate in the Oasis Pools. *Id.* Montie also organized trips for pool participants to visit Oasis's office in Florida to get them "fired up" about the Oasis Pools and inspire them to recruit others to Oasis. Ex. 2 at ¶10. Montie was also involved in determining who received incentive payments for referring pool participants to Oasis. Ex. 1 at ¶21.

During the course of Montie's solicitation of pool participants, there were "red flags"

that Oasis was a fraud, including, but not limited to, an email from a prospective pool participant asking several detailed questions about Oasis. Ex. 1 at ¶17, Ex. 1-F. The following is a short excerpt from the email chain:

> **Q:** Your last filing with the SEC [w]as in 2013 for up to $5mil [sic] of securities to be offered. You've obviously surpassed that level at this point. Where can we find your latest offering documents that have been filed with a regulatory body?
> **A:** In their filing cabinet.
> **Q:** Are you registered with the NFA? (NFA is the regulatory body for CTA's which they are – I could not find them in the NFA database). If not, why not?
> **A:** Registered with the NRA instead.
> **Q:** How are you allowed to pay referral fees to people who introduce new clients?
> **A:** With dollars.

Ex. 1-F. When Montie received this email from the Oasis employee who drafted the flippant answers to the prospective pool participant, he replied: "Love the answers," followed by some emojis. *Id*. When DaCorta received this email, he replied:

> Who is this guy? These questions show he has no idea what we do or how we do it. Unless he has [$]10 mil[lion] ready its [sic] just not worth our time. I have no interest in providing an education here.

*Id*. Montie's response: "Actually I was told he was a multi-millionaire. I will do a little digging." *Id*.

Another "red flag" was the Oasis website, which had a banner prominently displayed across the bottom of each page that stated, in part, that the Oasis investment was not being offered within the United States to U.S. persons. *See* Doc. #4 at 9, Doc. #110 at ¶31. Montie's Ambit assistant received logs from the service she used to set up Oasis sales calls, which noted the number of participants on Oasis sales solicitation calls and the phone

numbers from which they dialed in (almost all having U.S. area codes), which she forwarded to Montie.  Ex. 1 at ¶19, Ex. 1-G.

Montie made, among other things, the following misrepresentations to prospective and current pool participants during his solicitations:  (1) DaCorta was a trustworthy forex trader who was earning "incredible returns" trading forex; (2) the Oasis Pools had a 12% guaranteed annual return, but were actually returning between 12 and 25% per year; (3) in 2017 the Oasis Pools earned over 22% (103018 call), (4) that the Oasis Pools would earn a guaranteed 20% in 2018 (Update Call 103018), (5) the only risk associated with the Oasis Pools was a major, global economic event; (6) the Oasis Pools had never had a down day; (7) pool funds would be used to trade forex; and (8) pool participants could earn referral fees by recruiting other pool participants.  Exs. 1-D, 1-E; Ex. 2 at ¶¶9-13.

Montie profited $556,366.54 from the Oasis fraud.  Ex. 1 at ¶25, Ex. 2 at ¶14.  From December 2011 to April 2019, Montie (or individuals associated with him, such as his father and fiancée) deposited a total of $1,161,980.00 into OM or OIG accounts and received back $1,718,346.54 from these accounts.  Ex. 1 at ¶25, Ex. 2 at ¶14.

## C.    Additional Evidence of Haas's Participation in the Oasis Fraud.

Haas, the president and sole owner of SHC, was a major aggregator of pool funds, soliciting and receiving at least $14 million of pool funds to SHC.  Ex. 1 at ¶26; Ex. 2 at ¶16. Haas used SHC as a vehicle to receive retirement funds, a portion of which were invested in the Oasis Pools through SHC. [4]  Ex. 1 at ¶32.  Through Haas, SHC executed promissory

---

[4] It appears Haas also solicited pool participants for OIG because he had OIG email addresses—jhaas@oig.com and jhaas@oigconsulting.com—which he used frequently to communicate with prospective and current pool participants.  Ex. 1 at ¶31.  Haas also signed promissory notes with pool participants as OIG's president.  Ex. 1 at ¶27.

notes with pool participants.  Ex. 1 at ¶27.

Like Montie, Haas also drew on his network of Ambit consultants.  Ex. 1 at ¶¶20 and 23.  As noted above, as many as one-half of Oasis pool participants were also associated with Ambit.  Ex. 1 at ¶23.  Thirty-seven of seventy-one pool participants who have been interviewed by the CFTC since April 15 indicated that they were introduced or referred to Oasis through Ambit and were well-acquainted with Haas.  Ex. 2 at ¶8.  Seven pool participants indicated that they were introduced to Oasis specifically through Haas.  Ex. 2 at ¶8.

Haas directly solicited pool participants.  Like Montie, he spoke on conference calls promoting the Oasis Pools.  Ex. 1 at ¶15, 16, 18.  He jointly organized an Oasis sales contest with Montie in late 2018.  Ex. 1 at ¶16, Ex. 1-E.  During a conference call about this contest, Haas spoke of Oasis's returns and encouraged others to use these returns as a rallying point to get prospective pool participants to participate in the Oasis Pools.  *Id.*

Haas made, among other things, the following material misrepresentations to prospective and current pool participants during his solicitations:  (1) the Oasis Pools had a 12% guaranteed annual return; (2) the Oasis Pools were in and out of forex trades so quickly there was no risk involved, and the only risk was if the entire banking system collapsed; (3) the Oasis Pools had never had a down day; (4) pool funds would be used only to trade forex; and (5) "[f]unds are just sitting in an account" with "[n]othing to unwind, no 'projects that went bad,' nothing that has to sell, etc.," and that funds "can just be all sent back at once to everyone if need be."  Ex. 2 at ¶13.[5]  Haas also falsely warranted to Equity Trust—the self-

---

[5]Haas denies communicating any "substantive information concerning how OIG invested money and made

6

directed IRA custodian that pool participants were directed to use—that, among other things, the Oasis Pools "complie[d] with all applicable federal, state, and local laws, including any applicable securities regulations." Ex. 1-J.

Haas misappropriated pool participant funds. Haas opened and had complete control of a bank account in SHC's name at Wells Fargo, which he used to receive Oasis pool funds. Ex. 2 at ¶16. The SHC bank account received $14,368,770.93 in pool funds from December 9, 2014 through March 8, 2019. *Id*. The only other source of funds into the SHC account during that time period was $593,742.96 from Relief Defendant Mainstream Fund Services ("Mainstream"). *Id*. It is unclear whether this money was a reimbursement, a purported profit from trading, an interest payment, or something else, because there were no memos or descriptions on the deposits. *Id*. Regardless, the amount of funds received from Mainstream was significantly less than the amount paid out to pool participants ($1,140,104.85) and the amount paid out to Haas ($1,008,350.00). *Id*. at ¶17. Consequently, the primary source of money being paid out was pool funds. *Id*. at ¶¶16-17. Moreover, Haas began paying pool participants and himself before any funds arrived into the SHC account from Mainstream. *Id*.[6]

Finally, Haas profited by approximately $963,597.24 from the Oasis fraud. Ex. 1 at ¶33. Since 2011, Haas deposited a total of $62,926.09 in Oasis and SHC bank accounts and

---

returns on its investment," claiming that DaCorta communicated all this information. Doc. #143 at 11. The record, however, is replete with evidence that Haas, too, relayed this information to prospective pool participants. *See* Exs.1-D, 1-E.

[6]Haas claims that his withdrawals from SHC were akin to other pool participants withdrawing returns on their Oasis investments. Doc. #143 at 7. Oasis victims, however, neither controlled a bank account receiving pool funds nor had the ability to see that insufficient "interest" or "trading profits" were being deposited into the bank account such that legitimate withdrawals could be made. Stated differently, true Oasis victims lacked the information to know that their Oasis payments were not from trading profits, but from pool funds, aka Ponzi payments. Haas, however, did know the payments were not made from trading profits.

received back a total of $1,026,523.33.

## II.    MEMORANDUM OF LEGAL AUTHORITY

For the Court to issue a preliminary injunction against Montie, Haas, and SHC, the CFTC need only make a prima facie showing that: (1) they violated the Act; and (2) there is a reasonable likelihood of future violations. *CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429, at *6 (N.D. Ill. July 12, 2016). The CFTC has met this burden.

Montie and Haas principally argue in their respective opposition briefs that the CFTC did not establish a violation of the Act or Regulations because it did not have evidence sufficient to meet the scienter requirement. This argument fails for two reasons. One, the CFTC does not need to show that Montie or Haas acted with scienter to show that they violated Section 4*o*(1)(b), 7 U.S.C. § 6*o*(1)(b) (2012) of the Act. Defendants fail to address this charge and its lack of an individual scienter requirement anywhere in their opposition briefs. Two, the CFTC has made a prima facie showing that Defendants acted, at least, recklessly which is sufficient to meet the scienter standard under Section 4b(a)(2)(A) and (C), 7 U.S.C. 6b(a)(2)(A), (C) (2012); Section 4*o*(1)(a), 7 U.S.C. § 6*o*(1)(a) (2012); and Regulation 5.2(b)(1), (3), 17 C.F.R. 5.2(b)(1), (3) (2018). Defendants' focus in attacking the scienter standard under those provisions appears to be on whether or not Montie or Haas knowingly perpetrated the Oasis fraud. To the extent it is addressed at all, Defendants only make conclusory legal statements that they were not reckless in their participation in the Oasis fraud. The evidence and relevant case law show otherwise.

Additionally, Montie argues that he should not be liable for OIG's violations because he was not a controlling person of OIG. Montie's failure to exercise the control he possessed

and the CFTC's evidence that he knowingly induced OIG's violations and/or did not act in good faith with respect to OIG, however, supports the CFTC's prima facie case that Montie is liable for OIG's violations as a controlling person.[7]

Finally, contrary to the Defendants' assertions, an injunction against them is proper because there is a reasonable likelihood that they will violate the law in the future; and such an injunction should not exclude Defendants' assets from its reach because there is no requirement that Defendants' assets be traced to the Oasis fraud in order to be frozen.

**A.    The CFTC Makes a Prima Facie Case that Defendants Violated the Act and Regulations.**

**1.    The CFTC Is Not Required to Show that Defendants Acted with Scienter to Establish that Defendants Violated 7 U.S.C. § 6$o$(1)(b).**

Commodity pool operators ("CPOs") and associated persons ("APs") of CPOs[8] are prohibited from engaging in transactions, practices, or courses of business *which operate as a fraud or deceit* upon any client or participant or prospective client or participant.  7 U.S.C. § 6$o$(1)(b) (emphasis added).  Defendants' focus on their purported lack of knowing participation in the Oasis fraud is misplaced.  Whether Defendants knew or were reckless in not knowing that Oasis was operating as a fraud is irrelevant.  Instead, the phrase "operates as a fraud or deceit" focuses "the force of the prohibition on the effect of the action rather than on the actor's state of mind, thereby indicating that Congress did not intend to require proof of *scienter* to establish a violation of [7 U.S.C. § 6$o$(1)(b)]."  *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 919 (11th Cir. 1987).  Stated differently, the CFTC does not have to prove

---

[7] The CFTC has not alleged that Haas is a controlling person of OIG.  The CFTC alleges that Haas controlled SHC and is therefore liable for SHC's violations of the Act and Regulations.  Doc. #4 at 28.

[8] Defendants do not dispute that, by accepting pool funds and recruiting pool participants, OIG and SHC acted as CPOs and Montie and Haas acted as APs of CPOs, which was briefed extensively by the CFTC.  *See* Doc. #4 at 7-8, 21-23, 25-26.

Defendants' scienter to establish they violated 7 U.S.C. § 6*o*(1)(b).  *CFTC v. Heffernan*, 245 F. Supp. 2d 1276, 1290 (S.D. Ga. 2003).  The CFTC's PI Motion, the Receiver's First Interim Report, and this Reply each contain numerous examples of Montie and Haas soliciting for the Oasis Pools and the CFTC makes a prima facie case that those solicitations operated as a fraud on pool participants.  Doc. #4 at 11-20; Doc. #113; Exs. 1-D, 1-E.

Additionally, through admissions in their responsive briefs, Defendants Montie and Haas effectively concede they violated 7 U.S.C. § 6*o*(1)(b).  First, they both admit that they participated in the solicitation of Oasis pool participants.  Montie acknowledges he solicited for and made representations about the Oasis Pools.  Doc. #142 at 10-11, 15 ("Montie…[brought] family members and loved ones to Oasis."; "Montie made representations . . . .").  Haas similarly admits that he solicited many pool participants.  Doc. #143 at 13-14 ("Haas …introduced his family and friends to…Oasis.").  Through these solicitations, Montie and Haas acted as APs of OIG and SHC, which were acting as CPOs.  Doc. #4 at 25.  Second, Defendants cannot dispute that their representations about the returns and risk of loss associated with the Oasis Pools were false and material.  For example, contrary to Defendants' representations, Oasis Pools did not generate returns between 12 and 24% per year and trading forex is inherently risky.  *See, e.g. CFTC v. R.J. Fitzgerald*, 310 F.3d 1321, 1330 (11th Cir. 2002) (finding misrepresentations concerning profit and risk are material as a matter of law).  Moreover, Haas misappropriated funds from SHC to pay himself and make Ponzi payments.  *See* Doc. #4 at 21-22; Doc. # 4-10; Ex. 2 at ¶¶15-18.  Stealing pool funds, at the very least, operates as a fraud.

10

> **2.    Defendants Recklessly Made Misrepresentations to Pool Participants and Haas Willfully Misappropriated Pool Participant Funds in Violation of** 7 **U.S.C. § 6b(a)(2)(A) and (C), 7 U.S.C. §** 6*o*(1)(a), **and 17 C.F.R. 5.2(b)(1) and (3).**

Despite Defendants' repeated arguments that they did not know Oasis was a fraud, the CFTC has made a prima facie case that, at a minimum, they were reckless in soliciting others to invest in the Oasis Pools, in organizing sales contests to bring $20 million in new investments to Oasis, and in encouraging others to solicit for the Oasis Pools. And Haas's misappropriation of almost $2 million is a willful act of fraud that cannot be explained away by his claimed ignorance. Through these activities, Defendants violated 7 U.S.C. § 6b(a)(2)(A), (C); 7 U.S.C. § 6*o*(1)(a); and 17 C.F.R. 5.2(b)(1) and (3).[9]

To prevail under these provisions, the CFTC does not have to prove "evil intent or intent to injure." *CFTC v. Vandeveld*, No. 04-2181-D/An., 2007 WL 2823307, at *5 (W.D. Tenn. Sept. 27, 2007). Rather, the CFTC must show that Defendants acted, at a minimum, with reckless disregard for the truth. *See CFTC v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 774 (9th Cir. 1995) (finding that with regard to 7 U.S.C. § 6b, the CFTC must show that a defendant either "intentionally violated the Act or acted with 'careless disregard' of whether his actions violated the Act"). In the context of promoting investment opportunities, courts have found various types of conduct to be reckless. It is reckless to promote an investment opportunity without verifying its legitimacy. *Vandeveld*, 2007 WL 2823307at *6 (finding it reckless to promote an investment and marketing materials before investigating and verifying

---

[9] The elements of 7 U.S.C. § 6b(a)(2)(A) and (C), 7 U.S.C. § 6*o*(1)(a), and 17 C.F.R. 5.2(b)(1) and (3) violations are analyzed in the CFTC's motion in greater detail. Doc. #4 at 28-36. In short, to establish a violation of these provisions, the CFTC must show that Defendants made a material misrepresentation, misleading statement, or deceptive omission with scienter.

legitimacy); *SEC v. George*, 426 F.3d 786, 788 (6th Cir. 2005) (promoting a risk-free investment with lucrative returns has all of the "hallmarks of a free lunch" and defendants were reckless when they failed to verify the legitimacy of the program they promoted).  It is reckless to rely on corporate insiders' representations at face value without making any independent investigation.  *SEC v. Gagnon*, No. 10–cv–11891, 2012 WL 994892, at *10 (E.D. Mich. Mar. 22, 2012).  It is reckless to ignore investors' suspicions, complaints, and allegations.  *See CFTC v. Complete Developments, LLC*, No. 4:10 CV 2287, 2014 WL 794181, at *12 (N.D. Ohio Feb. 26, 2014) (finding defendant acted recklessly in continuing to carry on with program after suspicions were raised by potential investors).

Here, the CFTC makes a prima facie case that Defendants were, at a minimum, reckless in their solicitations for the Oasis Pools and that reasonable due diligence by them would have revealed Oasis was a fraud through and through.[10]  A defendant's good faith belief in his material false representations also does not negate scienter.  *Complete Developments,* 2014 WL 79418, at *16.  Further, "[a] subjective belief based on a reckless inquiry cannot be considered a 'good faith' belief, and ignorance does not negate recklessness 'where a reasonable investigation would have revealed the truth.'"  *Id*. (citing *SEC v. Infinity Group Co.*, 212 F.3d 180, 193 (3d Cir. 2000)); *see also George*, 426 F.3d at 797 (stating that suffering a net deficit in the scheme does not matter; scienter was established through individual's failure to independently verify the legitimacy of the scheme).

---

[10] The CFTC has not conducted discovery on Defendants' scienter and does not concede that Defendants did not act knowingly.  For purposes of entering a preliminary injunction, however, the only question is whether the CFTC has made a prima facie case of a violation of the Act, so it has limited its analysis herein as to whether Defendants acted with reckless disregard for the truth, the minimum required to establish liability.

The falseness and audacity of Defendants' solicitations would have been revealed through minimal efforts. Defendants were promoting an investment opportunity that had the hallmarks of a "free lunch"—a purportedly risk-free investment in forex that supposedly had been generating annual returns of 12 to 24% for years. This combination of no risk and extraordinary track record of success in trading forex, a market that is generally known to be inherently risky, should have set off alarm bells that independent verification was required. A cursory review of Oasis's bank and trading statements would have revealed Oasis's abysmal trading returns and insolvency. *See George*, 426 F.3d at 795 (6th Cir. 2005) (finding scienter due to recklessness in failing to witness or receive any documentation confirming that securities had been traded and failing to verify the legitimacy of the investment programs advertised).

There were other red flags ignored by Montie and Haas. Montie did nothing to investigate questions posed to him by a prospective pool participant's financial advisor. These questions included whether Oasis had audited financial statements, whether it was registered with the National Futures Association, whether investors could view monthly statements of operation, and why prime brokers would require collateral if investor money was never at risk. Instead of finding and independently verifying answers to these questions, Montie joined in laughing at the joke answers prepared by another Oasis employee. Haas made numerous representations to Equity Trust about the Oasis investment, including warranting that it complied with all applicable federal and state laws, including securities regulations. Had he done any of the due diligence Equity Trust required, then he would have realized that Oasis was a sham. Lastly, OIG's website contained a clear disclaimer that it did

13

not offer services to U.S. persons.  Doc. #4 at 9.  Despite this, Defendants facilitated numerous solicitation conference calls with potential pool participants and almost all call participants dialed in from U.S. area codes.

Defendants make no mention in their briefs of any due diligence they performed. Rather, Defendants state repeatedly that they relied on what DaCorta and Anile told them about Oasis.  *See, e.g.,* Doc #142 at 15 (Montie "relied on the back office portal . . . [and] believed the fraud . . . DaCorta and Anile sold."); Doc. #143 at 16 (Haas "relied on statements made to him by . . . DaCorta and Anile.")).  Defendants also claim to be victims of the Oasis fraud, even though they both profited substantially from it.  Doc. #142 at 12 ("Montie…is [a] victim."); Doc. #143 at 13-14 ("Haas is a victim….").  Their claims of being victimized by DaCorta and Anile are not sufficient to avoid liability here.  *See George*, 426 F.3d at 793 (finding defendant's contention that he truly believed fraudster and that defendant himself lost money does not controvert the evidence that defendant encouraged people to invest in a program about which he knew nothing).

Montie and Haas were reckless to purportedly rely upon DaCorta's and Anile's statements with no additional effort to verify those statements, and Haas' misappropriation of almost $2 million of pool participant funds from the SHC account is a "willful and blatant" fraud that violates 7 U.S.C. § 6b(a)(2)(A) and (C), 7 U.S.C. § 6*o*1(a), and 17 C.F.R. 5.2(b)(1) and (3).  *CFTC v. Allied Markets LLC*, No. 3:15-cv-5-J-34MCR, 2019 WL 1014562, at *5 (M.D. Fla. Mar. 4, 2019).

14

3.      **The CFTC Makes A Prima Facie Case That Montie Was A Controlling Person of OIG.**

Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), states that a controlling person of an entity is liable for the violations of that entity if the controlling person knowingly induced the violations, directly or indirectly, or did not act in good faith. To establish liability pursuant to 7 U.S.C. § 13c(b), the CFTC must show that the defendant exercised control over the entity principally liable and "did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation." *See, e.g., JCC Inc. v. CFTC,* 63 F.3d 1557, 1567 (11th Cir. 1995). By virtue of being a founder, officer, director, principal shareholder, Vice President, and Executive Director of Sales for Oasis, Montie had general control over Oasis. *CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311, 1322-24 (S.D. Fla. 2014) (finding general control exists where the defendant is an officer, founder, principal, or the authorized signatory on the company's accounts) (emphasis added). Because control may be exercised jointly by a group, several persons may simultaneously be controlling persons of the same corporation. *JCC*, 63 F.3d 1557, 1561 (11th Cir. 1995). Finally, in evaluating controlling person liability, "the focus is upon the power to control, not whether that power is actually exercised." *CFTC v. Gibraltar Monetary Corp.*, No. 04-80132-CIV, 2006 WL 1789018, at *18 (S.D. Fla. May 30, 2006), *aff'd* 575 F.3d 1180 (11th Cir. 2009). Montie had general control over Oasis by virtue of being a founder, director, and principal stockholder of OIG. Additionally, he was a vice president and the Executive Director of Sales and solicited the majority of Oasis pool participants. He therefore controlled one of the specific activities—sales solicitations—that creates OIG's liability under the Act and Regulations.

Montie failed to act in good faith as an OIG director, vice president, and the executive director of sales. A control person fails to act in good faith by not maintaining a reasonably adequate system of internal supervision and control over the source of the misconduct, by not enforcing such a system with any reasonable diligence, or when there are repeated charges of illegal behavior from different sources. *Monieson v. CFTC*, 996 F.2d 852, 860-61 (7th Cir. 1993) (citations omitted). OIG had no policies or procedures and no accounting system for creating financial statements to verify that OIG's sales solicitations were truthful. Additionally, the CFTC has presented evidence that Montie knew prospective pool participants asked questions about Oasis that, if taken seriously, could have halted or minimized the Oasis fraud.

Montie also knowingly induced the acts of OIG that violated the various provisions of the Act and Regulations. Constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *JCC,* 63 F.3d at 1568. Constructive knowledge can be found where a defendant "lack[ed] actual knowledge only because he consciously avoided it." *Id*. at 1569 (citations omitted). Here, Montie knowingly induced the solicitation of Oasis investors through OIG by his numerous conference calls, telephone calls, and emails exchanges with pool participants and prospective pool participants and by organizing an OIG sales contest to raise additional funds for the Oasis Pools. A cursory review of OIG's trading records and bank records would have revealed that these solicitations were false.

**B.     Defendants' Network of Ambit Consultants and These Consultants' Apparent Trust in Defendants Present a Reasonable Likelihood of Future Violations.**

Defendants argue that there is not a reasonable likelihood that they will violate the law in the future. Doc. ##142 at 16-17, 143 at 17-18. Importantly, the CFTC may obtain a

preliminary injunction if it shows that a person violated and is likely to continue violating the Act, the latter of which "may be inferred from past unlawful conduct." *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 142 (2d Cir. 1977) (emphasis added). The CFTC makes a prima facie case that Defendants have violated the Act and Regulations.

Relevant considerations in the "reasonable likelihood" analysis resolve into essentially three areas of inquiry: (1) the nature of the past violation, (2) the defendant's present attitude, and (3) objective constraints on (or opportunities for) future violations. *CFTC v. Garcia*, No. 2:15-cv-237-FtM-38CM, 2015 WL 3453472, at * 3 (M.D. Fla. May 29, 2015).

Regarding the nature of the past violation, Defendants were involved in a $100 million fraud that deprived hundreds of investors of their savings and retirement funds. It is hard to imagine violations more egregious. Regarding the Defendants' present attitude, their opposition briefs make it clear that they believe—seven figure winners in the fraud collectively—are similarly situated to defrauded investors who lost everything. After the loss of tens of millions of dollars, Defendants excuse their role in this fraud by stating they simply relied on DaCorta's and Anile's representations and had no access to bank and trading statements, without disclosing that they were blindly taking DaCorta's and Anile's word for all representations about Oasis. They wholly fail to recognize their own wrongful conduct.

Finally, to find pool participants, Montie and Haas tapped into their Ambit consultant base to such a degree that at least one-half of the Oasis pool participants were affiliated with Ambit. The model has been proven, and these consultants' trust in Defendants is so clear that even now, after they have learned that Defendants brought them into a fraud that caused

them to lose their investments, they are still willing to sign affidavits in support of Montie

and Haas. This demonstrates a likelihood that their current occupations will present

opportunities for future violations. At best, both Montie and Haas are susceptible to

fraudulent schemes. Unfortunately for the defrauded pool participants, they infected their

friends, families, and network of downstream consultants and other colleagues with their

recklessness and gullibility.

**C.     Defendants Misstate Applicable Law Related to the Asset Freeze.**

Defendants also request that their various assets, including their incomes from Ambit

Energy—a multi-level marketing energy company whose consultants comprised at least one-

half of Oasis pool participants—be excluded from any asset freeze. Doc. ##142 at 2,143 at

2.[11]  Both Defendants argue that their income from Ambit and other frozen assets bear no

nexus to any funds derived from the Oasis fraud and therefore cannot be frozen. Doc. ##142

at 19 and 143 at 19.

Defendants misstate the nexus required with respect to asset freezes in citing to *CFTC*

*v. Next Financial Services Unlimited, Inc.*, No. 04-80562-CIV, 2005 WL 6292467 (S.D. Fla.

June 7, 2005) (underline denying motion to vacate personal asset freeze). Following the Dodd-Frank

Act's addition of Section 6c(d)(3), the CEA expressly authorizes the CFTC to obtain in its

enforcement actions equitable remedies, including the equitable remedies of restitution and

disgorgement, for *any* violation of the CEA and regulations by *any* person. *See* 7 U.S.C. §

---

[11] To the extent Defendants request that the asset freeze be modified for living expenses, attorneys' fees, or otherwise, such modification must be in the interest of the defrauded investors. *See SEC v. Coates*, No. 94 Civ. 5361, 1994 WL 455558, at *1 (S.D.N.Y. Aug. 23, 1994). In response to requests for modification, the CFTC and Receiver invited Montie and Haas to make specific proposals for consideration. To date, they have made no proposals. Without such information, the CFTC cannot evaluate how modification would impact or be in the interest of defrauded pool participants.

13a-1(d)(3) (2010); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub.L.

111-203, Title VII, § 744, 124 Stat. 1731, 1735 (2010).  To impose the equitable remedy of

restitution, the CEA requires only a showing that "persons . . . have sustained losses

proximately caused by [a] violation," with restitution measured by the "amount of such

losses."  *Id.*  Similarly, to obtain disgorgement all that must be proved is that gains were

received in connection with a violation.  *See id.*  These are the required nexuses that the

CFTC must demonstrate to obtain relief.  The CFTC does not need to show that specific

assets resulting from a fraud are in the defendants' possession or traceable to the defendant.

Here, the FAC contains allegations and charges that entitle the CFTC to equitable

remedies including restitution and disgorgement, and the CFTC seeks particular assets in

Defendants' possession—namely, *all* of their assets—because all assets are needed for a

possible restitution award.  Doc. #110 at 53-57.  Assuming, *arguendo*, that nexus and tracing

are different concepts and the CFTC must establish a nexus or causal relationship between

the Oasis fraud and assets frozen, then the proper nexus is between the amounts frozen and

the likely sanctions.  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005); *SEC

v. Lauer*, 445 F. Supp. 2d 1362, 1370 (S.D. Fla. 2006)  ("The amount of assets to be frozen,

prior to the finding of liability, is determined not by whether the funds themselves are

traceable to the fraudulent activity underlying the lawsuit, but by showing a reasonable

approximation of the amount, with interest, the defendant was unjustly enriched."); *FTC v.

Life Management Services of Orange County, LLC*, No. 6:16-cv-982-Orl-41TBS, 2019 WL

1093023, at *8 (M.D. Fla. Jan. 24, 2019) (finding, in an FTC matter seeking disgorgement,

that the causal connection required is between the amount by which the defendant was

unjustly enriched and the amount he can be required to disgorge.); *SEC v. Current Financial Svcs.*, 62 F. Supp. 2d 66, 68 (D.C.Cir.1999) (refusing to release personal funds not traceable to the fraud because defendant's liability exceeded total funds frozen).  In other words, the Court can freeze enough assets to cover the amounts Montie and Haas could ultimately be liable for in restitution or disgorgement.

If the CFTC prevails in its lawsuit against Defendants, then they stand to be jointly and severally liable for millions of dollars in restitution.  *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) ("[J]oint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct . . . even where one defendant is more culpable than the other.").  Given what is known today about the total pool participant losses, the amount of assets frozen in this matter do not come close to totaling what Defendants are potentially liable for in restitution.  Thus, there is a nexus or causal connection between the Oasis fraud and the asset freeze encompassing *all* of Montie's and Haas's assets, including their Ambit incomes.

### III.    CONCLUSION

The CFTC makes a prima facie showing that Montie, Haas, and SHC have violated the Act and Regulations and there is a reasonable likelihood of future violations.  For good cause shown, the CFTC therefore requests that this Court enter a preliminary injunction against them.

Dated:  July 2, 2019                Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

By: /s/ Jennifer J. Chapin
Jo E. Mettenburg, jmettenburg@cftc.gov
TRIAL COUNSEL
Jennifer J. Chapin, jchapin@cftc.gov
J. Alison Auxter, aauxter@cftc.gov
Attorneys for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
4900 Main Street, Suite 500
Kansas City, MO 64112
(816) 960-7700
(816) 960-7751 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2019, I filed a copy of the foregoing with the Clerk of the Court via the CM/ECF system, which served all parties of record who are equipped to receive service of documents via the CM/ECF system.

I hereby certify that on July 2, 2019, I provided service of the foregoing via electronic mail to:

Gerard Marrone
Law Office of Gerard Marrone P.C.
66-85 73rd Place
Second Floor
Middle Village, NY 11379
gmarronelaw@gmail.com
**COUNSEL FOR DEFENDANT JOSEPH S. ANILE, II**

I hereby certify that on July 2, 2019, I provided service of the foregoing via electronic mail to the following unrepresented party:
Michael J. DaCorta, mdacorta@oasisig.com