## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

COMMODITY FUTURES TRADING
COMMISSION,

                                    Case No. 8:19-CV-886-T-33SPF

       Plaintiff,

v.

OASIS INTERNATIONAL GROUP,
LIMITED; OASIS MANAGEMENT, LLC;
SATELLITE HOLDINGS COMPANY;
MICHAEL J. DACORTA; JOSEPH S.
ANILE, II.; RAYMOND P. MONTIE III;
FRANCISCO "FRANK" L. DURAN; and
JOHN J. HAAS,

       Defendants;

and

FUNDADMINISTRATION, INC.;
BOWLING GREEN CAPITAL
MANAGEMENT LLC; LAGOON
INVESTMENTS, INC.; ROAR OF THE
LION FITNESS, LLC; 444 GULF OF
MEXICO DRIVE, LLC; 4064 FOUNDERS
CLUB DRIVE, LLC; 6922 LACANTERA
CIRCLE, LLC; 13318 LOST KEY PLACE,
LLC; and 4 OAKS LLC,

       Relief Defendants.

_____/

## THE RECEIVER'S THIRTEENTH INTERIM REPORT

Information and Activity from April 1, 2022 through June 30, 2022.

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................... 1

BACKGROUND .................................................................. 4

I.      Procedure and Chronology ............................................. 4

II.     Overview of the Receiver's Findings .................................. 9

ACTIONS TAKEN BY RECEIVER ................................................ 12

III.    Securing The Receivership Estate .................................. 122

        A.      Cooperation with the Department of Justice, Federal Bureau
                of Investigation, and U.S. Marshals Service .................... 13

        B.      Freezing Bank Accounts and Liquid Assets ..................... 14

                1.      The ATC Account in the United Kingdom ............... 15
                2.      Financial Assets in Belize ......................... 16

        C.      Securing Real Property ...................................... 17

                1.      All Receivership Real Estate Has Been Sold........... 17
                2.      Defendant Montie's Real Property.................... 18
                3.      Defendant Haas's Real Property ..................... 19

        D.      Securing Personal Property .................................. 20

                1.      Vehicles .......................................... 20
                2.      Cash and Precious Metals .......................... 21
                3.      Other Personal Property............................ 21

        E.      Securing the Receivership Entities' Books and Records ......... 22

        F.      Operating or Related Businesses.............................. 22

IV.     Retention of Professionals .......................................... 22

V.      Pending and Contemplated Litigation ............................... 25

                1.      Completed and Related Litigation .................. 25

2. Pending and Related Litigation ................................................27

3. Contemplated Litigation ........................................................ 34

VI. Claims Process.............................................................................35

VII. The Next Ninety Days ................................................................... 40

CONCLUSION .........................................................................................41

## INTRODUCTION

Burton W. Wiand, the Court-appointed receiver over the assets of the above-captioned defendants and relief defendants (the "**Receiver**" and the "**Receivership**" or "**Receivership Estate**"), files this Thirteenth Interim Report to inform the Court, investors, creditors, and others interested in this Receivership of activities to date as well as the Receiver's proposed course of action. The Receiver has established a website, www.oasisreceivership.com, which he updates periodically. The Receiver will continue to update the website regarding the Receiver's most significant actions, important Court filings, and other items that might be of interest to the public. This Thirteenth Interim Report, as well as all other reports, will be posted on the website.[1]

## Overview of Significant Activities During this Reporting Period

On April 27, 2022, prosecutors representing the United States of America during the criminal trial of defendant Michael DaCorta called the Receiver as a witness, and he testified for several hours about the Receivership and the Oasis Ponzi scheme. In December 2019 and February 2021, a federal grand jury indicted DaCorta on one count of conspiracy to commit wire fraud and mail fraud, one count of engaging in an illegal monetary transaction (*i.e.*, money laundering), and one count of making a false and fraudulent statement on an income tax return. The

---

[1] As directed by the Court, the Receiver will submit his next interim report and subsequent reports within thirty days after the end of each calendar quarter. Where possible, the Receiver has also included information about events occurring between June 30, 2022 (the end of the reporting period) and the date of this filing.

trial began on April 18, 2002, and the jury began deliberations on May 4, 2022. After more than two weeks of testimony and argument, the jury required less than four hours to find DaCorta **guilty on all counts**. While DaCorta was not immediately taken into custody, he faces a lengthy imprisonment. DaCorta's sentencing hearing is scheduled for 11 a.m. on October 20, 2022, before the Honorable William F. Jung.

In addition, during the time covered by this Thirteenth Interim Report, the Receiver and his professionals engaged in the following significant activities:

- Collected and analyzed 8 objections, approximately 460 Personal Verification Forms, and other documents necessary to finalize the claims process and to initiate distributions of recovered funds to claimants with approved claims (*see infra* § VI);

- Submitted a petition for remission, seeking the return of approximately **$7.8 million** from the Department of Justice in connection with civil and criminal asset forfeitures for distribution through the claims process (*see infra* § III.A.);

- Collected **$7,871.92** in interest income on seized funds (*see* Ex. A);

- Collected litigation income of **$45,387.10** through clawback settlements and the enforcement of default judgments (*see id.*);

- Collected **$15,000** in additional, escrowed funds from the sale of defendant Montie's New York property (*see id.*);

- Continued efforts to repatriate **$500,000** from Belize in cooperation with local counsel and to obtain remission of approximately **$2 million** that the Department of Justice repatriated from the United Kingdom (*see infra* § III.B.);

- Prepared to resume prosecution of a lawsuit against defendant Raymond P. Montie III, seeking tort damages and the recovery of fraudulent transfers (*see infra* § V.2.c.); and

- Continued to prosecute a second lawsuit against ATC Brokers Ltd., David Manoukian, and Spotex, LLC, seeking compensatory and punitive damages and alleging claims for aiding and abetting fraud, aiding and abetting breaches of fiduciary duties, recovery of fraudulent transfers against ATC, gross negligence, and simple negligence (*see infra* § V.2.d.).

## Overview of Activities Since the Beginning of this Receivership

Since the beginning of this Receivership, the Receiver and his professionals have engaged in the following significant activities:

- Served subpoenas or the order appointing the Receiver and freezing the assets of the defendants and relief defendants on approximately **100 individuals and entities** who could have assets or records belonging to the Receivership Estate;

- Seized more than **$8.66 million** from frozen bank accounts at numerous financial institutions;

- Generated **$53,335.13** in business income, primarily from mortgages and rentals;

- Liquidated an additional approximately **$7,892,523.41** (net) in assets, mostly subject to agreements with the Department of Justice and the United States Marshals Service;

- Collected **$194,239.04** in interest and/or dividend income;

- Collected total litigation income of **$5,081,528.88** through clawback and other third-party settlements;

- Collected other miscellaneous income of **$143,854.01**;

- Confirmed the repatriation by the Department of Justice of approximately **$2 million** from the United Kingdom;

- Retained legal counsel (domestic and foreign), forensic accountants, tax accountants, a technology services firm, and an asset manager to assist the Receiver and obtained Court approval of those engagements;

- Completed forensic reconstructions of at least 25 bank accounts, including more than 26,000 individual transactions;

- Interviewed dozens of individuals, including certain defendants, employees, sales agents, investors, legal counsel, and accountants;

- Established a website for investors and other interested parties;

- Collected hundreds of thousands of pages of documents from dozens of nonparties, including employees, banks, credit card companies, accountants, and lawyers; and

- Fielded hundreds of calls from investors and/or their counsel.

Finally, although the Receiver and his professionals are not responsible for criminal prosecutions, on November 18, 2020, defendant Joseph S. Anile, II was sentenced to imprisonment of **120 months** (*i.e.*, 10 years) and supervised release of three years. He was also ordered to pay restitution of **$53,270,336.08**. The sentence was based on his plea of guilty to multiple felony counts underlying this Ponzi scheme. Anile reported to prison on June 1, 2022, in Rochester, Minnesota. The above activities are discussed in more detail in the pertinent sections of this Thirteenth Interim Report and in the Receiver's previous interim reports.

## **BACKGROUND**

### I.   **Procedure and Chronology**

On April 15, 2019, the Commodity Futures Trading Commission ("**CFTC**") filed a complaint (Doc. 1) against (1) defendants Oasis International Group, Limited ("**OIG**"); Oasis Management, LLC ("**Oasis Management**"); Michael J. DaCorta ("**DaCorta**"); Joseph S. Anile, II ("**Anile**"); Francisco "Frank" L. Duran ("**Duran**"); Satellite Holdings Company ("**Satellite Holdings**"); John J. Haas ("**Haas**"); and Raymond P. Montie, III ("**Montie**") (collectively, the "**defendants**") and (2) relief defendants Fundadministration, Inc. ("**FAI**");

Bowling Green Capital Management, LLC ("**Bowling Green**"); Lagoon Investments, Inc. ("**Lagoon**"); Roar of the Lion Fitness, LLC ("**Roar of the Lion**"); 444 Gulf of Mexico Drive, LLC ("**444 Gulf of Mexico**"); 4064 Founders Club Drive, LLC ("**4064 Founders Club**"); 6922 Lacantera Circle, LLC ("**6922 Lacantera**"); 13318 Lost Key Place, LLC ("**13318 Lost Key**"); and 4Oaks LLC ("**4Oaks**") (collectively, the "**relief defendants**"). The foregoing defendants and relief defendants are referred to as the "**Receivership Entities**."

The complaint charges the defendants with violations of the Commodity Exchange Act and CFTC regulations and seeks to enjoin their violations of these laws regarding a fraudulent foreign currency ("**forex**") trading scheme. The CFTC alleges that between mid-April 2014 and April 2019, the defendants fraudulently solicited over 700 U.S. residents to invest in two forex commodity pools – Oasis Global FX, Limited and Oasis Global FX, S.A. (collectively, the "**Oasis Pools**"). The CFTC also asserts that the defendants raised approximately $75 million from these investors and misappropriated over $28 million of the pool funds to make payments to other pool participants and over $18 million for unauthorized personal and business expenses, including the transfer of at least $7 million to the relief defendants.[2]

On the same day the CFTC filed its complaint, April 15, 2019, the Court entered an order appointing Burton W. Wiand as temporary Receiver for the

---

[2] On June 12, 2019, the CFTC filed an amended complaint (Doc. 110), which contains additional allegations about certain defendants and relief defendants.

Receivership Entities (Doc. 7) (the "**SRO**"). The Court directed him, in relevant part, to "[t]ake exclusive custody, control, and possession of the Receivership Estate," which includes "all the funds, properties, premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants." *See id.* at p. 14, ¶ 32 & p. 15, ¶ 30.b. The SRO also imposed a temporary injunction against the defendants and relief defendants and froze their assets. *Id.* at 19.

Subsequently, all defendants and relief defendants either defaulted or consented to the entry of a preliminary injunction against them (with some differences unique to the circumstances of each party). *See* Docs. 35, 43, 44, 82, 85, 172, 174-77. On July 11, 2019, the Court entered a Consolidated Receivership Order, which is now the operative document governing the Receiver's activities. Doc. 177 (the "**Consolidated Order**").[3] Pursuant to the Consolidated Order and its predecessors (*see* Docs. 7, 44), the Receiver has the duty and authority to (1) administer and manage the business affairs, funds, assets, and any other property of the Receivership Entities; (2) marshal and safeguard the assets of the Receivership Entities; and (3) investigate and institute legal proceedings for the benefit of the Receivership Entities and their investors and other creditors as the Receiver deems necessary.

---

[3] On April 23, 2021, the Court reappointed the Receiver for purposes of 28 U.S.C. § 754, but the order of reappointment attaches and incorporates the Consolidated Order by reference. *See* Doc. 390. As such, the provisions of the Consolidated Order continue to govern the Receiver's mandate upon reappointment. *Id.*

On June 26, 2019, the Department of Justice, through the United States Attorney's Office for the Middle District of Florida (the "**DOJ**"), moved to stay this litigation to protect an ongoing criminal investigation. Doc. 149. The Court granted the DOJ's motion on July 12, 2019, but exempted the Receiver's activities from the stay. Doc. 179. The Court also required the DOJ to provide periodic status reports during the stay. *Id.*

On August 8, 2019, defendant Anile pled guilty to three counts involving the scheme – (1) conspiracy to commit wire and mail fraud; (2) engaging in an illegal monetary transaction; and (3) filing a false income tax return. *See United States of America v. Joseph S. Anile, II,* Case No. 8:19-cr-334-T-35CPT (M.D. Fla.) (the "**Anile Criminal Action**" or "**ACA**"). A copy of Anile's plea agreement was attached as Exhibit A to the Receiver's Second Interim Report. Doc. 195. On November 18, 2020, Anile was sentenced to imprisonment of 120 months and supervised release of three years. ACA Doc. 56. He was also ordered to pay restitution of $53,270,336.08. *Id.*

On December 17, 2019, a federal grand jury returned a two-count indictment against defendant DaCorta, alleging conspiracy to commit wire and mail fraud as well as engaging in an illegal monetary transaction. *See United States of America v. Michael J. DaCorta,* Case No. 8:19-cr-605-T-02CPT (M.D. Fla.) (the "**DaCorta Criminal Action**" or "**DCA**"). A copy of the indictment was attached as Exhibit A to the Receiver's Third Interim Report. According to the grand jury, as early as

November 2011, DaCorta entered into a conspiracy to defraud investors by making numerous fraudulent representations. *See* DCA Doc. 1 ¶ 14b.-d.

> It was a further part of the conspiracy that conspirators would and did use funds "loaned" by victim-investors to: (i) conduct trades, via an offshore broker, in the FOREX market, which trades resulted in catastrophic losses; (ii) make Ponzi-style payments to victim-investors; (iii) pay expenses associated with perpetuating the scheme; and (iv) purchase million-dollar residential properties, high-end vehicles, gold, silver, and other liquid assets, to fund a lavish lifestyle for conspirators, their family members and friends, and otherwise for their personal enrichment.

*Id.* at ¶ 14k. On February 17, 2021, the DOJ filed a superseding indictment against DaCorta, adding a third count for making a "false and fraudulent statement" on an income tax return. A copy of the superseding indictment is attached to the Receiver's Eighth Interim Report as Exhibit D.[4]

On May 4, 2022, after two weeks of testimony and argument before the Honorable William F. Jung, a jury found DaCorta guilty on all three counts. DCA Doc. 192. While DaCorta was not immediately taken into custody, he faces a lengthy imprisonment. DaCorta's sentencing hearing is scheduled for 11 a.m. on October 20, 2022, before Judge Jung.

---

[4] On December 2, 2021, defendant DaCorta filed a motion to dismiss the Receiver. *See* Doc. 447. His arguments were frivolous and based on misrepresentations of relevant facts and governing law. As such, on December 16, 2021, the Receiver and the CFTC opposed the motion. *See* Docs. 452, 453. On December 16, 2021, DaCorta also filed an extremely belated motion to dismiss the CFTC's complaint (Doc. 454), and on January 13, 2022, the CFTC opposed the motion (Doc. 465). Along with his attempts to frustrate the claims process (*see infra* § VI), DaCorta's frivolous motions and other filings appeared designed to deplete Receivership resources and to hinder the payment of approved claims submitted by victims and other creditors. On March 7, 2022, the Court denied both of DaCorta's motions. *See* Doc. 481 ("DaCorta failed to raise any objections to the Receiver's appointment for the last two and a half years. He cannot legitimately do so now, and he has put forth no allegations or evidence showing how or why the Receiver is not lawfully appointed or failing to diligently fulfil his lawful mandate.").

On January 14, 2022, the DOJ moved the Court to extend the stay in this enforcement action for an additional six months to protect its ongoing investigation. Doc. 467. The Court granted the motion and extended the stay until July 24, 2022. Doc. 470. After the DOJ declined to further extend the stay, the Court noted its expiration on July 24, 2022, and ordered the parties to confer and file a case management report by August 8, 2022. Doc. 652. The existence of the stay did not impact the Receiver, who continued to marshal assets, develop a claims process, and plan litigation, consistent with his Court-ordered mandate. Now that the DOJ's criminal case against DaCorta has concluded, the CFTC's civil case against him and the other defendants has resumed.

While the Receiver is not a party to the CFTC action, its outcome against individual defendants is important to the Receiver because the CFTC seeks monetary relief from those defendants. The Receiver has tolling agreements with several individuals and may wait for the resolution of the CFTC's claims before pursuing any direct action against them.

## II.   __Overview of the Receiver's Findings__

The Consolidated Order authorizes, empowers, and directs the Receiver to "investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted...." Doc. 177 ¶ 44. Pursuant to that mandate, the Receiver obtained and reviewed records from Receivership Entities and third parties. The Receiver has formed certain conclusions based on his review

9

of a portion of the records received and interviews with employees, lawyers, accountants, and others.

As demonstrated by Anile's 2019 guilty plea and DaCorta's 2022 criminal conviction following a two-week jury trial, there is abundant evidence that the defendants were operating a fraudulent investment scheme. The scheme began with the sale of preferred shares in OIG, which is registered in the Cayman Islands. The shares promised a 12% dividend that was to be derived from trading by a related company:  first, Oasis Global FX, Limited and then Oasis Global FX, S.A. – *i.e.*, the Oasis Pools. These companies were registered in New Zealand and Belize, respectively, and were purportedly introducing brokers that would trade currencies or currency-related contracts. The 12% return was to be derived from trading profits and transaction income earned by the brokers. The preferred shares were sold to investors through a private placement memorandum that contained significant false representations and omitted numerous material facts, including that DaCorta, the "Chief Investment Officer," was prohibited from currency trading through a prior regulatory action in the United States. As the scheme grew, other companies – Oasis Management and Satellite Holdings – were used to gather investments and funnel them into the scheme. Preferred shareholders became purported "lenders" who were told they were lending money to certain defendants. Investors were regularly sent statements showing an account with a principal amount and accrued and accruing earnings. All of this was false, as confirmed by defendant Anile's guilty plea and DaCorta's conviction.

As the scheme matured, the perpetrators created a website that investors could access to view their purported accounts. Investors' account pages showed that they were credited with a 1% "interest" payment each month and, on a daily basis, a portion of purported trading income earned by the scheme's trading entity.[5] The scheme was successful and proliferated because of the continued deception of the investors with respect to their purported accounts. They were led to believe that they held valuable loan accounts that continually earned money when, in fact, the scheme appears to have been insolvent since its inception. As an example, when the CFTC stopped the scheme in April 2019, the fraudulent website showed investors that they were owed an aggregate of over $120 million. In truth, OIG only had liquid assets of less than $10 million and was losing money.

The Receiver's analysis indicates that a total of approximately $80 million was raised from investors.[6] An analysis from the beginning of 2017 indicates that approximately $20 million was deposited for trading, which resulted in substantial losses. The remainder of the money raised from investors was used to make Ponzi

---

[5] Specifically, many investors were told by those perpetrating the scheme that the investors would receive a portion of the "spread pay" that Oasis Global FX, S.A. earned from its purported role as a broker of forex transactions for OIG. The spread pay, however, was nothing more than a markup on all transactions and served to increase the losses in the OIG account. No spread pay (or any portion thereof) was ever distributed to an investor. Rather, it was a ruse used to deceive investors into believing that they were receiving enhanced returns when, in fact, fictitious amounts were being credited to their fraudulent accounts. In truth, Oasis Global FX, S.A. and its traders conducted continually and routinely unprofitable trades and lost almost all the investors' money. The fabrication of returns based on purported spread pay was an integral part of the system through which the perpetrators lured investors into the scheme.

[6] To the extent these numbers differ from those alleged by the CFTC, the Receiver understands that the CFTC only considered transactions within the pertinent statute of limitations while the Receiver is reviewing all available transactions.

payments to other investors, to pay expenses to perpetuate the scheme, and to enrich the defendants. Through the claims process discussed below in Section VI, investors and other creditors have submitted hundreds of claims totaling approximately $70 million.

**ACTIONS TAKEN BY THE RECEIVER**

During this reporting period, the Receiver has taken steps to fulfill his mandates under the Consolidated Order and its predecessors. Doc. 177 ¶ 56.A.

## III.   Securing The Receivership Estate

Attached as **Exhibit A** to this Thirteenth Interim Report is a cash accounting report showing (1) the amount of money on hand from April 1, 2022, less operating expenses plus revenue, through June 30, 2022, and (2) the same information from the beginning of the Receivership (as opposed to the current reporting period). *See* Doc. 177 ¶ 56.B. & C. This cash accounting report does not reflect non-cash or cash-equivalent assets. Thus, the value of uncollected or unsold property discussed below is not included in the accounting report. From April 1, 2022, through June 30, 2022, the Receiver collected income of $68,259.02.[7]

---

[7] As explained in footnote 1, to the extent possible, the Receiver has included in this Thirteenth Interim Report transactions and events occurring after June 30, 2022, to give the Court and others the most current overview of the Receiver's activities. Money collected after that date, however, is not reflected in Exhibit A. Those collections will be included in the Receiver's next interim report.

A.      **Cooperation with the Department of Justice, Federal Bureau of Investigation, and U.S. Marshals Service**

As discussed more fully in the Receiver's First Interim Report (Doc. 113), on April 17, 2019, the DOJ, through the United States Attorney's Office for the Middle District of Florida, filed a civil forfeiture action against almost all the properties identified in § III.C below (which were already under the Receiver's control pursuant to the Consolidated Order and/or its predecessors). *See United States of America v. 13318 Lost Key Place, Lakewood Ranch, Florida et al.,* Case No. 8:19-cv-00908 (M.D. Fla.) (the "**Forfeiture Action**" or "**FA**") (FA Doc. 1 ¶ 1). In addition, the Federal Bureau of Investigation ("**FBI**") instituted administrative forfeiture proceedings against, at minimum, the vehicles described in § III.D.1 and the cash, gold, and silver described in § III.D.2. The Receiver, the DOJ, and the United States Marshals Service ("**USMS**") reached agreements governing the forfeiture and sale of this property as well as the transfer and remission of the sale proceeds. *See* Doc. 105, Ex. A (Consent Forfeiture Agreement); Ex. B (Memorandum of Understanding or "**MOU**"); Ex. C (Liquidation Plan). On June 7, 2019, the Receiver moved the Court to approve these agreements (Doc. 105), and the Court granted the Receiver's motion on June 13, 2019 (Doc. 112). According to the MOU, "[t]he Receiver has sole discretion to decide the logistics of the sale of the Forfeited Receivership Assets, on the terms and in the manner the Receiver deems most beneficial to the Receivership Estate and with due regard to the realization of the true and proper value of such property." Doc. 105, Ex. B. The MOU also recognizes that "[a]ll sales of Receivership Assets, including Forfeited

Receivership Assets, must comply with the provisions set forth in the Receivership Orders." *Id.* After the Receiver sells a property subject to forfeiture, the Receiver will transfer the net proceeds to the USMS for deposit in the Department of Justice Asset Forfeiture Fund. *Id.* The Receiver will subsequently file one or more petitions for remission with the DOJ, and the sale proceeds will be returned for distribution to defrauded investors through a claims process supervised by this Court. *See* § VI.

The Forfeiture Action and the FBI's administrative forfeiture proceedings are complete, and the Receiver has sold all material assets. On October 9, 2020, the Receiver transferred $3,295,119.94 to the USMS pursuant to the MOU. On May 25, 2021, the Receiver transferred an additional $2,341,505.18 to the USMS pursuant to the MOU. These amounts are listed on Line 12 of Exhibit A (from inception). The funds will be remitted to the Receiver in connection with the claims process and his distribution plan. <u>The transfer and remission are intended to comply with certain forfeiture regulations and will not affect the total amount of money available for distribution to claimants</u>. The Receiver anticipates that the DOJ will also remit approximately $2,000,000 recovered from the United Kingdom for distribution through the claims process. To that end, the Receiver has submitted a petition for remission to the DOJ seeking the return of approximately $7.8 million for distribution through the claims process.

## B.     Freezing Bank Accounts and Liquid Assets

As explained in the First Interim Report, the Receiver identified and/or froze approximately $11 million at various financial institutions in the United States, the

United Kingdom, and Belize. The Receiver opened a money market account for the Receivership at ServisFirst Bank (the "**Receivership Account**").[8] The Receiver has now deposited more than $8.6 million of the frozen funds into this account.[9] The remaining amount is almost entirely composed of the money from Belize and the United Kingdom, as discussed below. The Receiver will attempt to obtain as much of that money as possible and to identify any other accounts containing assets belonging to the Receivership Estate. A list of bank or other financial accounts organized by defendant, relief defendant, and/or affiliated entity is attached as **Exhibit B**.

### 1.    The ATC Account in the United Kingdom

On April 18, 2019, the Receiver served London-based ATC Brokers LTD ("**ATC**") with a copy of the SRO and requested that ATC freeze all accounts associated with the defendants and relief defendants. In cooperation with domestic law enforcement and the United Kingdom's National Crime Agency, ATC identified and froze one account in the name of Oasis Global FX, S.A., which contained $2,005,368.28. During October 2021, the DOJ recovered those funds pursuant to certain international agreements, and the agency now has custody of the repatriated money. As noted above, the Receiver has petitioned the government

---

[8] The Receiver also opened a checking/operating account for making disbursements.

[9] Carolyn DaCorta – defendant DaCorta's wife – paid $32,100 for a membership in the Long Boat Key Club one week before the Receiver was appointed. The Receiver obtained a $30,000 refund without the need for litigation, which is included in the above calculation. The membership was purchased with misappropriated investor funds, and during his criminal trial, DaCorta's purchase of the membership was an important example of his illegal diversion of assets.

for remission of those and other funds. The money will be distributed to victim-investors through the claims process established by the Court and the Receiver.

### 2.    Financial Assets in Belize

Shortly after his appointment, the Receiver learned that Oasis Global FX Limited owned an account (x4622) at Choice Bank Limited ("**Choice Bank**") in Belize. On June 29, 2018, however, regulators in Belize revoked Choice Bank's license and appointed a liquidator. During October 2021, the Receiver recovered a total of $55,960.78 from the liquidator. Those funds are now within the Receivership Estate and included in Exhibit A.

The Receiver also learned that Oasis Global FX, S.A. has an account at Heritage Bank Limited ("**Heritage Bank**") in Belize containing $500,000. The money served as a bond that allowed Oasis Global FX, S.A. to operate as a broker-dealer in Belize. On May 7, 2019, the Belize International Financial Services Commission suspended the entity's trading licenses. On October 22, 2019, the Receiver and defendant Anile executed corporate documents to take legal control of Oasis Global FX, S.A. (in addition to the powers conferred by the Consolidated Order). To bring finality to this matter, the Receiver has retained new local counsel in Belize with the Court's approval. *See* Docs. 478, 488. The Receiver is working with the new counsel to resolve this issue as soon as possible so that the funds can be distributed through the claims process.

C.     **Securing Real Property**

The Receivership Estate contained numerous parcels of real property, including single-family homes, condominiums, and a waterfront office building.[10] In the Consolidated Order and its predecessors, the Court directed the Receiver to "[t]ake all steps necessary to secure the business and other premises under the control of the Receivership Defendants" (Doc. 7 at 15-16) and to "take immediate possession of all real property of the Receivership Defendants, wherever located, including but not limited to all ownership and leasehold interests and fixtures" (Doc. 44 ¶ 19; Doc. 177 ¶ 19).

1.     **All Receivership Real Estate Has Been Sold**

The Receiver has sold all real property in the Receivership Estate. The transactions are explained in prior interim reports and summarized in the following chart. The "Net Recovery" column represents the amounts transferred to the Receivership Estate at closing after satisfying any claims against the properties (like mortgages and taxes) and paying closing costs and commissions.

| PROPERTY | SALE PRICE | NET RECOVERY |
|---|---|---|
| 444 Gulf of Mexico Drive Longboat Key, Florida | $2,100,000 | $1,994,155.06 |
| 13318 Lost Key Place Lakewood Ranch, Florida | $1,100,000 | $1,038,704.75 |

---

[10]  In addition to the properties discussed below, relief defendant 444 Gulf of Mexico Drive, LLC holds an $80,000 mortgage on the property located at 1605 55th Avenue West, Bradenton, Florida 34207. The mortgage matured on December 1, 2021. On January 19, 2022, the mortgage was satisfied in the amount of $82,324.03, which is now within the Receivership Estate and included in Exhibit A.

| | | |
|---|---|---|
| 6922 Lacantera Circle Lakewood Ranch, Florida | $2,050,000 | $372,823.83 |
| 4064 Founders Club Drive Sarasota, Florida | $1,875,000 | $581,712.41 |
| 4058 Founders Club Drive Sarasota, Florida | $195,000 | $186,252.37 |
| 7312 Desert Ridge Glen Lakewood Ranch, Florida | $846,000 | $774,740.08 |
| 16804 Vardon Terrace #307 Lakewood Ranch, Florida | $198,000 | $187,542.50 |
| 16804 Vardon Terrace #108 Lakewood Ranch, Florida | $212,000. | $204,312.38 |
| 16904 Vardon Terrace #106 Lakewood Ranch, Florida | $184,000 | $177,104.89 |
| 17006 Vardon Terrace #105 Lakewood Ranch, Florida | $198,000 | $187,813.91 |
| 6300 Midnight Pass Rd., No. 1002, Sarasota, Florida | $913,000 | $863,654.69 |

## 2.    Defendant Montie's Real Property

Defendant Montie owned real estate in Hauppauge, New York. He expressed a desire to sell the property and identified a potential purchaser. The Receiver commissioned an independent appraisal and confirmed that the proposed sale price of $505,000 reflected market value. Montie conferred with the CFTC and the Receiver, and the parties agreed to the sale. On December 22, 2020, the Court granted Montie's unopposed motion to permit the sale. Doc. 342. The transaction closed on April 23, 2021. After satisfaction of a mortgage and payment of closing

costs, the net proceeds of the sale were $278,274.46. Those funds are being held in escrow pending the resolution of claims against Montie.

Montie also owns property in Jackson, New Hampshire, which he valued at $1,412,800, based on "local property assessor figures." The current estimate from Zillow.com is $1,645,100, but Realtor.com lists the value as $2,193,200. As of June 15, 2019, the property carried a mortgage of $845,747. Finally, Montie owns property in Lake Ariel, Pennsylvania, which he valued at $926,700, based on "local property assessor figures." The current estimate from Zillow.com is $2,037,000, but Realtor.com lists the value as $1,407,200. As of August 1, 2019, the property carried a mortgage of $658,254. Montie's currently unsold properties thus carried positive net equity of approximately $835,499 in 2019. The Receiver is in the process of obtaining more accurate, updated valuations and mortgage balances through settlement and other negotiations. "Montie is responsible for making mortgage, property tax, and insurance payments and for the general upkeep of these residences." Doc. 177 ¶ 20. The Receiver will pursue these properties and any other disclosed (or undisclosed) assets when the circumstances warrant.

### 3.   Defendant Haas's Real Property

Defendant Haas owns a property in New York, which he estimated to be worth approximately $502,000. As of August 2021, it had a mortgage in the amount of $97,000. As such, Haas's property carries positive net equity of approximately $405,000 but might need certain repairs before any liquidation. "Haas is responsible for making mortgage, property tax, and insurance payments

and for the general upkeep of this residence." Doc. 177 ¶ 21. The Receiver will pursue this property and any other disclosed (or undisclosed) assets when the circumstances warrant.

### D.   Securing Personal Property

#### 1.   Vehicles

On April 18, 2019, FBI agents executed search warrants and seized, among other things, luxury automobiles purchased by certain defendants and relief defendants. The FBI then instituted administrative forfeiture proceedings against the vehicles. On October 11, 2019, the Receiver filed a motion seeking the Court's approval of his plan to auction the vehicles pursuant to the MOU. Doc. 192. The Court granted the motion on October 29, 2019. Doc 194. Orlando Auto Auction sold the vehicles that were not underwater, which resulted in a recovery of approximately $307,714. The Receiver obtained the sale proceeds in January 2020. The Receiver has now sold all forfeited vehicles and collected all related funds.[11] For more information, please see the Receiver's prior reports.

#### 2.   Cash and Precious Metals

Law enforcement agents also seized cash, gold, and silver from certain defendants or their residences. On November 4, 2019, the Receiver moved the Court to approve a procedure for the sale of the metals, and the Court granted the motion on November 7, 2019. *See* Docs. 197, 200. After obtaining several bids from

---

[11] During a previous reporting period, the Receiver and defendant Montie coordinated to sell his 1996 Mercedes 500SL for $10,500. Those funds are being held in escrow along with the proceeds from the sale of his New York property.

companies that deal in precious metals, the Receiver sold the gold and silver to International Diamond Center for $657,382.25. *See* Doc. 205. The Receiver has now sold all forfeited metals and collected all related funds.[12] For more information, please see the Receiver's prior interim reports.

### 3.    Other Personal Property

When the Receiver and his representatives visited certain defendants' residences on April 18, 2019, they observed and photographed potentially valuable items, including art, antiques, collectibles, sports memorabilia, and jewelry. The defendants have been instructed that all such personal property is subject to the asset freeze, and they are not to sell, transfer, or otherwise dispose of anything without the Receiver's authorization. To date, the Receiver has identified and/or seized the property listed in **Exhibit C**.[13] He has sold most items as set forth in the exhibit. The Receiver is working with the defendants and their counsel to identify additional property that rightfully belongs to the Receivership Estate.

### E.    Securing the Receivership Entities' Books and Records

As explained in prior interim reports, the Receiver and his professionals have taken substantial steps to secure the Receivership Entities' books and records, including computer systems, emails, and other documents. The Receiver has also obtained documents from numerous nonparties under the Consolidated Order or

---

[12]  This does not include certain assets in the possession of defendants Haas and Montie, as disclosed in their financial affidavits.

[13]  Importantly, the values identified in Exhibit C were and are only estimates. Actual recoveries have been and will be subject to market conditions and other factors.

through subpoenas. During this reporting period, the Receiver has obtained documents directly from investors in connection with his demand letters, clawback litigation, and/or the claims process. The Receiver continues to encourage investors who dispute the Receiver's calculations of gains or losses related to the scheme to provide documents substantiating the dispute. This will ultimately conserve resources and avoid unnecessary litigation.

## F.   Operating or Related Businesses

In prior interim reports, the Receiver has provided information about three businesses: (1) relief defendant Roar of the Lion; (2) Mirror Innovations, LLC; and (3) Diamond Boa LLC d/b/a Kevin Johnson Reptiles. While some issues still require resolution, the Receiver does not believe any of these businesses have material value to the Receivership Estate.[14]

## IV.   Retention of Professionals

The Consolidated Order authorizes the Receiver "[t]o engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders,

---

[14] During a prior reporting period, the Receiver authorized the destruction of the Roar of the Lion inventory, which primarily consisted of "nutritional" supplements and similar items promising an unfounded array of purported health benefits. The Receiver first contacted e-commerce professionals to determine whether the company's intellectual property had any value, but those efforts did not produce commercially viable results. The Receiver also contacted potential distributors but learned that the products would have to meet certain requirements relating to the provenance and composition of their ingredients. Given (1) the Receiver obtained control over Roar of the Lion as part of a massive fraud, and (2) the company's products are meant for human consumption and promise unsubstantiated health benefits, the Receiver determined that resale of the supplements would not be commercially viable or benefit the Receivership Estate and might even be unsafe to consumers. To eliminate substantial storage costs, the Receiver authorized the destruction of the inventory, as permitted by the Consolidated Order.

registered representatives, financial or business advisors, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers." Doc. 177 at ¶ 8.F.

On May 30, 2019, the Receiver moved the Court to approve his engagement of the following legal, accounting, and other professionals: (1) Wiand Guerra King P.A. n/k/a Guerra King P.A. ("**WGK**" or "**GK**"), a law firm; (2) KapilaMukamal, LLP ("**KM**"), a forensic accounting firm; (3) PDR CPAs ("**PDR**"), a tax accounting firm; (4) RWJ Group, LLC ("**RWJ**"), an asset management and investigations firm; and (5) E-Hounds, Inc. ("**E-Hounds**"), a technology and computer forensics firm. *See* Doc. 87. On June 6, 2019, the Court granted the Receiver's motion for approval to retain these professionals. Doc. 98. The Receiver has also retained special counsel to assist with the repatriation of foreign assets:  Wayne A. Piper and Flores Piper LLP in Belize (Doc. 488) and Maples Group in the Cayman Islands (Doc. 187).

On March 5, 2020, the Receiver filed a motion seeking to retain Sallah Astarita & Cox, LLC (the "**Sallah Firm**") on a contingency fee basis to investigate and pursue claims against FAI. Doc. 238. Similarly, on March 20, 2020, the Receiver moved the Court to approve his retention of Sergio C. Godinho as a litigation consultant to assist the Receiver's and the Sallah Firm's investigation and prosecution of those claims. Doc. 253. FAI opposed both motions, and after related briefing, on April 7, 2020, the Court granted the Receiver's motions, thereby approving his engagement of the Sallah Firm and Mr. Godinho. Doc. 261. As explained in Section V.1.a., the Receiver has since resolved his claims against FAI.

On March 24, 2020, the Receiver moved the Court to approve the engagement of John Waechter and Englander Fischer to assist the Receiver and his primary counsel with clawback litigation. Doc. 285. The Court granted the Receiver's motion on April 13, 2010. Doc. 264. As explained in Section V.2.b. below, the Receiver was pursuing litigation against numerous defendants, but that litigation is now substantially complete, and the Receiver has begun collecting the judgments obtained.

On March 31, 2021, the Receiver filed a second motion seeking to retain the Sallah Firm on a contingency fee basis to investigate and pursue claims against ATC Brokers Ltd. and its affiliates and principals. Doc. 385. On April 23, 2021, the Court granted the Receiver's motion, thereby approving his second engagement of the Sallah Firm. Doc. 390. On July 13, 2021, the Court also granted the Receiver's motion to approve the engagement of Thomas Bakas as a litigation consultant to the Receiver and the Sallah Firm. *See* Docs. 412, 415.

Recently, attorney Jared Perez left GK and is now practicing through his own firm, Jared J. Perez P.A. Because Mr. Perez was the lead counsel and senior attorney on this matter, the Receiver intends to continue to use his services and to make other changes to the representation of the Receivership. Mr. Perez is still assisting the Receiver — in particular, with the preparation of this report. In the coming weeks, the Receiver will file a motion with the Court describing the legal services he will require and will request the Court's approval of the changes.

## V.   Pending and Contemplated Litigation

The Consolidated Order requires this Thirteenth Interim Report to contain "a description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in (i) reducing the claims to judgment and (ii) collecting such judgments.)." Doc. 177 ¶ 56.E. The following subsections address both asserted and unasserted claims held by the Receivership Estate and certain related litigation.

### 1.   Completed and Related Litigation

#### a.   Fundadministration, Inc.

As explained above in Section IV, the Court authorized the Receiver to retain the Sallah Firm to investigate and pursue claims against FAI on a contingency fee basis. The Receiver and FAI mediated their dispute on October 13, 2020, and subsequently reached an agreement regarding the Receiver's claims. On February 8, 2021, the Receiver moved the Court to approve the parties' agreement (Doc. 368), and on February 25, 2021, the Court granted the Receiver's motion (Doc. 376). On or about March 1, 2021, FAI transferred net settlement proceeds of $3,555,000.00 to the Receiver. FAI also reached an agreement with the CFTC, which provided for its dismissal as a relief defendant from the agency's enforcement action. *See* Docs. 364, 366. As such, FAI is no longer a party to any litigation involving the Receiver or the CFTC.

### b.      The Government's Civil Forfeiture Action

The Department of Justice instituted administrative and civil forfeiture proceedings against certain assets of defendants in the CFTC Action. These actions are essentially complete. Judgments of forfeiture have been entered against all defendant properties in the civil forfeiture action. *See* FA Docs. 60, 63, 65, 67. The FBI's administrative forfeiture action against certain personal property is also complete. As of the Ninth Interim Report, the Receiver had sold all material, forfeited real and personal property in the Receivership Estate. As a result of the criminal convictions of Anile and DaCorta, additional forfeitures have been or will be sought. The actions will be for millions of dollars, but the debts are unlikely to be satisfied because those individuals have few, if any, remaining assets.

### c.      The Anile Criminal Action

As noted above, defendant Anile pled guilty to several felony charges regarding the scheme, and the court in the Anile Criminal Action accepted his guilty plea on October 15, 2019. ACA Docs. 19, 27. He was sentenced to imprisonment of 120 months (*i.e.*, 10 years) and supervised release of three years. He was also ordered to pay restitution of $53,270,336.08. The DOJ has repatriated approximately $2 million from the United Kingdom (*see supra* § III.B.1.), and the Receiver believes the Anile Criminal Action is essentially complete. Anile reported to prison on June 1, 2022, in Rochester, Minnesota. He has applied for a reduction in sentence considering his cooperation with prosecutors in related criminal proceedings and with the Receiver in his efforts to recover assets.

### 2.    Pending and Related Litigation

The Receiver is not aware of any litigation against Receivership Entities that was pending at his appointment, and the Consolidated Order enjoins the filing of any litigation against Receivership Entities without leave of Court.

### a.    The DaCorta Criminal Action

As also noted above, defendant DaCorta was indicted in a separate but related action. DCA Doc. 1. A copy of the initial indictment was attached as Exhibit A to the Receiver's Third Interim Report, and a copy of the superseding indictment was attached as Exhibit D to the Receiver's Eighth Interim Report. DaCorta stood trial in April 2022, and after two weeks of testimony and argument, a jury found him guilty on all counts, including mail and wire fraud and money laundering. DaCorta's sentencing is scheduled for 11 a.m. on October 20, 2022.

### b.    The Receiver's General Clawback Litigation

The Court found that entry of the Consolidated Order was necessary and appropriate for the purposes of marshaling and preserving all assets, including in relevant part, assets that "were fraudulently transferred by the Defendants and/or Relief Defendants." Doc. 177 at 2. The Court also authorized the Receiver "to sue for and collect, recover, receive and take into possession all Receivership Property" (*id.* ¶ 8.B.) and "[t]o bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver" (*id.* ¶ 8.I.). Similarly, the Court authorized, empowered, and directed the Receiver to "prosecute" actions "of any kind as may

27

in his discretion, and in consultation with the CFTC's counsel, be advisable or proper to recover and/or conserve Receivership Property." *Id.* ¶ 43.

Pursuant to that mandate, the Receiver worked with forensic accountants to perform a cash-in/cash-out analysis of the Receivership Entities. This allowed the Receiver to identify any investor who received more money from a Receivership Entity than he or she contributed to the Receivership Entity. In Ponzi schemes, such amounts are generally referred to as "false profits" because the money transferred to the pertinent investor was not derived from legitimate activities but from other defrauded investors. Receivers in the Eleventh Circuit (and nationwide) have a clear right to recover false profits through fraudulent transfer or "clawback" litigation. *See, e.g., Wiand v. Lee, et al.*, 753 F.3d 1194 (11th Cir. 2014).[15]

On February 28, 2020, the Receiver filed a motion seeking approval of certain pre-suit settlement procedures regarding his fraudulent transfer and unjust enrichment claims against investors who received false profits. Doc. 237. The Court granted that motion on March 16, 2020. Doc. 247. The Receiver then mailed approximately 175 demand letters to potential defendants, offering to waive the Receiver's entitlement to prejudgment interest and to settle the Receiver's

---

[15] *See also* Doc. 237 § II; *Wiand v. Lee*, 2012 WL 6923664, at *17 (M.D. Fla. Dec. 13, 2012), *adopted* 2013 WL 247361 (M.D. Fla. Jan. 23, 2013) ("[A]s the Receiver indicates, it is well-settled that a receiver is entitled to recover from winning investors profits above the initial outlay, also known as 'false profits,' and an investor in a scheme does not provide reasonably equivalent value for any amounts received from [the] scheme that exceed the investor's principal investment."); *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) ("Any transfers over and above the amount of the principal—*i.e.,* for fictitious profits—are not made for 'value' because they exceed the scope of the investors' fraud claim and may be subject to recovery….").

claims for 90% of the investor's false profits. Those letters also offered potential

defendants the opportunity to dispute the Receiver's calculations. The pre-suit

resolution procedures were fruitful in several important ways:

- First and most importantly, the procedures resulted in settlements collectively worth $246,497.09.

- Second, many investors and/or their counsel took the afforded opportunity to contest the Receiver's calculations by providing documents showing that they did not, in fact, receive false profits or, for example, that the investor was entitled to an equitable setoff because one account received false profits but a related account suffered even greater losses. This conserved resources by avoiding unnecessary litigation.

- Third, in more complicated situations, the Receiver and investors and/or their counsel entered into tolling agreements to afford additional time to exchange documents, reconcile accounts, and engage in negotiations. This process is ongoing.

Given the foregoing, the Receiver believes the pre-suit settlement

procedures were productive and successful, but unfortunately, many investors did

not take advantage of the afforded opportunity. In preparation for that likely event,

on March 24, 2020, the Receiver moved the Court for authority to file clawback

litigation. Doc. 258. The Court granted the Receiver's motion on April 13, 2010.

Doc. 264. Pursuant to the Consolidated Order and the Court's express

authorization, on April 14, 2020, the Receiver filed a clawback complaint against

almost 100 non-settling investors, seeking to recover approximately $4.4 million

plus costs and prejudgment interest. A copy of the complaint can be found on the

[Receiver's website](#) (the "**Clawback Action**").[16]

Since filing the Clawback Action, the Receiver has reached settlements with

many defendants:

- On July 13, 2020, the Receiver moved the Court to approve 10 settlements with 15 defendants in the total amount of $99,414.39. *See* Doc. 280. The Court granted the Receiver's motion on July 14, 2020. Doc. 281.

- On August 28, 2020, the Receiver moved the Court to approve 5 settlements with 8 defendants in the total amount of $109,148.48. *See* Doc. 312. The Court granted the Receiver's motion on August 31, 2020. Doc. 314.

- On January 14, 2021, the Receiver moved the Court to approve 5 settlements with 6 defendants or potential defendants in the total amount of $175,631.62. *See* Doc. 350. The Court granted the Receiver's motion on January 21, 2021. Doc. 357.

- On March 9, 2021, the Receiver moved the Court to approve 2 settlements with 3 defendants or potential defendants in the total amount of $33,266.33. *See* Doc. 379. The Court granted the Receiver's motion on March 31, 2021. Doc. 383.

- On May 21, 2021, the Receiver moved the Court to approve 3 settlements with 5 defendants or potential defendants in the total amount of $482,449.96. *See* Doc. 399. The Court granted the Receiver's motion on June 4, 2021. Doc. 404.

- On August 20, 2021, the Receiver moved the Court to approve 7 settlements with 8 defendants or potential defendants in the total amount of $315,006.31. *See* Doc. 425. The Court granted the Receiver's motion on August 26, 2021. Doc. 427.

---

[16] The Receiver did not include individuals who received smaller amounts of false profits in the Clawback Action, but importantly, he has not abandoned his claims against those individuals. He will pursue them in a cost-efficient manner and will explore alternative methods of recovery. As such, the Receiver continues to encourage people who received demand letters but were not named in the Clawback Action to reach resolutions with the Receiver.

- The Receiver has also entered into four additional post-judgment settlements and will shortly move the Court to approve those agreements.

In total, the Receiver has obtained pre-suit settlements worth approximately $246,497.09 and approved, post-suit or post-judgment settlements worth approximately $1,214,917.09. He has also obtained default judgments worth approximately $2,145,880.47. One judgment-debtor was attempting to set aside the default judgment entered against him, but he recently filed a bankruptcy petition. A second judgment-debtor has also filed for bankruptcy protection. The Receiver has filed claims in the bankruptcies and is preparing a motion to prevent discharge in one case where the filings appear irregular. The liability portion of the Clawback Action is otherwise complete. The Receiver continues to register default judgments, seek writs of garnishment, and employ other collection mechanisms, including post-judgment discovery. These efforts are producing material results.

### c.     The Receiver's Litigation Against Montie

The Receiver sued Raymond P. Montie, III for (like others) the recovery of fraudulent transfers and unjust enrichment but also for breaching his fiduciary duties to Oasis International Group, Ltd. and related entities and for aiding and abetting the criminal breaches of fiduciary duties owed to those entities by Anile and DaCorta (the "**Montie Litigation**"). The Receiver seeks to recover fraudulent transfers in the amount of $1.7 million that Montie received from the scheme and more than $50 million in damages based on his tortious conduct. On June 16, 2020, Montie filed a motion to dismiss the Receiver's complaint (ML Doc. 9), and

on June 30, 2020, the Receiver filed a notice of his intent to amend the complaint, as a matter of right under the Federal Rules of Civil Procedure (ML Doc. 12). On July 2, 2020, Montie filed a motion seeking to strike the Receiver's notice and to dismiss the Receiver's case with prejudice. ML Doc. 13. During an in-person hearing on July 13, 2020, the judge presiding over the Montie Litigation denied the motion to strike. ML Doc. 22. The judge also denied Montie's motion to dismiss as moot. ML Doc. 23.

On July 7, 2020, the Receiver filed an amended complaint, a copy of which is available on the Receiver's website. On July 27, 2020, Montie filed a second motion to dismiss. ML Doc. 24. On November 2, 2020, the Court denied Montie's second motion to dismiss. ML Doc. 45. The parties mediated their dispute on April 30, 2021, but did not reach a resolution. On May 25, 2021, the DOJ moved to stay the litigation to protect its ongoing criminal investigation, including the impending trial of defendant DaCorta. The court granted that motion on May 28, 2021. ML Doc. 62. Because DaCorta's criminal trial concluded earlier this year, the Montie Litigation will resume, and the Receiver hopes to resolve it by settlement. Should that not be possible, the Receiver will aggressively pursue this action, as it appears a substantial recovery may be possible.

### d. The Receiver's Litigation Against ATC Brokers Ltd., Spotex LLC, and Affiliates

As explained in Section IV above, the Court approved the engagement of the Sallah Firm to further investigate and prosecute claims against ATC and its affiliates. The Court also approved the engagement of Thomas Bakas as a litigation

consultant. On May 28, 2021, the Receiver filed suit against ATC Brokers Ltd., David Manoukian, and Spotex LLC. The complaint asserts claims for aiding and abetting fraud, aiding and abetting breaches of fiduciary duties, recovery of fraudulent transfers from ATC, gross negligence, and simple negligence. The Receiver is seeking both compensatory and punitive damages. A copy of the complaint was attached as Exhibit D to the Receiver's Ninth Interim Report and is also available on the [Receiver's website](). The defendants have filed a motion to dismiss the complaint, and the litigation is ongoing. A mediation occurred in May 2022, but the parties did not resolve their dispute.

### e.     The Receiver's Litigation Against Doug Clark

On July 1, 2022, the Receiver filed a complaint against former Oasis sales agent Doug Clark and his entity, Clark Asset Management Co., alleging fraudulent transfers, unjust enrichment, and aiding and abetting breaches of fiduciary duty and seeking the recovery of $120,000. *See Burton W. Wiand, as Receiver for Oasis International Group, Ltd, et al. v. Clark Asset Management Co. & Douglas Clark*, Case No. 8:22-cv-01512 (M.D. Fla.). A copy of the complaint is available on the [Receiver's website](). The complaint alleges that Clark, a former registered investment advisor who had worked with DaCorta on a previous fraudulent scheme, helped onboard Oasis investors. This litigation has only just begun; no motions or responsive pleadings have been filed.

### 3.    Contemplated Litigation

In addition to clawback claims, the Receiver is considering tort and fraudulent conveyance claims against sales agents and others (like Doug Clark) where the Receiver believes individuals have liability and an action appears to be of economic benefit to the Receivership.

### a.    Contemplated Litigation Against Insiders

The Receiver is considering litigation against certain OIG insiders, including principals, sales agents, employees, "traders," and others. On the one hand, the Receiver can assert legal and equitable claims that are independent of and distinct from any claims the government can assert, either through the CFTC, the DOJ, or otherwise. On the other hand, the Receiver seeks to avoid duplicating efforts made (or to be made) by the government to conserve resources and avoid unnecessary litigation. For example, the Receiver likely will not pursue independent litigation against defendant Anile because the DOJ has already obtained a multi-million-dollar criminal forfeiture judgment against him. The Receiver and the government have seized "his" assets, including the house in which he was living (Founders Club), the cars he and his wife were driving, and other personal property. Most of these assets have already been sold. The Receiver believes that DaCorta will be subject to a forfeiture judgement as part of his criminal conviction in an amount similar the judgment against Anile. To avoid unnecessary expenditures, the Receiver will rely on that judgement to acquire assets DaCorta might still retain.

The Receiver has entered into tolling agreements with defendants Haas and Duran. This will afford the parties additional time to resolve matters and to reach agreements, establish liability, and recover assets with minimal need for litigation or at least litigation funded by the Receivership Estate. The Receiver will coordinate with the CFTC to avoid the duplication of efforts with respect to these defendants and possibly others.

## VI.   **Claims Process**

As explained more fully in prior interim reports, the Receiver – with this Court's approval – has established a claims process though which he intends to distribute the proceeds of the Receivership Estate to creditors, including defrauded investors. The Claim Bar Date (as defined in Doc. 230 – *i.e.*, the deadline for submitting claims to the Receiver) was June 15, 2020. As of that date (with minimal exceptions), investors and other creditors submitted approximately 800 proof of claim forms totaling approximately $70 million. Anyone who did not submit a proof of claim form by that date is barred from participating in a distribution from the Receivership Estate.

The Receiver filed the Claims Determination Motion on November 9, 2021 (Doc. 439), but defendant DaCorta opposed the motion, arguing the Receiver has no right to compensate creditors using DaCorta's alleged "property" (*see* Doc. 445). DaCorta, however, ignored that he, Anile (his admitted coconspirator), and others stole that "property" from defrauded investors in violation of federal law. Notably, the other defendants did not object to the relief requested in the motion – *i.e.*, the

continuation of the process through which the Receiver will ultimately return money to defrauded investors and other claimants. The Court directed the Receiver to respond to DaCorta's opposition (Doc. 446), and the Receiver filed a short brief on December 3, 2021 (Doc. 448). The Receiver explained that (1) DaCorta's arguments were without merit; (2) the relief requested in the motion was consistent with well-established equitable principles; and (3) delay would only further prejudice defrauded investors. *Id.*

On March 7, 2022, the Court granted the Claims Determination Motion. Doc. 482. The Court also expressly approved and implemented the Receiver's proposed Objection Procedure (*see* Doc. 439 at pp. 44-45):

> The Objection Procedure as set forth in the Motion for objections to the plan of distribution and the Receiver's claim determinations and claim priorities is logical, fair, and reasonable and is approved, and any and all objections to claim determinations and claim priorities as set forth in the Motion or Exhibits 1 through 5, or to the plan of distribution shall be presented to the Receiver in accordance with the Objection Procedure as set forth in the Motion.

Doc. 482 ¶ 5. The Receiver then posted a copy of the Court's Order on the Receivership website.[17] The Receiver also sent substantively identical information to claimants and other interested parties via email. On March 25, 2022, the Receiver mailed more than 1,000 customized letters to claimants, and if applicable, their attorneys. As such, the Court-ordered deadline for submitting objections to the Receiver's claim determinations was **April 14, 2022**. *See* Doc.

---

[17] *See* www.oasisreceivership.com.

439 § VIII.A.(c) at p. 45. Many claim determinations also required the associated claimant(s) to submit additional information to the Receiver – most commonly, a Personal Verification Form but, in some instances, supplemental information like bank statements or affidavits.

The Receiver and his professionals have largely completed their analysis of the claimants' submissions (or lack thereof), which can be summarized as follows:

- Only approximately 8 claimants submitted timely objections pursuant to the Court-approved Objection Procedure. In the Receiver's experience, most objections can be resolved or settled using the Court-approved procedures, but if any objections cannot be resolved, they will be presented to the Court for determination.

- Approximately 19 claimants associated with New Horizon were required to submit an independent proof of claim form, but only 14 claimants submitted the required form.

- Approximately 409 claimants were required to submit a Personal Verification Form, but only approximately 376 claimants submitted the required form.

- Approximately 310 claimants who submitted a Personal Verification Form altered the form by striking "pursuant to Florida law" from the declaration under penalty of perjury.

- Approximately 326 claimants submitted documents that purported to be "declarations."[18] Like the Notices, these documents are legal

---

[18] Similarly, in mid-April 2022, approximately 150 individuals (out of approximately 800 submitted claims) filed a substantively identical document entitled "Beneficiary's Notice And Objection To Receiver's Continued Operations In The Absence Of Discovery, Hearing, And Final Judgment" (the "**Notices**"). The Notices asked the Court to prohibit the Receiver from making any distributions to any claimants until a final judgment has been entered in this action, which is currently stayed and without an operative case management order or trial date. On April 18, 2022, the Court *sua sponte* struck the Notices and certain related "declarations" from the docket as a "scheme" to undermine the Receivership. *See* Doc. 638 at p. 7 ("[T]he deluge of identical filings seems to the Court merely to be a scheme — clearly led and directed by one person or a group of people — to disrupt the orderly administration of this Receivership case."). Unless directed otherwise by the Court, the Receiver will not treat the Notices as objections under the Objection Procedure because, among other procedural and substantive reasons, they have no connection to

(footnote cont'd)

nullities, and the Receiver will not treat them as objections under the Objection Procedure.

- Approximately 11 claimants were required to submit supplemental information like an affidavit or bank records, but 9 of those claimants failed to submit the required documents. Their failures are particularly consequential because several of them are related to or affiliated with insiders.

- Throughout the claims process, a group of approximately 400 individuals have repeatedly submitted deficient, altered, or otherwise improper documents like the "declarations" and Notices mentioned above and in footnote 18 based on advice from purported attorney Brent Winters and members of the so-called "Oasis Helper Group." The Court has rejected these efforts to obstruct the Receivership, but the numerous filings have delayed the distribution of funds to defrauded investors by at least eight months.

- Despite serving and/or filing hundreds of identical documents on several occasions, approximately 342 claimants verified under penalty of perjury that Winters does not represent them in connection with this matter. Approximately 26 claimants, however, verified that Winters does represent them. An additional 5 claimants verified that Winters initially represented them, but they have since terminated his representation or indicated that they no longer wish for him to represent them. Such contradictory and often evasive responses have needlessly complicated this claims process.

Recently, to clarify these matters, the Receiver contacted several claimants to ask why they were attempting to impede their receipt of distributions from the Receivership. Some of the individuals told the Receiver to talk to their lawyer, Brent Winters. Others indicated that there was no proof of wrongdoing by DaCorta

---

the Claims Determination Motion. As the Court observed, the Notices essentially sought an injunction against the Receiver's continued operations until a final judgment has been entered in the enforcement action underlying this Receivership. They failed to address the claimants' individualized determinations, the pooling of assets and liabilities, the priority of distributions, the use of the "Net Investment Method," the Objection Procedure, due process requirements, or anything else discussed in the Receiver's lengthy Claims Determination Motion.

and others, despite the mass of evidence filed by the CFTC in this case and the detailed reports of the Receiver documenting the Ponzi scheme that victimized the claimants and others. Presumably, the trial and conviction of DaCorta on all counts by a jury of 12 citizens who required less than four hours to determine his guilt should allay any concerns about the fraudulent nature of the Oasis scheme. It should also convince the victims of this scheme that Winters and the "Oasis Helper Group" have misled them from the start and should be ignored in the future. The Receiver believes it a shame that the victims of the scheme were misled in making their investments, but their continued deception and evasion during the claims process is inexcusable. For more than two years and with the Court's approval, the Receiver has afforded claimants substantial due process and several opportunities to comply with governing procedures and/or correct deficiencies in claims and supporting documents. Aside from additional action under the Objection Procedure for qualified claimants, the Receiver is unlikely to provide further opportunities unless expressly directed otherwise by the Court.

Once the claims process has been completed or substantially completed, the Receiver will evaluate the amount of cash available for distribution and move the Court to approve a first interim distribution to claimants with approved claims. If material objections are pending at the time the Receiver determines a distribution is appropriate, he might move the Court to establish reserves for the disputed claims, so they do not impair the Receiver's ability to make a distribution to

claimants with undisputed claims. The Receiver anticipates making multiple distributions, subject to cost/benefit concerns.

## VII.   <u>The Next Ninety Days</u>

The Consolidated Order requires this Thirteenth Interim Report (and all subsequent reports) to contain "[t]he Receiver's recommendations for a continuation or discontinuation of the [R]eceivership and the reasons for the recommendations." Doc. 177 ¶ 56.G. At this stage, the Receiver recommends continuation of the Receivership because he still has (1) approximately $7.8 million to recover from the DOJ and to distribute to victim-investors; (2) approximately $500,000 to repatriate from Belize; (3) additional personal property to liquidate; (4) litigation to bring and/or prosecute; and (5) a claims process to complete and funds to distribute.

During the next 90 days, the Receiver will continue to collect and analyze documents from nonparties and other sources. The Receiver will continue asserting claims against other third parties that have liability either to the Receivership Estate or investors. The Receiver will continue to attempt to locate funds and other assets and may institute additional proceedings to recover assets on behalf of the Receivership Entities if warranted. In an effort to more fully understand the conduct at issue and in an attempt to locate more assets, the Receiver will continue to conduct interviews and/or depositions of parties and third parties who might have knowledge of the fraudulent scheme. The Receiver invites investor claimants to contact him to provide information about the

activities of the individuals who solicited their investments in the Oasis scheme as well as information about those who have provided false and misleading guidance to impede the activities of the Receivership.

## **CONCLUSION**

Investors and other creditors of the Receivership Entities are encouraged to periodically check the Receiver's website (www.oasisreceivership.com) for current information concerning this Receivership. The Receiver and his counsel have received an enormous amount of emails and telephone inquiries and have had to expend significant resources to address them. While the Receiver and his staff are available to respond to any inquiries, to minimize those expenses, investors and other creditors are strongly encouraged to consult the Receiver's website before contacting the Receiver or his counsel. Should the website not answer your question, please reach out to us. The Receiver continues to encourage individuals or attorneys representing investors who have information that might be helpful in securing further assets for the Receivership Estate or identifying other potential parties who might have liability to either the Receivership Estate or investors to email (jrizzo@guerraking.com) or call Jeffrey Rizzo at 813-347-5100. The Receiver can be contacted directly by email (Burt@BurtonWWiandPA.com) or by phone at 727-460-4679.

Dated this 1st day of August 2022.

Respectfully submitted,

**s/ Burton W. Wiand**
Burton W. Wiand, Receiver

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on August 1, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

<u>**s/ Jared J. Perez**</u>
Jared J. Perez, FBN 0085192
Jared.Perez@JaredPerezLaw.com
Jared J. Perez P.A.

*and*

Lawrence J. Dougherty, FBN 0068637
ldougherty@guerraking.com
cgibson@guerraking.com
GUERRA KING P.A.
1408 N Westshore Blvd., Suite 1010
Tampa, FL 33607
T: (813) 347-5100
F: (813) 347-5198

*Attorneys for Receiver, Burton W. Wiand*