UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

COMMODITY FUTURES
TRADING COMMISSION,

      Plaintiff,

v.                                    Case No. 8:19-cv-886-VMC-SPF

OASIS INTERNATIONAL GROUP,
LTD., et al.,

      Defendants.
_____/

### ORDER

This matter is before the Court on consideration of Plaintiff Commodity Futures Trading Commission's Motion for Summary Judgment Against Defendant Michael J. DaCorta (Doc. # 749), filed on July 17, 2023, and Michael J. DaCorta's Motion for Summary Judgment on Behalf of Defendant Michael J. DaCorta (Doc. # 750), also filed on July 17, 2023. Both parties responded on August 7, 2023. (Doc. ## 756, 757). Both parties also replied on August 21, 2023. (Doc. ## 761, 762). For the reasons that follow, the Commodity Futures Trading Commission's Motion is granted, and Michael J. DaCorta's Motion is denied.

I.   **Background**

   A.   **Procedural History**

   Plaintiff   Commodity   Futures   Trading   Commission
("CFTC")   filed   a   complaint   against   Defendants   Oasis
International Group, Limited ("OIG"), Oasis Management, LLC
("OM"),   Satellite   Holdings   Company   ("SHC"),   Michael   J.
DaCorta,   Joseph   S.   Anile,   II,   Raymond   P.   Montie,   III,
Francisco   L.   Duran,   and   John   J.   Haas   on   April   15,   2019.
(Doc.   #   1).   This   complaint   alleged   violations   of   the
Commodity   Exchange   Act   ("Act")   and   the   regulations
promulgated   under   it.   (Id.).   Specifically,   the   complaint
alleged that Defendants had "engaged in a fraudulent scheme
to   solicit   and   misappropriate   money   from   over   700   U.S.
residents   for   pooled   investments   in   retail   foreign   currency
contracts."   (Id. at 1).   The   Court   subsequently   entered   a
restraining   order   against   Defendants.   (Doc.   #   7).   It   also
entered Consent Judgments for preliminary injunctions and
other   equitable   relief   against   Defendants   later   that   year.
(Doc.   ##   43,   174-76).   The   CFTC   also   filed   an   amended
complaint on June 12, 2019. (Doc. # 110).

   Now,   the   CFTC   seeks   final   summary   judgment   in   its
favor   against   DaCorta.   (Doc.   #   749).   DaCorta   also   seeks
final   summary   judgment   in   his   favor.   (Doc.   #   750).   Both   the

CFTC and DaCorta responded (Doc. ## 756, 757), and replied. (Doc. ## 761, 762). The Motions are ripe for review.

**B.    The Oasis Entities[1]**

The claims against DaCorta stem from his conduct regarding two entities: (1) OIG and (2) OM (together, the "Oasis entities"). OIG "solicited, received, and accepted funds" for foreign exchange ("forex") trading. (Doc. # 749 at ¶ 9; Doc. # 749-3 at 50:5-10). Similarly, OM "solicited, received, and accepted funds for investment." (Doc. # 749 at ¶ 11; Doc. # 749-2 at 94:1-8). Both OIG and OM aggregated funds from participants into pools for investment purposes. (Doc. # 4-1 at ¶¶ 45, 48, 57, 60).

Neither OIG nor OM was operated like a typical company. Neither entity retained standard written policies nor prepared income statements that disclosed their losses. (Doc. # 749 at ¶¶ 13, 15; Doc. # 757 at ¶¶ 13, 15).

---

[1] While DaCorta disputes several of the underlying facts of this case, he does not provide sufficient evidence to create a genuine dispute of material fact. See Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)) ("When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.").

Additionally, the pooled funds were not retained in accounts named after the commodity pools. E.g., (Doc. # 4-1 at ¶ 30) (discussing two accounts named "Fundadministration Inc." and "Fundadministration Inc./Mainstream Fund Services").

Further, within each entity, funding from participants was commingled with funding used for other purposes. At OIG, the bank account used to pay employees, principals, and charges related to OIG's properties consisted entirely of participant funds provided for investment purposes. (Doc. # 749-2 at 153:5-157:13). Similarly, the OM bank account consisted primarily of participant funds. (Doc. # 4-1 at ¶¶ 44-45). DaCorta admitted to using some of the OM account funds to purchase "at least two personal residences, multiple luxury vehicles . . . , vacations, and a trip on a private jet." (Doc. # 749 at ¶ 50; Doc. # 757 at ¶ 50).

OIG and OM also insufficiently disclosed investment risks to potential participants. OIG provided potential participants with two documents: a "Promissory Note and Loan Agreement" and an "Agreement and Risk Disclosures" document. (Doc. # 749 at ¶ 62; Doc. # 757 at ¶ 62). The Promissory Note and Loan Agreement guaranteed a minimum 12%

annual return on investment. (Doc. # 454 at 34). The Agreement and Risk Disclosure also insufficiently alerted participants to risks associated with foreign exchange trading. See generally (Id. at 37-45) (excluding disclosures required by 17 C.F.R. § 4.24(a)-(b)(2)); (Doc. # 749 at ¶¶ 64-65).

OIG also did not provide required information to participants about "fees and expenses incurred . . . , past performance disclosures, [nor] a statement that the [commodity pool operator] is required to provide all pool participants with monthly or quarterly account statements, as well as an annual report containing financial statements certified by an independent public accountant." (Doc. # 749 at ¶ 66) (noting that such disclosures are required by 17 C.F.R. § 4.24(d)-(w)); (Doc. # 454 at 34-45). Nor did OIG provide information about the pools' "aggregate subscriptions . . . [,] current net asset value, or information regarding the [pools'] largest draw downs." (Doc. # 749 at ¶ 67) (noting that such disclosures are required by 17 C.F.R. § 4.25); (Doc. # 454 at 34-45).

Neither OIG nor OM have ever been registered with the CFTC. (Doc. # 749 at ¶¶ 7, 12; Doc. # 757 at ¶¶ 7, 12).

### C.   <u>DaCorta's Relationship with the Oasis Entities</u>

DaCorta played a leading role in the management and operations of OIG and OM. DaCorta was a co-founder, principal shareholder, and director of OIG. (Doc. # 749 at ¶ 3; Doc. # 757 at ¶ 3). He also acted as OIG's Chief Executive Officer and Chief Investment Officer. (Doc. # 749 at ¶ 4; Doc. # 757 at ¶ 4). In these positions, he was responsible "for all investment decisions, trading execution, services, sales, clearing, and operations." (Doc. # 749 at ¶ 4; Doc. # 757 at ¶ 4). He therefore "served on the OIG Board of Directors, was a member of OIG, was an officer of OIG, operated OIG, and controlled OIG." (Doc. # 749 at ¶ 8; Doc. # 757 at ¶ 8). DaCorta was also the sole principal and general partner of OM. (Doc. # 749 at ¶ 10; Doc. # 757 at ¶ 10).

DaCorta played a prominent role in attracting new participants to these entities. He participated in conference calls with potential investors. (Doc. # 749-3 at 205:4-11, 206:8-15). He assured investors of a 12% annual return and conveyed that his foreign exchange trading had been profitable. (Doc. # 165-1 at ¶ 15). He further informed call participants that trading risk was limited to systematic risks. (Doc. # 749 at ¶¶ 30-31; Doc. # 757 at ¶¶

30-31). Finally, DaCorta also encouraged participants to refer others to invest in the Oasis entities by promoting opportunities to receive referral fees. (Doc. # 749 at ¶ 32; Doc. # 757 at ¶ 32).

DaCorta was also responsible for all investment decisions at the Oasis entities, including forex trading. (Doc. # 749 at ¶ 68; Doc. # 757 at ¶ 68). He directed deposits into the trading account for the OGFXSA, one of the trading pools, and was listed as the sole trader in the account applications for both pools. (Doc. # 749 at ¶¶ 69-70; Doc. # 757 at ¶¶ 69-70). He was also the sole signatory on OM bank accounts. (Doc. # 749 at ¶ 71; Doc. # 757 at ¶ 71).

DaCorta also directed that participants be "issued misleading account statements that concealed the trading losses and misappropriation." (Doc. # 749 at ¶ 45); (Doc. # 749-2 at 216:25-217:22) (stating that the investment portal showed only "the amount of money lent and the amount of accrued interest," without showing losses); (Doc. # 749-3 at 216:25-217:18) (noting that portal setup was at DaCorta's direction). Specifically, these statements prevented participants from viewing "profits, losses, or

fees attributable to their individual investments." (Doc. # 749 at ¶ 72; Doc. # 757 at ¶ 72).

DaCorta was originally listed as a principal with the National Futures Association ("NFA") and registered with the CFTC as an associated person of a Commodity Trading Advisor from 2006 to 2010. (Doc. # 749 at ¶ 5; Doc. # 757 at ¶ 5). He withdrew both his registration and listing after a 2010 settlement with the NFA. (Doc. # 749 at ¶ 5; Doc. # 757 at ¶ 5). This settlement "barred him from trading in any capacity that would require registration with the NFA." (Doc. # 749 at ¶ 6; Doc. # 757 at ¶ 6). He never re-registered. (Doc. # 749 at ¶ 5; Doc. # 757 at ¶ 5).

### D.   Forex Trading by the Oasis Entities

Over 800 participants invested over $75,000,000 in the Oasis Entities. (Doc. # 165-1 at ¶ 12, 22; Doc. # 757 at ¶ 33). Several participants contributed funding that constituted a significant portion of their savings. See, e.g., (Doc. # 756-8 at 19:7-20:18) (providing testimony from Patti Katter that she wanted to invest in something low risk and that the investment was a significant value for her family).

Only approximately $22,000,000 of the funding contributed was used for forex trading. (Doc. # 439 at 6). DaCorta and other members of the entities misappropriated over $28,000,000 of the funds invested by participants. (Doc. # 165-1 at ¶ 23.d). The forex trading also was not profitable. Between June 2015 and April 2015, the entities had a net trading loss of $20,271,450.35. (Doc. # 749-4 at 165:19-167:1). Including fees and costs, losses totaled over $62,000,000. (Id. at 167:2-6). On April 14, 2019, OIG and OM, along with a related company SHC, owed participants approximately $120,000,000. (Doc. # 165-1 at ¶ 23.a). On this date, the entities had less than $10 million in assets. (Id.). DaCorta was aware of these trading losses. (Doc. # 749 at ¶¶ 42-43; Doc. # 757 at ¶¶ 42-43).

Profits were never returned to any bank account. (Doc. # 749 at ¶ 41; Doc. # 757 at ¶ 41). Funds returned to participants, totaling at least $30,364,607, were drawn from investments by other participants. (Doc. # 439-7 at 16-17).

**E.   Related Criminal Proceeding**

DaCorta was also prosecuted for several crimes based on similar allegations to those underlying this complaint. United States v. DaCorta, No. 8:19-cr-605-WFJ-CPT-1 (M.D.

Fla.). On May 4, 2022, a jury found DaCorta guilty of (1) conspiracy to commit wire fraud and mail fraud, (2) money laundering, and (3) making a false and fraudulent statement on an income tax return. (Doc. # 749-9 at 2-3).

As to the count charging conspiracy to commit wire fraud and mail fraud, the jury instructions stated that it is "a Federal crime to knowingly and willfully conspire or agree with someone to do something that, if actually carried out, would result in the crime of wire fraud or mail fraud." (Doc. # 749-8 at 11). Importantly, DaCorta needed to have "wrongful intent" to be guilty of conspiracy. (Id. at 12). The instructions further defined mail fraud and wire fraud, outlining that each requires proof beyond a reasonable doubt that:

> (1) the Defendant knowingly devised or participated in a scheme to defraud someone, or obtain money or property, using false or fraudulent pretenses, representations, or promises;
>
> (2) the false or fraudulent pretenses, representations, or promises were about a material fact; [and]
>
> (3) the Defendant intended to defraud someone . . . .

(Id. at 14); (Id. at 16) (similar).

Additionally, mail fraud requires that the Defendant used the services of a requisite mail carrier or the United States Postal Service to help carry out the scheme. (Id. at 14). Similarly, wire fraud requires that "the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud." (Id. at 16).

In total, the criminal trial established that participants lost at least $53,270,336.08 from the operations of the Oasis entities. (Doc. # 749-12 at 7). It also determined that DaCorta personally obtained and dissipated at least $2,817,876.16 in proceeds from his conspiracy to commit wire fraud and mail fraud and money laundering offenses. (Id. at 9).

## II.   **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone cannot defeat a properly pled motion for summary judgment; only a genuine issue of material fact will preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp., 477 U.S. at 323). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is

presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Further, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in

themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed[.]" (citation omitted)).

Finally, collateral estoppel can establish that a genuine dispute of material fact does not exist. Specifically, collateral estoppel "bar[s] a defendant who is convicted in a criminal trial from contesting this conviction in a subsequent civil action with respect to issues necessarily decided in the criminal trial." Securities & Exchange Comm'n v. Rand, 805 F. App'x 871, 875 (11th Cir. 2020) (citing United States v. Jean-Baptiste, 395 F.3d 1190, 1194 (11th Cir. 2005)). Collateral estoppel applies if (1) "the issue in question [is] 'identical in both the prior and current action,'" (2) "the issue [was] 'actually litigated' in the criminal trial", (3) "the determination of the issue [was] 'critical and necessary to the judgment in the prior action,'" and (4) "the burden of persuasion in the subsequent action [is not] 'significantly heavier.'" Jean-Baptiste, 395 F.3d at 1195 (quoting In re Bilzerian, 153 F.3d 1278, 1281 (11th Cir. 1998)).

"When the criminal conviction was based on a jury verdict of guilty, 'issues which were essential to the

verdict must be regarded as having been determined by the judgment.'" <u>Rand</u>, 805 F. App'x at 875 (quoting <u>Wolfson v. Baker</u>, 623 F.2d 1074, 1078 (5th Cir. 1980)). To determine which issues were essential, "the court may 'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" <u>Id.</u> (quoting <u>Ashe v. Swenson</u>, 397 U.S. 436, 444 (1970)).

III.   **<u>Analysis</u>**

   A.   **Michael J. DaCorta's Motion for Summary Judgment**

DaCorta contends that he is entitled to summary judgment on all of the CFTC's claims because the CFTC has not met its burden on any of the elements of its claims. For the reasons explained below, DaCorta's Motion for Summary Judgment is denied.

As a preliminary matter, this Court notes that it agrees with the CFTC's assessment that DaCorta's Motion does not comply with the Court's order regarding summary judgment motions. (Doc. # 756 at 1). The Motion does not contain a section titled "Statement of Material Facts" with each fact "supported by a pinpoint citation to the specific

part of the record relied upon to support that fact." (Doc. # 659 at 2). Violation of this order does constitute grounds for denial of the motion. See Id. ("Failure to submit a proper statement of material facts constitutes grounds for denial of the motion."). Even so, this Court will briefly address the arguments raised in the motion.

DaCorta makes two arguments: (1) OIG and OM were not a Ponzi scheme, as OIG was always solvent, and (2) the Oasis entities did not operate commodity pools.

First, DaCorta argues that OIG and OM were not Ponzi schemes because they were solvent. (Doc. # 750 at 34-37). It is true that Ponzi schemes must be insolvent. See Wiand v. Lee, 753 F.3d 1194, 1201 n.3 (11th Cir. 2014) ("[T]he Ponzi scheme operator's insolvency[] is necessarily present in every Ponzi scheme."). However, DaCorta does not clarify how lack of conformity to this definition precludes the CFTC's success on any of the claims raised in this case. Solvency and the presence of a Ponzi scheme are not elements of any of the claims and, therefore, not relevant to their resolution. See (Doc. # 756 at 17) ("[T]he CFTC did not charge DaCorta . . . with 'insolvency' or with any violations that require proof of insolvency as an element . . . . [A] determination that DaCorta operated a Ponzi

16

scheme is not an element of any of the CFTC's five counts against DaCorta."). DaCorta's emphasis on these concepts is misplaced.

The Court also acknowledges the concerns the CFTC raises about the evidence DaCorta offers in support of his insolvency and Ponzi scheme arguments. (Doc. # 756 at 19-24). Given that the Court agrees with the CFTC that this argument does not impact whether the CFTC may be granted summary judgment on the counts alleged, this Court will not further expound upon the insufficiencies of the evidence provided.

Second, DaCorta argues that the Oasis entities did not operate commodity pools. (Doc. # 750 at 37-42). Instead, DaCorta argues that OIG and OM were eligible contract participants ("ECPs") and the CFTC does not have jurisdiction over them. (Id. at 38-39).

A commodity pool is "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." 7 U.S.C. § 1a(10)(A). These pools include any "agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title," which include forex transactions. Id. § 1(a)(10)(A)(ii); Id. §

2(c)(2)(C)(i). "[A]ggregation of investors' funds into a single account" is an essential aspect of a commodity pool. Commodity Futures Trading Comm'n v. Amerman, 645 F. App'x 938, 941-42 (11th Cir. 2016) (quoting Commodity Futures Trading Comm'n v. Perkins, No. 06-4674 (RBK), 2009 WL 806576, at *4 (D.N.J. Mar. 25, 2009)). Here, no dispute exists that funds from participants were aggregated into entities OM and OIG. (Doc. # 749 at ¶¶ 21-25; Doc. # 757 at ¶¶ 21-25) (disputing the CFTC's facts only as they included terms such as "pool participants"). Additionally, the record is clear that such funds were invested for trading in commodity interests. (Doc. # 749 at ¶¶ 9, 11; Doc. # 749-2 at 94:1-8; Doc. # 749-3 at 50:5-10).

No additional dispute is raised by the nature of the investment system used by the Oasis entities. Whether participation is based on a promissory note system as opposed to direct investing does not affect whether these entities can be classified as commodity pools. See Commodity Futures Trading Comm'n v. Collins, No. 94 C 4375, 1997 WL 106135, at *2 (N.D. Ill. Feb. 10, 1997) (determining that a commodity pool existed even where some participants were told their transactions were loans).

Instead, the focus is on the aggregation of funds for trading.

Further, the Oasis entities do not qualify as ECPs. "[C]ommodity pool[s] in which any participant is not otherwise an eligible contract participant" cannot be ECPs. 7 U.S.C. § 1a(18)(A)(iv)(II). Therefore, if any of the participants in the Oasis entities were not ECPs, the pools themselves do not qualify as ECPs.

No genuine dispute exists regarding whether these pools included individuals who do not meet the definition of an ECP. An individual qualifies as an ECP if they "ha[ve] amounts invested on a discretionary basis, the aggregate of which is in excess of . . . $10,000,000; or . . . $5,000,000 and who enters into an agreement, contract, or transaction in order to manage the risk . . . ." Id. § 1a(18)(A)(xi).

Several of the participants provided sworn testimony that demonstrates that they do not qualify as an ECP. For example, Ms. Patti Katter invested $100,000 in the pools, which was a significant value for her family. (Doc. # 756-8 at 19:7-20:18). Ms. Katter "wanted to invest in something that [she] knew [she] wouldn't be able to lose the money because [her family was] in a really big pinch at the

time." (Id. at 19:2-4). Ms. Katter testified that her husband had suffered an injury while in the military. (Id. at 41:8-11). As a result, she was unable to work full-time, and could not save money for her children's education, nor to help them buy cars or provide for their weddings. (Id. at 41:14-18). The investment was the family's "little cushion that was taken from [them]." (Id. at 41:20-22).

Similarly, Mr. Anthony Charles invested $100,000 and noted that the loss has had a significant impact on his family. (Doc. # 756-6 at 137:6-138:12). Specifically, he could no longer send his son to private school and remains financially impacted by the loss. (Id. at 138:14-23).

Based on these facts, these individuals could not have had sufficient "amounts invested on a discretionary basis" to qualify as ECPs. Therefore, neither OIG nor OM is an ECP. Instead, they are commodity pools subject to the jurisdiction of the CFTC. See 7 U.S.C. § 2(c)(2)(B)(i)(II) ("[T]he Commission shall have jurisdiction over[] an agreement, contract, or transaction in foreign currency that . . . is offered to, or entered into with, a person that is not an eligible contract participant . . . .").

Finally, as part of this argument, DaCorta asserts that OIG and OM did not engage in retail forex

transactions. (Doc. # 750 at 38). A retail forex transaction is "any account, agreement, contract or transaction described in section 2(c)(2)(B) or 2(c)(2)(C) of the Act." 17 C.F.R. § 5.1(m). This definition excludes such transactions "that [are] contract[s] of sale of a commodity for future delivery . . . that [are] executed, traded on or otherwise subject to the rules of a contract market." Id.

DaCorta has openly acknowledged that he engaged in forex transactions through OIG and OM. (Doc. # 749 at ¶ 68; Doc. # 757 at ¶ 68). Additionally, no evidence has been provided that DaCorta and his entities should be excluded from the retail forex transaction definition through the exception regarding contract markets.

The CFTC has jurisdiction over forex transactions. 7 U.S.C. § 2(c)(2)(C)(i)(I). Therefore, the CFTC has jurisdiction over the Oasis pools and their retail forex transactions.

### B.   Commodity Futures Trading Commission's Motion for Summary Judgment

The CFTC seeks summary judgment on all counts of the Amended Complaint: (1) violations of Section 4(b)(a)(2)(A)-(C) of the Act and Regulation 5.2(b) for forex fraud by

misrepresentations, omissions, false statements, and misappropriation; (2) violation of Section 4*o*(1)(A)-(B) of the Act for fraud and deceit by commodity pool operators and associated persons of commodity pool operators; (3) violation of Sections 2(c)(2)(C)(iii)(1)(cc), 4k(2), 4m(1) of the Act and Regulation 5.3(a)(2) for failure to register as a commodity pool operator and retail forex commodity pool operator and associated person of a commodity pool operator and associated person of retail forex commodity pool operator; (4) violation of Regulation 4.20(b)-(c) for failure to receive pool funds in pools' names and commingling pool funds; and (5) violation of Regulation 4.21 for failure to provide pool disclosures. (Doc. # 749 at 20). The Court will address each count in turn.

As an initial matter, the Act establishes that a controlling person of an entity may be liable for that entity's violations of the Act if they either "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." 7 U.S.C. § 13c(b). For the CFTC to demonstrate that DaCorta knowingly induced the violative acts, the agency "must show that the controlling person had actual or constructive knowledge of the core activities that make up the violation at issue and

allowed them to continue." Commodity Futures Trading Comm'n
v. R.J. Fitzgerald & Co., Inc., 310 F.3d 1321, 1334 (11th
Cir. 2002). To qualify, the individual must "possess[],
directly or indirectly, the power to direct or cause the
direction of the management and policies of [the] entity."
(Doc. # 749 at 31). Given DaCorta's role as a co-founder,
principal shareholder, and director of OIG, as well as sole
principal and general partner of OM, (Id. at ¶¶ 3, 10; Doc.
# 757 at ¶¶ 3, 10), he qualifies as a controlling person
under this provision and may be held liable for the
violations by these entities, where appropriate. As
discussed below, DaCorta knowingly induced the violations
by OIG and OM and failed to act in good faith through his
intent to defraud. Therefore, he may be held liable for the
violations by the Oasis entities.

1. **Forex fraud by misrepresentations, omissions, false statements, and misappropriation**

In Count I, the CFTC alleges that DaCorta has violated
Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-
(C), and Regulation 5.2(b), 17 C.F.R. § 5.2(b), by
committing forex fraud by misrepresentations, omissions,
false statements, and misappropriation. (Doc. # 110 at ¶¶
118-29).

Section 4b(a)(2)(A)-(C) provides:

It shall be unlawful . . . for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, . . .

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract . . . .

7 U.S.C. § 6b(a)(2)(A)-(C).

Section 4b applies to forex transactions entered into with non-eligible contract participants. 7 U.S.C. § 2(c)(2)(C)(i), (iv). Therefore, it applies to DaCorta and his entities.

Regulation 5.2(a)-(b), 17 C.F.R. § 5.2(a)-(b), similarly prohibits such activity in any retail forex transactions, such as those conducted by DaCorta.

The CFTC must prove three elements to establish liability for fraud under Section 4b: "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." R.J. Fitzgerald & Co., Inc., 310 F.3d at 1328.

The CFTC has established that there is no genuine dispute of material fact that DaCorta violated both Section 4b and Regulation 5.2(a)-(b).

First, as the jury in the related criminal proceedings found DaCorta guilty of conspiracy to commit wire fraud and mail fraud, DaCorta is necessarily precluded from arguing the elements of scienter and materiality.[2]

Scienter requires that the "Defendant intended to defraud, manipulate, or deceive, or [that] Defendant's conduct represents an extreme departure from the standards of ordinary care." R.J. Fitzgerald & Co., Inc., 310 F.3d at 1328-29. To find DaCorta guilty of conspiracy to commit mail and wire fraud, the jury must have determined that he had intent to defraud. See (Doc. # 749-8 at 14, 16) (including that "the Defendant intended to defraud someone" as an element of mail and wire fraud).

Further, a misrepresentation, misleading statement, or deceptive omission is material "if a reasonable investor

---

[2] DaCorta argues that collateral estoppel cannot be applied in this case as his appeal has not yet been decided. (Doc. # 757 at 26). However, a pending appeal generally does not prevent the applicability of collateral estoppel. United States v. Internat'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, 905 F.2d 610, 621 (2d Cir. 1990).

would consider it important in deciding whether to make an investment." R.J. Fitzgerald & Co., Inc., 310 F.3d at 1329. As above, the jury must have determined that DaCorta's false statements were about a material fact. See (Doc. # 749-8 at 14, 16) (including that "the false or fraudulent pretenses, representations, or promises were about a material fact" as an element of mail and wire fraud).

Second, there is no genuine dispute of material fact that DaCorta made "misrepresentation[s], misleading statement[s], or [] deceptive omission[s]." R.J. Fitzgerald & Co., Inc., 310 F.3d at 1328.

While DaCorta disputes the CFTC's use of terms like "pool participants" and "Oasis pools," he does not deny the underlying facts demonstrating that he made misrepresentations. (Doc. # 757 at ¶¶ 26-29). These facts include misrepresentations that all funding would be used in forex trading, participants were guaranteed to "earn a minimum . . . 12% annually," the forex trading had been profitable, no trading risk existed other than systematic risk, and participants would receive referral fees when they introduced additional participants. (Doc. # 749 at ¶¶ 26-32; Doc. # 165-1 at ¶ 15; Doc. # 757 at ¶¶ 30-32).

Consequently, DaCorta also made several material omissions, including that only some of the participant funds were used in forex trading, the pools suffered net losses, payments to participants were drawn from funds contributed by other participants, and some funding was misappropriated to fund DaCorta's lifestyle. (Doc. # 439 at 6; Doc. # 439-7 at 16-17; Doc. # 749 at ¶¶ 33, 35-41, 49-52; Doc. # 749-4 at 165:19-167:6; Doc. # 757 at ¶ 41-42). DaCorta also did not inform participants that he had previously been barred from trading in a way requiring NFA registration and that neither he nor the Oasis entities were registered with the CFTC, retained appropriate records, nor had the ability to return participants' principal. (Doc. # 165-1 at ¶ 23.a; Doc. # 749 at ¶¶ 5-7, 9-15, 33-34, 39, 41-43; Doc. # 757 at ¶¶ 5-7, 10, 12-15).

DaCorta further misled participants by misappropriating funds. He did so by storing participant funds in an account used for business and personal expenses, using such funds for these purposes, and paying participants from funds contributed by other participants. (Doc. # 4-1 at ¶¶ 44-45, 57; Doc. # 439-7 at 16-17; Doc. # 749 at ¶¶ 16-18, 46-52; Doc. # 749-2 at 153:5-157:13; Doc. # 757 at ¶ 50).

Therefore, no genuine dispute of material fact exists that DaCorta violated Section 4b(a)(2)(A)-(C) of the Act. As Regulation 5.2(b) mirrors Section 4b(a)(2)(A)-(C), the CFTC has also established that DaCorta violated this regulation.

### 2.   **Fraud and deceit by CPOs and APs of CPOs**

In Count II, the CFTC asserts that DaCorta has violated Section 4*o*(1)(A)-(B), 7 U.S.C. § 6*o*(1)(A)-(B), of the Act by committing fraud and deceit as a CPO and AP of a CPO. (Doc. # 110 at ¶¶ 130-45).

Section 4*o*(1) provides:

> "It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, **commodity pool operator**, or **associated person of a commodity pool operator**, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
>
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1)(A)-(B) (emphasis added). Section 4*o*(1)(A) requires knowing conduct, while Section 4*o*(1)(B) does not. Messer v. E.F. Hutton & Co., 847 F.2d 673, 678-79 (11th Cir. 1988).

A commodity pool operator ("CPO") is defined as:

[A]ny person . . . engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

(I) commodity for future delivery, security futures product, or swap;

(II) agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title . . . .

7 U.S.C. § 1a(11)(A)(i)(I)-(II).

Further, a retail forex CPO is "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant . . . , and that engages in retail forex transactions." 17 C.F.R. § 5.1(d)(1).

Additionally, an associated person of a CPO includes:

[A]ny natural person who is associated in any of the following capacities with: (1) A futures commission merchant as a partner, officer, or employee (or any natural person occupying a similar status or performing similar functions), in any capacity which involves

(i) The solicitation or acceptance of customers' orders (other than in a clerical capacity) or

(ii) the supervision of any person or persons so engaged.

Id. § 1.3.

An AP of a retail forex CPO is defined as:

[A]ny natural person associated with a commodity pool operator as defined in paragraph (d)(1) of this section as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:

(i) The solicitation of funds, securities, or property for a participation in a pooled investment vehicle; or

(ii) The supervision of any person or persons so engaged.

Id. § 5.1(d)(2).

There is no genuine dispute of material fact that both OIG and OM were both CPOs and retail forex CPOs. As discussed above, they both operated commodity pools by soliciting and receiving funds for pooled trading in commodity futures. Additionally, they are retail forex CPOs as they both operated and solicited funding for pooled investment and engaged in retail forex trading. Further, neither entity qualifies as an ECP.

Additionally, there is no genuine dispute of material fact that DaCorta was both an AP of a CPO and an AP of a retail forex CPO. He solicited and accepted participant

30

funds on behalf of the Oasis entities. (Doc. # 749 at ¶ 68; Doc. # 749-3 at 205:4-11, 206:8-15; Doc. # 757 at ¶ 68).

Therefore, no genuine dispute of material fact exists that, by engaging in a scheme to defraud current and potential participants, DaCorta violated Section 4*o*(1)(A)-(B). DaCorta acted with intent to defraud participants and actually did defraud them through his work with OIG and OM, causing millions of dollars in losses. (Doc. # 749-8 at 14, 16).

3. <u>**Failure to register as a CPO and retail forex CPO and AP of a CPO and AP of retail forex CPO**</u>

In Count III, the CFTC asserts that DaCorta has violated Sections 2(c)(2)(C)(iii)(1)(cc), 4k(2), 4m(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(1)(cc), 6k(2), 6m(1), and Regulation 5.3(a)(2), 17 C.F.R. § 5.3(a)(2), by failing to register as a CPO and retail forex CPO and AP of a CPO and AP of retail forex CPO. (Doc. # 110 at ¶¶ 146-65).

The Act and supporting regulations require that CPOs, retail forex CPOs, APs of CPOs, and APs of retail forex CPOs register as such. 7 U.S.C. § 6m(1) (establishing a registration requirement for CPOs); 17 C.F.R. § 5.3(a)(2)(i) (similar for retail forex CPOs); 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc)   (establishing a registration

requirement for APs of CPOs); <u>Id.</u> § 6k(2) (similar); 17 C.F.R. § 5.3(a)(2)(ii) (similar for APs of retail forex CPOs).

As discussed above, there is no genuine dispute of material fact that OIG and OM were CPOs and retail forex CPOs. Nor is there any similar dispute as to whether DaCorta was an AP of CPOs and retail forex CPOs.

DaCorta admits that neither OIG nor OM was registered as a CPO or a retail forex CPO. (Doc. # 749 at ¶¶ 7, 12; Doc. # 757 at ¶¶ 7, 12). Additionally, he admits that he was not registered as an AP of a CPO or retail forex CPO. (Doc. # 749 at ¶ 5; Doc. # 757 at ¶ 5). Therefore, the CFTC has met its burden of proof regarding this count.

### 4. **Failure to Receive Pool Funds in Pools' Names and Commingling Pool Funds**

In Count IV, the CFTC asserts that DaCorta has violated Regulation 4.20(b)-(c), 17 C.F.R. § 4.20(b)-(c), by failing to receive pool funds in pools' names and commingling pool funds. (Doc. # 110 at ¶¶ 166-73).

Regulation 4.20(b) provides that "[a]ll funds, securities or other property received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment

(whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate must be received in the pool's name." 17 C.F.R. § 4.20(b). Regulation 4.20(c) provides that "[n]o commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person." Id. § 4.20(c). These regulations apply to anyone who is required to register as a CPO. Id. § 5.4.

The Oasis entities did not receive participant funds in the names of the pools. (Doc. # 4-1 at ¶ 30). Additionally, the pools' property was commingled with the property of others. (Id. at ¶¶ 44-45, 57; Doc. # 749 at ¶ 50; Doc. # 749-2 at 153:5-157:13; Doc. # 757 at ¶ 50).

Therefore, no genuine dispute of material fact exists that OM and OIG violated these provisions.

### 5.   <u>Failure to Provide Pool Disclosures</u>

In Count V, the CFTC asserts that DaCorta has violated Regulation 4.21, 17 C.F.R. § 4.21, by failing to provide pool disclosures. (Doc. # 110 at ¶¶ 174-80).

Regulation 4.21 provides:

[E]ach commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool

33

> prepared in accordance with §§ 4.24 and 4.25 by
> no later than the time it delivers to the
> prospective participant a subscription agreement
> for the pool.

17 C.F.R. § 4.21.

This regulation applies to anyone required to register as a CPO under provisions relating to forex transactions. See Id. § 5.4.

No genuine dispute of material fact exists that OIG did not provide disclosures to potential participants as required by Regulations 4.24 and 4.25. See (Doc. # 454 at 34-45) (excluding such disclosures from documents provided to potential participants). Therefore, the CFTC has carried its burden regarding this count.

## IV.   **Remedies**

The CFTC has requested (1) injunctive relief, (2) restitution, and (3) a civil penalty to be leveraged against DaCorta. Considering the facts of this case, the Court determines it is appropriate to award all three forms of relief.

### A.   **Injunctive Relief**

The CFTC requests that the Court enter a permanent injunction against DaCorta pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a). This provision states that the

CFTC may bring suit to enjoin violations of the Act and its supporting regulations, as well as enforce compliance with such rules, when it appears that a person "has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder." Id. "Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." Id. § 13a-1(b).

A court may issue a statutory injunction under this provision based only on "[a] prima facie case of illegality;" the CFTC does not need to prove "irreparable injury or the inadequacy of other remedies." Commodity Futures Trading Comm'n v. Muller, 570 F.2d 1296, 1300 (5th Cir. 1978). To determine the appropriateness of an injunction, the Court focuses on "whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp., 531 F.3d 1339, 1346 (11th Cir. 2008) (quoting SEC v. Caterinicchia, 613 F.2d 102, 105 (5th Cir. 1980)).

The Court considers several factors in this analysis. The primary factor is the defendant's past illegal conduct.

Id. However, the Court also considers (1) "[t]he egregiousness of the defendant's actions," (2) whether the violation was isolated or recurrent, (3) "the degree of scienter involved," (4) "the sincerity of the defendant's assurances against future violations," (5) the defendant's recognition that his conduct was wrongful, and (6) "the likelihood that the defendant's occupation will present opportunities for future violations." Id. (quoting SEC v. Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982)). This determination is made based on the totality of the circumstances. Commodity Futures Trading Comm'n v. Altamont Global Partners, LLC, No. 6:12-cv-1095-GAP-TBS, 2014 WL 644693, at *11 (M.D. Fla. Feb. 19, 2014).

Here, the Court determines that it is appropriate to permanently enjoin DaCorta from further violations of the Act and supporting regulations, as well as from other activities that would present opportunities for further violations. Each of the factors weighs in favor of granting an injunction, and the severity of DaCorta's violations justify a permanent injunction.

As the above discussion highlights, DaCorta violated multiple provisions of the Act and its supporting regulations. In doing so, he harmed over 800 participants

36

and caused at least $53,270,336.08 in damages. (Doc. # 165-1 at ¶ 12; Doc. # 749-12 at 7-8). Additionally, given DaCorta's role in OIG and OM (Doc. # 749 at ¶¶ 3-4, 8, 10; Doc. # 757 at ¶¶ 3-4, 8, 10), he played a significant role in shaping the actions of those entities. DaCorta's actions persisted over the course of OIG and OM's operations and his actions were at least reckless, if not willful. E.g., (Doc. # 749-8 at 14, 16). Additionally, DaCorta maintains that he is not liable for this conduct. E.g., (Doc. # 757 at ¶ 57) ("DaCorta admits he was found guilty beyond a reasonable doubt but strongly denies he is in fact guilty of such offense. DaCorta specifically testified he did not intend to deceive or cheat investors . . . ."). Additionally, these violations occurred despite a 2010 settlement under which DaCorta agreed not to engage in activities requiring NFA registration. (Doc. # 749 at ¶ 5; Doc. # 757 at ¶ 5).

The Court therefore enjoins DaCorta from directly or indirectly violating the Act and its supporting regulations by:

- Cheating or defrauding, or attempting to cheat or defraud, other persons in or in connection with any

order to make, or the making of, any contract of sale of any retail forex transaction that is made, or to be made, for or on behalf of, or with, any other person, in violation of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3);

- Employing any device, scheme, or artifice to defraud any client or participant or prospective client or participant, or engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant in violation of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B);

- Being associated with a CPO as a partner, officer, employee, consultant, or agent, or a person occupying a similar status or performing similar functions, in any capacity that involves the solicitation of funds, securities, or property for participation in a retail forex pool without being registered with the CFTC as an AP of the CPO, in violation of Sections 2(c)(2)(C)(iii)(I)(cc) and 4k(2) of the Act, 7 U.S.C.

§§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), and Regulation 5.3(a)(2), 17 C.F.R. § 5.3(a)(2);

- Failing to operate a commodity pool as an entity cognizable as a legal entity separate from that of the pool operator, in violation of Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1);

- Failing to require that all funds, securities, or other property received by a CPO from a prospective or existing pool participant be received in the commodity pool's name, in violation of Regulation 4.20(b), 17 C.F.R. § 4.20(b);

- Commingling the property of a commodity pool in violation of Regulation 4.20(c), 17 C.F.R. § 4.20(c); and

- Failing to provide prospective pool participants with pool disclosure documents in the form specified in Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25, in violation of Regulation 4.21, 17 C.F.R. § 4.21.

The Court further enjoins DaCorta from directly or indirectly:

- Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

- Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3), for his own personal account or for any account in which he has a direct or indirect interest;

- Having any commodity interests traded on his behalf;

- Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

- Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

- Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and

- Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

**B.    Restitution**

Section 6c(d)(3) also permits the award of equitable remedies including "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)." 7 U.S.C. § 13a-1(d)(3)(A); see also Smithers, 2013 WL 4851684, at *11 (calculating restitution based on the "amount of customer losses").

The related criminal proceeding determined that DaCorta's actions resulted in at least $53,270,336.08 of loss. (Doc. # 749-12 at 7-8). Therefore, the Court determines that DaCorta shall pay $53,270,336.08 plus post-judgment interest.

**C.    Civil Penalty**

Section 6c also provides for the award of civil penalties. 7 U.S.C. § 13a-1(d). Violations committed

41

between October 23, 2012, and November 1, 2015, may not exceed the greater of $140,000 or "triple the monetary gain to the person for each violation." Id. § 13a-1(d)(1)(A); 17 C.F.R. § 143.8(b)(1). Violations committed after November 2, 2015, may not exceed the greater of $214,514 or "triple the monetary gain to the person for each violation." 7 § U.S.C. 13a-1(d)(1)(A); 17 C.F.R. § 143.8(b)(1).

To determine the appropriate value of a civil penalty, courts have considered "the general seriousness of the violation," including whether the violation was of a core provision of the Act and whether scienter existed, as well as any aggravating or mitigating circumstances. Wilshire Inv. Mgmt. Corp., 531 F.3d at 1346. Additionally, courts consider the consequences of the violations and harm to both consumers and the market. U.S. Commodity Futures Trading Comm'n v. Gutterman, No. 12-21047-CIV, 2012 WL 2413082, at *10 (S.D. Fla. June 26, 2012). Penalties must be "rationally related to the offense charged or the need for deterrence." U.S. Commodity Futures Trading Comm'n v. Levy, 541 F.3d 1102, 1112 (11th Cir. 2008). Courts often calculate monetary gain by subtracting funds paid to customers and trading losses from the total value provided

by participants into a fund. E.g., Smithers, 2013 WL
4851684, at *12 n.5.

The CFTC has requested that the Court award the
maximum civil penalty under this provision. Specifically,
they requested that the Court award $8,453,628.48, or three
times the monetary gain to DaCorta from his conduct. (Doc.
# 749 at 41). The CFTC used the criminal judgment to
estimate monetary gain, as it held that "at least
$2,817,876.16 in proceeds was obtained and dissipated by
[DaCorta] from the wire fraud and mail fraud conspiracy and
the money laundering offense, for which he was convicted."
(Doc. # 749-12 at 9).

The Court agrees that this severe civil penalty is
justified in this case. By defrauding participants, DaCorta
violated core provisions of the Act. See Wilshire Inv.
Mgmt. Corp., 531 F.3d at 1346 ("Defrauding customers is a
violation of the core provisions of the CEA and 'should be
considered very serious.'" (citation omitted)). He also did
so knowingly and repeatedly. (Doc. # 749-8 at 14, 16).
DaCorta has not accepted responsibility for his actions and
still denies that he violated the law. See generally (Doc.
# 750) (denying that DaCorta is liable based on any of the
counts alleged). Further, DaCorta committed these

violations while already bound by a 2010 settlement that prohibited him "from trading in any capacity that would require registration with the NFA." (Doc. # 749 at ¶ 6). Therefore, the Court determines that a strong penalty is warranted here to both account for the severity of DaCorta's conduct and provide sufficient deterrence for future violations.

## V.   **Conclusion**

The Court grants summary judgment in favor of the CFTC on all counts. The CFTC has demonstrated that there is no genuine dispute of material fact regarding these claims, both as to whether DaCorta individually can be held responsible for the violations and whether he can be held liable for OIG and OM's violations pursuant to Section 13b of the Act. Because the CFTC is entitled to summary judgment, the Court also denies DaCorta's Motion.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiff Commodity Futures Trading Commission's Motion for Summary Judgment Against Defendant Michael J. DaCorta (Doc. # 749) is **GRANTED.**

(2)   Defendant   Michael   J.   DaCorta's   Motion   for   Summary
      Judgment   on   Behalf   of   Defendant   Michael   J.   DaCorta
      (Doc. # 750) is **DENIED.**

(3)   The   Clerk   is   directed   to   enter   judgment   in   favor   of
      the   CFTC   and   against   Defendant   Michael   J.   DaCorta   on
      all   counts   of   the   complaint   in   the   amount   of
      $53,270,336.08   plus   post-judgment   interest   as
      restitution   and   $8,453,628.48   as   a   civil   penalty.
      Additionally,   DaCorta   is   permanently   enjoined   from
      further   violations   of   the   Commodities   Exchange   Act   and
      supporting   regulations,   and   actions   presenting
      opportunities   for   future   violations,   as   described   in
      this   Order.   The   Clerk   is   directed   to   include   the
      language   of   the   permanent   injunction,   as   stated   on
      pages 37-41 of this Order in the Judgment.

(3)   In   light   of   this   Order,   Defendant   Michael   J.   DaCorta's
      Petition   for   Writ   of   Habeas   Corpus   ad   Testificandum
      (Doc. ## 769, 770) is **DENIED.**

(4)   The Clerk is directed to **CLOSE** the case.

      **DONE** and **ORDERED** in Chambers in Tampa, Florida, this
6th day of December, 2023.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE