**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

COMMODITY FUTURES TRADING COMMISSION,

PLAINTIFF,

V. CASE NO. 8:19-CV-886-T-33SPF

OASIS INTERNATIONAL GROUP, LIMITED; OASIS MANAGEMENT, LLC; SATELLITE HOLDINGS COMPANY; MICHAEL J. DACORTA; JOSEPH S. ANILE, II.; RAYMOND P. MONTIE III; FRANCISCO "FRANK" L. DURAN; AND JOHN J. HAAS,

DEFENDANTS;

AND

FUNDADMINISTRATION, INC.; BOWLING GREEN CAPITAL MANAGEMENT LLC; LAGOON INVESTMENTS, INC.; ROAR OF THE LION FITNESS, LLC; 444 GULF OF MEXICO DRIVE, LLC; 4064 FOUNDERS CLUB DRIVE, LLC; 6922 LACANTERA CIRCLE, LLC; 13318 LOST KEY PLACE, LLC; AND 4 OAKS LLC,

RELIEF DEFENDANTS.
_______________________________________________/

**RECEIVER'S VERIFIED MOTION FOR AN ORDER TO SHOW CAUSE WHY RESPONDENTS SHOULD NOT BE HELD IN CONTEMPT FOR FAILURE TO COMPLY WITH THE COURT'S ORDERS**

Burton W. Wiand, as receiver (the "**Receiver**") over the assets of the above-captioned defendants and relief defendants (the "**Receivership**" or "**Receivership Estate**"), moves the Court for an order to show cause why certain individuals associated with the so-called "Oasis Helpers Group" (the "**Helpers Group**") – *i.e.*, Jason McKee (individually and as trustee of Trust, LLT), Greg Melick, defendant Michael DaCorta, and attorneys Brent Winters and Stephen Preziosi (collectively, the "**Respondents**") – should not be held in civil contempt for violating the Court's Consolidated Receivership Order (the "**Consolidated Order**") (Doc. 177) and its predecessors.[1] This motion concerns the Respondents' ongoing obstruction of this Receivership, including the defrauding of victim-claimants of the Ponzi scheme and Receivership for the express benefit of defendant DaCorta (the "**Recovery Fraud**").[2]

---

[1] On July 11, 2019, the Court entered the Consolidated Order (Doc. 177), which combined and superseded two prior orders (Docs. 7 and 44) and is the operative document governing the Receiver's activities. *See also* Doc. 43 (Consent Preliminary Injunction) & Doc. 390 (reappointing Receiver).

[2] In support of this motion, the Receiver incorporates by reference the PowerPoint and oral presentations he made and the evidence he submitted during the public, duly-noticed status conference the Court held on March 24, 2026. Copies of those documents are stored in the Clerk's office. *See* Doc. 902. The Receiver has separately filed a PDF copy of the PowerPoint presentation in the Court's docket (*see* Doc. 903 (cited herein as "**Slide [__]**")) and also posted a copy of the presentation on the Receivership website – www.oasisreceivership.com. Finally, the Receiver is submitting a declaration along with this motion identifying even more documents and evidence (the "**Wiand Declaration**"). As a matter of law, receivers can serve as record custodians with respect to documents gathered during their investigations. *See, e.g., Curtis v. Perkins*, 781 F.3d 1262, (11th Cir. 2015) ("As IMA's court-appointed receiver, the trustee was the 'custodian' of the underlying documents"); *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006) ("the Receiver qualified as RDI's record custodian").

Respondents have directly harassed and interfered with the Receiver and this Court's administration of the Receivership by, among other things:

- Misrepresenting this Court's orders and the Receiver's authority and purpose to claimants (*see, e.g.,* Slides 11, 19-21, 25, 34, 38, 40);
- Discouraging communications with the Receiver by requiring victims to sign nondisclosure agreements and claiming that the Receiver will bring criminal charges against victims who contact him (*see, e.g.,* Slides 22, 23; 37, 38);
- Actively and consistently interfering with the Court-ordered claims process by disseminating false information to claimants, obstructing communications, and manipulating claim-related submissions (*see, e.g.,* Slides 34-42);
- Directly interfering with Court-ordered distributions by soliciting and coercing claimants into paying monies, including a purported 15% "contingency fee" of their approved distributions from the Receivership (*see, e.g.,* Slides 18; 24-26);
- Falsely representing to victims of the Oasis Ponzi scheme that Michael DaCorta did nothing wrong and that Oasis was a bona fide business as part of their scheme to impede the Receivers' activities and garner funds for themselves and DaCorta (*see, e.g.,* Slides 16-19);
- Falsely advising the victims that Receiver was acting improperly and that there was no basis for the CFTC's action against Oasis and DaCorta or evidence of their wrongdoing (*see, e.g.,* Slides 16-19, 20, 21, 25);
- Causing numerous false accusations to be submitted to the Florida Bar that the Receiver was acting improperly (*see, e.g.,* Wiand Decl. Exs. A-C);
- Falsely representing that claimants will receive a full recovery exceeding $700 million of all claimed losses plus interest that would have been earned to date if they fund DaCorta's legal defense (*see, e.g.,* Slide 18);
- Falsely representing that Winters and the Helpers Group were entitled to a percentage of recoveries and distributions when they have done nothing to create the fund nor provided any legitimate assistance in connection with the claims process (*see, e.g.,* Slides 18; 24-26, 34-42);
- Falsely representing that claimants will receive no further recovery unless they fund DaCorta's legal defense (*see, e.g.,* Slide 29); and
- Using fabricated judicial imagery, including an AI-generated depiction of this Court, to lend false authority to these lies (*see, e.g.,* Slides 27, 28).

This conduct violates the Consolidated Order's prohibition against interfering with or harassing the Receiver or interfering in any manner with the exclusive jurisdiction of this Court over the Receivership. The Recovery Fraud also violated the Court's asset freeze and calls for disgorgement.

## BACKGROUND

On April 15, 2019, the Court entered a statutory restraining order appointing Burton W. Wiand as temporary Receiver for the Receivership Entities (Doc. 7) (the "**SRO**"). The SRO also imposed a temporary injunction against the defendants and relief defendants and froze their assets. *Id.* at 19. On July 11, 2019, the Court entered the Consolidated Order, which is now the operative document governing the Receiver's activities. Doc. 177. Pursuant to the Consolidated Order and its predecessors (*see* Docs. 7, 43, 44), the Receiver has the duty and authority to (1) administer and manage the business affairs, funds, assets, and any other property of the Receivership Entities; (2) marshal and safeguard the assets of the Receivership Entities; and (3) investigate and institute legal proceedings for the benefit of the Receivership Entities and their investors and other creditors as the Receiver deems necessary.

To ensure that the Receiver would be able to fulfill these mandates, the Court included a provision in the Consolidated Order (and its predecessors) enjoining any interference with the Receiver:

> **VII. Injunction Against Interference with Receiver**
>
> 31. The Receivership Defendants . . . and **all persons** receiving notice of this Order by personal service, facsimile **or otherwise**, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:
>
> D. Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

Doc. 177 (emphasis added); *see also* Doc. 7 § VIII; Doc. 44 § VII.[3]

Pursuant to this Court's orders, the Receiver conducted a comprehensive claims process to determine investor losses and distribute recovered funds in an equitable manner. That process required claimants to submit sworn Proof of Claim Forms and resulted in the Court's approval of claim determinations and interim distributions of approximately $19 million to eligible claimants to date. These distributions were derived from the Receiver's efforts, including the recovery and liquidation of assets and the prosecution of claims on behalf

[3] Respondents are on notice of the Consolidated Order and its predecessors. First, defendant DaCorta is a party to this enforcement action. He was served with the SRO, and he agreed to the entry of both the Consent Preliminary Injunction and the Consolidated Order (*see* Docs. 35-3 & 172). Because Winters is DaCorta's attorney, DaCorta's notice is imputable to and binding upon Winters. Fed. R. Civ. P. 65(d)(2)(B). Preziosi is also DaCorta's attorney, and further, he has appeared *pro hac vice* in this action. *See* Doc. 824. The Receiver also posts Court filings, including the relevant orders, on his website – www.oasisreceivership.com. McKee and Melick closely monitor that website, and the Receiver has obtained documents establishing that they too have actual notice of the Court's orders. For example, the Helpers Group prepared a slideshow presentation encouraging claimants to submit Florida Bar complaints against the Receiver. *See* Wiand Decl. Ex. A. The 47-page slideshow, dated August 22, 2021, includes a description of the SRO (Doc. 7), mention of the permanent order of the Receiver's appointment (Doc. 44), and a discussion including the Consolidated Order (Doc. 177). *Id.* at slides 8, 32, and 35. Countless other Helpers Group communications and videos explicitly reference the Court's orders, the claims process, and the status of distributions. *See, e.g., id.* Ex. D & E ("the Receiver is posting more of the recent court filings on the Oasis Receivership website, though not all: https://www.oasisreceivership.com/court-filings/").

of the Receivership Estate and the collection of assets in cooperation with the Department of Justice.

From the outset of the Receivership, however, the Helpers Group, along with Brent Winters and others, have engaged in conduct that has disrupted and interfered with the administration of the Receivership. The Helpers Group and Winters solicited victims of DaCorta to retain Winters as their attorney to provide legal representation in connection with Oasis, claiming that his help was necessary to secure a return of their funds. Rather, the Helpers Group and Winters provided only incompetent, worthless, deceptive "assistance" and advice as they solicited funds from the victims through the Recovery Fraud. As previously reported to the Court, this conduct has included instructing claimants not to communicate with the Receiver, submitting altered claim forms, providing directions to claimants contrary to Court-approved claims procedures, lying to the victims about the conduct, assets, and intentions of Oasis and DaCorta, including the possibility that DaCorta had any potential to recover funds that could benefit his victims (much less $700 million), and otherwise impeding the orderly administration of the claims process, resulting in increased costs and delays. *See, e.g.*, Docs. 811, 889 & 902 Ex. 1.

This motion concerns Winters' and the Helpers Group's continued and escalating interference with this Court's administration of the Receivership, particularly in connection with the claims process and distribution of funds to

claimants. In addition, as detailed below, the Helpers Group, Winters, and their associates have and are likely continuing to collect funds from claimants through the Recovery Fraud based on misrepresentations about this Court's orders, the Receiver's role, and the claimants' rights, including demands that claimants pay a purported 15% "contingency fee" tied directly to distributions approved and administered by this Court.

## I. The Helpers Group and Related Actors

The conduct at issue is being carried out for the benefit of defendant DaCorta by a group of individuals and entities in active concert and participation with DaCorta commonly referred to as the Helpers Group, along with Winters and Preziosi. The Helpers Group has communicated directly with investor-claimants and purported to act on their behalf since nearly the inception of this Receivership.

- **Brent Winters** is an attorney for DaCorta who simultaneously purports to act as "counsel" or "attorney-in-fact" for hundreds of claimants. Documents identify Winters as the individual responsible for providing legal services to claimants in connection with the Receivership (*see* Slides 7 & 8), despite never successfully appearing in this action or any related actions.

- **Greg Melick** is the principal organizer of the Helpers Group and the primary author of communications to claimants. He claims to be in direct contact with DaCorta and relays messages to and from claimants as an intermediary. *See* Wiand Decl. Exs. T & U. He also claims to be a paralegal for Brent Winters. Under agency principals, all of Melick's misrepresentations to claimants are thus imputable to Winters, who is responsible for supervising his paralegal activities. They are also imputable to DaCorta, who uses Melick as a conduit.

- **Jason McKee** acts as a representative and "treasurer" of the Helpers Group and has appeared in videos and communications directed to claimants (*see*

Slide 27). He is also a signatory on the bank account used to collect victims' funds and the trustee of Trust, LLT (*see* Slide 6).

- **Stephen Preziosi** is another attorney for DaCorta who has been paid at least $155,450 in funds raised from victims to appeal this Court's order granting summary judgment and to file a *habeas corpus* petition. *See* Slides 12-13.

As set forth below and in prior reports to the Court, the Helpers Group's and Winters' coordinated conduct, both historically and continuing to the present, has interfered with the Receiver and with this Court's exclusive jurisdiction over the Receivership in violation of the Consolidated Order. *See* Docs. 811, 889, and 902 Ex. 1.

## II. The Recovery Fraud

As extensively explained during the Status Conference, the diagram below depicts the Recovery Fraud in which Respondents are engaged:



Put simply, McKee, Melick, and others tell investors that they must contribute to DaCorta's legal defense if they hope to recover any funds. According to them, when Preziosi succeeds in overturning this Court's entry of summary judgment against DaCorta and also frees DaCorta from prison trough a *habeas corpus* petition currently pending in a related criminal action, the federal government will be forced to pay DaCorta more than $700 million in damages. *See* Slide 18; Wiand Decl. Ex. F. DaCorta, however, purportedly has no moral or legal obligation to share that money with investors; rather, he will only help those that helped him first by funding his legal defense and by paying Preziosi's expensive bills. *See* Slide 29; Wiand Decl. Ex. F. Meanwhile, at least $322,000 of the money raised from investors slipped out the back door and was used to buy gold coins, the whereabouts of which are currently unknown. All of this conduct violates the Court's asset freeze, and the Respondents, jointly and severally, should have to disgorge the money they raised and/or accepted from investors.

## III. Interference with the Court's and the Receiver's Administration of the Claims Process

The Court-approved claims process is the central mechanism by which claimants' rights are determined and distributions are administered. The integrity of that process depends on the claimants' submission of accurate information, their ability to communicate with the Receiver, and their

compliance with the Court's established procedures. The Helpers Group and Winters have directly and repeatedly interfered with this process by (1) disseminating false information regarding the claims process and the Receiver's role therein, (2) obstructing communications between the claimants and the Receiver or his professionals, and (3) manipulating forms and other claim-related submissions. In particular, they have done the following:

- Altered hundreds of Proof of Claim Forms to attempt to evade the Court's jurisdiction and escape imagined "criminal charges" (*see, e.g.,* Slide 35);
- Submitted claim forms reflecting amounts that differed from those provided by the Receiver and computed in a manner that was inconsistent with the method directed in the Courts order without required supporting documentation or explanation, causing the Receiver's professionals to expend substantial additional time and effort to determine each claimant's correct loss amount;
- Required claimants to sign power of attorney forms, which confused claimants as to whether Winters was their lawyer or just their representative (*i.e.*, while Winters has asserted he was just an "attorney in fact," the agreement he had victims sign empowers and requires him to act as their lawyer—which he did (*see* Slides 8, 36);
- Required investors to sign non-disclosure agreements so they purportedly could not communicate with the Receiver (*see* Slides 37, 38);
- Encouraged claimants to ignore the Receiver and intimidated them by falsely telling the claimants that if they talk to the Receiver or his professionals, the Receiver will press criminal charges against them (*see, e.g.,* Slides 22, 23);
- Lied to investors about the need to execute Personal Verification Forms, which cost claimants up to $752,265 in denied claim amounts (*see* Slides 39, 40);
- Filed hundreds of automated "notices and objections" to the continued operation of the Receivership, which the Court struck *sua sponte* and described as a "scheme … to disrupt the orderly administration of this Receivership case" (*see* Docs. 489-586, 588-636; *see also* Slides 41, 42);
- Lied about the Receiver's motives and claimed that his sole interest is to enrich himself (*see, e.g.,* Slides 11, 20, 21, 25);

- Falsely claimed that the Receiver has distributed all the funds he is planning to distribute and the only way to recover any additional money is by funding DaCorta's defense (*see, e.g.,* Slide 29);
- Misrepresented to claimants that the Court determined they had no standing to seek any relief from the Court as opposed to reality in which the Court instructed the claimants to file appropriate objections in the Court-approved claims process before seeking any direct relief related to their claims (*see, e.g.,* Slide 28); and
- Generally provided outrageously deficient, incompetent, and false legal advice.

Taken together, this conduct reflects a deliberate and continuing effort to interfere with the Receiver's administration of the claims process and to undermine this Court's exclusive jurisdiction over the Receivership Estate. By altering Court-approved forms, obstructing communications between claimants and the Receiver, disseminating false and misleading statements regarding this Court's orders and the status of distributions, and imposing unnecessary and improper burdens on the claims process, the Helpers Group and Winters have repeatedly disrupted the orderly administration of this Receivership. This interference has caused significant delay, confusion, and the unnecessary expenditure of Receivership resources, requiring the Receiver and his professionals to devote substantial additional time and effort to correcting the effects of this misconduct. Accordingly, this continuing violation of the Receivership Order warrants the entry of remedial relief, including injunctive measures to prevent further interference and compensatory

sanctions to reimburse the Receivership for the costs and expenses directly attributable to this conduct.

## IV. Interference with the Court's Administration of Distributions

Separate from their direct interference with the claims process, the Helpers Group and Winters have engaged in ongoing conduct that interferes with this Court's administration of distributions and the Receiver's execution of his Court-appointed duties. The distribution of funds to claimants pursuant to this Court's orders represents the culmination of the Receivership process and is carried out under the Court's exclusive supervision. Those distributions are derived entirely from the Receiver's efforts in marshaling and recovering assets and are governed by procedures established and approved by this Court.

The Helpers Group and Winters have sought to exploit that process by demanding that claimants pay a purported "contingency fee" equal to 15% of all funds received through the Receivership. These demands are expressly tied to the Court-ordered distributions the claimants received and are being extorted from the claimants under the ruse that funding DaCorta's defense will result in claimants recovering all their losses plus interest and more. *See, e.g.,* Wiand Decl. Ex. F. Winters and the Helpers did nothing to marshal the funds used for distributions, and their efforts only impeded or, in some cases, prevented victims' recovery.

In support of these demands, the Helpers Group has made false and misleading representations regarding the status of distributions and the effect of this Court's orders. Specifically, they have represented that the Receiver has completed all planned distributions and that claimants will receive no further recovery unless they fund DaCorta's legal efforts. They have further represented that claimants lack standing to seek relief from this Court, cannot retain independent counsel, and must rely exclusively on DaCorta to obtain any additional recovery. These statements mischaracterize this Court's orders and are designed to distort claimants' understanding of their rights.

The Helpers Group has also attempted to lend false authority to these representations through the dissemination of fabricated media, including a video featuring an AI-generated depiction of a judge resembling the presiding judge in this case. In the video, the AI-depiction of the presiding judge selectively quotes from this Court's orders and presents misleading conclusions regarding the claimants' rights. The use of fabricated judicial imagery to convey false legal conclusions is misuse of this Court's authority and is intended to influence claimants subject to this Court's jurisdiction.

In addition, the Helpers Group has employed coercive tactics to induce claimants to pay the demanded 15% fee, including threats of collection activity and statements that claimants who do not pay will receive no further recovery. These statements are tied directly to distributions ordered by this Court and

are being used to pressure claimants into relinquishing a portion of those distributions. Unlike the conduct described above regarding the claims process, which increased the administrative burden on the Receiver, this conduct directly targets the distributions themselves. By attempting to extract a percentage of Court-ordered distributions through misrepresentation and coercion, the Helpers Group is effectively imposing a private levy on funds distributed under this Court's authority.

Taken together, this conduct reflects a deliberate and ongoing effort to interfere with the Receiver's administration of distributions and to undermine this Court's exclusive jurisdiction over the Receivership Estate in violation of the Consolidated Order. It also constitutes harassment of the Receiver by complicating and undermining the distribution process and by forcing the Receiver to address ongoing misinformation directed at the claimants. Accordingly, this conduct warrants the entry of targeted injunctive relief to prevent further interference with Court-ordered distributions and the imposition of compensatory sanctions to reimburse the Receivership for the costs and expenses incurred in responding to and mitigating this misconduct.

## ARGUMENT

A court has the inherent power to enforce compliance with its lawful orders and mandates by civil contempt.[4] *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *S.E.C. v. Pension Fund of America, L.C.*, 2006 WL 1104768, *7 (S.D. Fla. 2006). This inherent power is in addition to the Court's broad authority to supervise an equity receivership and to determine the appropriate actions to be taken in the administration of the receivership. *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992).

Civil contempt is "wholly remedial" and is intended to coerce compliance with an order of the court. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191 (1949). A sanction is considered "civil" and "remedial" if it either coerces the contemnor into compliance with a court order or compensates the complainant for losses sustained. *International Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821, 827 (1994). This power is essential to the

[4] The Consolidated Order and its predecessors bind DaCorta under Federal Rule of Civil Procedure 65(d)(2)(A) because he is a party to this action and because he consented to their entry (aside from the SRO). They bind Winters and Preziosi under Rule 65(d)(2)(B) because they are DaCorta's attorneys. They bind McKee and Melick because they are DaCorta's agents under Rule 65(d)(2)(B), and they are also "in active concert or participation with" DaCorta, Winters, and Preziosi under Rule 65(d)(2)(C). Finally, Melick claims to work as a paralegal for Winters, which also makes him an employee or agent of both Winters and DaCorta. Jurisdiction under Rule 65 even extends to "a nonparty who aids or abets a nonparty in privity with an enjoined party." *United States of Am. v. Robinson*, 83 F.4th 868, 881 (11th Cir. 2023) (vacating criminal contempt conviction on unrelated grounds). These principles are broad enough to encompass each and every Respondent. "An order committing a person for civil contempt of a decree or injunction issued to enforce federal law may be served and enforced in any district." Fed. R. Civ. P. 4.1(b).

proper conduct of the judicial function; without it, courts would be unable to preserve decorum or assert their authority by order or decree. *See, e.g.*, *In re Williams*, 306 F. Supp. 617, 618 (D.D.C. 1969). "Without the power to punish noncompliance with its orders, this Court's authority to issue judgments would be nothing more than a mere mockery." *S.E.C. v. Yun*, 208 F. Supp. 2d 1279, 1288 (M.D. Fla. 2002) (quoting *United States v. United Mine Workers*, 330 U.S. 258, 290 n. 56 (1947)). After recounting the contumacious judgment debtor's actions, the *Yun* court noted that through "months of deception, [contemnor] has taken deliberate strides to make a mockery of the jury verdict against her and the judgment of this Court. [Contemnor] has flouted the authority of this Court for far too long. It ends here." *Yun*, 208 F. Supp. 2d at 1288.

Contempt is committed when a person or entity "violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order." *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir 1987), *cert. denied* 487 U.S. 1205 (1988) (quoting *S.E.C. v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir. 1981)). In a civil contempt proceeding, the movant has the burden of establishing by clear and convincing evidence that: (1) a court order was in effect; (2) the order required certain conduct by the respondent; and (3) the respondent failed to comply with the court's order. *Petroleos Mexicanos v. Crawford Enterprises. Inc.*, 826 F.2d 392, 401 (5th Cir. 1987). Contempt is

established where there is clear and convincing evidence that the "violated order was valid and lawful; . . . the order was clear and unambiguous; and the . . . alleged violator had the ability to comply." *F.T.C. v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010); *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000). This question does not focus on the subjective belief or intent of the alleged contemnor, but rather simply whether or not they complied with the order at issue. *S.E.C. v. Solow*, 682 F.Supp.2d 1312, 1325 (S.D. Fla. 2010); *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990).

## I. RESPONDENTS COMMITTED CIVIL CONTEMPT BY VIOLATING THE COURT'S ASSET FREEZE

The Court first implemented the asset freeze on April 15, 2019, through the SRO. *See* Doc. 7 ¶ 8 ("[T]here is good cause for the Court to freeze assets owned, controlled, managed or held by Defendants … **or in which they have any beneficial interest**." (Emphasis added.)); *see also* ¶ 20 (implementing asset freeze) & ¶ 23 ("The assets affected by this Order shall include existing assets and assets acquired after the effective date of this Order.").

On April 30, 2019, the Court continued the asset freeze with respect to DaCorta through the Consent Order of Preliminary Injunction. *See* Doc. 43 ¶ 9 ("Any … person that holds, controls, or maintains custody of any account or asset titled in the name of, **held for the benefit of**, or otherwise under the control of Defendants … who receives notice of this Order by personal service

or otherwise, is hereby notified that this Order prohibits Defendants … from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling, or otherwise disposing of Defendants' … assets, except as directed by further order of the Court." (Emphasis added.)); *see also* ¶ 8 ("This Order shall apply to any of Defendants' … assets derived from or otherwise related to the activities alleged in the Complaint, regardless of when the asset is obtained.") & Doc. 44 ¶ 4 (continuing asset freeze). DaCorta consented to these provisions and to the preliminary injunction generally. *See* Doc. 35-3.

On July 11, 2019, the Court entered the Consolidated Order, which provides that "all Receivership Property remains frozen until further order of this Court." Doc. 177 ¶ 4. "Accordingly, all persons and entities with direct or indirect control over any Receivership Property, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets." *Id.* The Consolidated Order defines "Receivership Property" as "Receivership Assets" and "Recoverable Assets." *Id.* at p. 2. "Receivership Assets" are "all assets (real, personal, intangible, or otherwise) of the Defendants…." *Id.* "Recoverable Assets" are "assets of any **other entities or individuals** that: (a) are attributable to funds **derived from pool participants, lenders, investors, or clients** of the

Defendants…; (b) are **held in constructive trust for the Defendants**…; (c) were fraudulently transferred by the Defendants…; and/or (d) may otherwise be includable as assets of the estates of the Defendants….” *Id.* DaCorta consented to the entry of the Consolidated Order. *See* Doc. 172 at p. 5.

The money obtained through the Recovery Fraud meets all of these definitions, and its disposition violates each of the orders described above. Specifically, the money was "derived from pool participants, lenders, investors, or clients" of DaCorta. *See* Wiand Decl. ¶¶ 14 & 15. It was held "in constructive trust" (indeed, in a literal trust) "for the benefit of" DaCorta. *See* Slides 5, 6. It was transferred to DaCorta's lawyers and used to fund his legal defense. Wiand Decl. Exs. N, P & Q. Once the funds left the investors' respective accounts, they became subject to the asset freeze as after-acquired assets held for DaCorta's benefit. *Cf. TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 929 F. Supp. 2d 1255, 1263 (M.D. Fla. 2013) (applying prejudgment asset freeze pending disgorgement to retainer held by law firm that did not properly inquire into source of funds); *S.E.C. v. Credit Bancorp, Ltd.*, 109 F. Supp. 2d 142, 144 (S.D.N.Y. 2000) ("Generally speaking, funds held in an escrow account, such as an attorney trust account, are considered to be funds owned by the client and held by the attorney in a fiduciary capacity."); *C.F.T.C. v. Wilson*, 2011 WL 6398933, at *3 (S.D. Cal. Dec. 20, 2011) (applying asset freeze to funds in attorney trust account because "[w]hen funds are linked directly to the fraud,

it would frustrate the purpose of the regulation to allow the defendant to use funds for attorney fees"). The funds at issue here are not only "linked" to the fraud; they are derived from many of the exact same victims.

The Helpers Group, DaCorta, and/or his numerous attorneys should have moved the Court for relief from the asset freeze to properly raise and spend any such funds. They failed to do so because involving the Court would have revealed their outrageous misrepresentations and strong-arm tactics, including the fact that most of the money raised was not spent on lawyers at all but rather on gold coins, the whereabouts of which remain unknown.

Their conduct constitutes civil contempt because the SRO, Consent Preliminary Injunction, and Consolidated Order are all valid, lawful, and unambiguous orders. Respondents had the ability to comply with the orders because carveouts for legal expenses are contentious but not rare. Respondents could have followed a legal pathway to achieve their purported goals, but instead, they chose to perpetrate the Recovery Fraud.[5] At minimum, the Court

---

[5] A party's inability to comply with a court's order is a defense to a contempt motion. *See S.E.C. v. Greenberg*, 105 F.Supp.3d 1342, 1346 (S.D. Fla. 2015) (SEC's burden was to prove that defendant had the ability to comply; the burden then shifts to defendant to prove his "present inability to comply"). A party demonstrates an "inability" to comply by showing that he has made "'in good faith all reasonable efforts to comply.'" *Watkins,* 943 F.2d at 1301 (quoting *Ryan* at 534). The defense is not available where "the condition making compliance unfeasible is a condition of the party's own making." *See U.S. v. Baker Funeral Home, Ltd.*, 196 F.Supp.3d 530, 554 (E.D. Pa. 2016); *see also Carty v. Turnbull*, 144 F. Supp.2d 395, 417-18 (D.V.I. 2001); *Government Guarantee Fund of Republic of Finland v. Hyatt Corp.* 182 F.R.D. 182, 184 (D.V.I. 1998) (Hyatt designed financial system and therefore could not rely on the system's deficiencies in for inability to comply defense).

should require the disgorgement of all funds raised from investors – at least $581,000 as of 2023 – into the Court's registry.

## II. RESPONDENTS COMMITTED CIVIL CONTEMPT BY HARASSING THE RECEIVER AND INTERFERING WITH THE ADMINISTRATION OF THE RECEIVERSHIP

As excerpted above, the Consolidated Order prohibits any person with notice of its terms "from directly or indirectly taking any action or causing any action to be taken … which would … [i]nterfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates." Doc. 177. The Consolidated Order's predecessors contained similar provisions. Again, all of these orders are valid, lawful, and unambiguous. Respondents had the ability to comply with the orders by simply refraining from undertaking the numerous affirmative acts that harassed the Receiver and interfered with the administration of the Receivership Estate. As explained above in Background Section III, Winters and the Helpers' Group interfered with the claims process in numerous ways, most egregiously by intimidating victims and telling them not to file claims directly or to communicate with the Receiver lest they face criminal charges.

As explained above in Background Section IV, Winters and the Helpers Group interfered with the distribution process in numerous ways, most egregiously by using threats of debt collections under a bogus contingency fee agreement to appropriate or attempt to appropriate approximately $1.1 million

from claimants – *i.e.*, 15% of the Receiver's distributions to claimants "represented" by Winters to date. As a matter of law, Winters is not entitled to any portion of the fund marshaled by the Receiver and the CFTC. *See, e.g., In re Boesky Sec. Litig.*, 888 F. Supp. 551, 558 (S.D.N.Y. 1995) ("No private counsel played any significant role in the disgorgements which the SEC obtained …; those funds having been created solely through the efforts of the SEC. Accordingly, there is no compensation to be paid on account of the creation of those funds."). Most of the money raised from investors appears to have been converted into gold coins, the location of which is currently unknown.

## III. PREZIOSI SHOULD EXPLAIN HIS RECEIPT OF VICTIM FUNDS, HIS APPARENT CONFLICT OF INTEREST, AND THE USE OF HIS WORK TO RAISE MONEY FROM INVESTORS

Unlike Winters and the Helpers Group, Preziosi was not involved in the claims process to the best of the Receiver's knowledge. The Receiver has not identified any communications between Preziosi and victim-investors, and Preziosi has produced competent legal work, even if the Receiver believes his efforts will ultimately prove unsuccessful. His representation of DaCorta is nevertheless problematic, and he is included in this motion for two important reasons: (1) he is representing DaCorta while being paid by DaCorta's victims, which appears to be an unwaivable conflict of interest, and (2) the Helpers Group is using his representation of DaCorta to defraud money from victims

by claiming that his efforts will recover $700 million in damages for DaCorta, who will then share those damages only with the people who fund Preziosi.

First, Preziosi has received at least $155,450 from DaCorta's victims. He received $80,000 from a single investor, but the Helpers Group is treating that payment as a "bridge loan" and seeking to reimburse that investor from the larger victim pool. *See* Slide 32 (demanding reimbursement for "Bridge Loan" for "appeal attorney"). The remainer of Preziosi's compensation was wired to him from the Trust, which in turn was funded by victim-investors. *See* Wiand Decl. ¶ 17 & Ex. P. As such, it is indisputable that Preziosi is being paid to represent DaCorta by the very people DaCorta has been criminally adjudicated as having defrauded. To discharge the Court's show cause order, Preziosi should explain why this does not represent a conflict of interests or demonstrate that he has obtained the requisite conflict waivers from all the investors who have funded his representation.

Second, the Court should also order Preziosi to state whether he is aware of the representations the Helpers Group is making to investors about his services – specifically, that when Preziosi prevails in the civil and criminal actions, DaCorta will be entitled to damages from the federal government exceeding $700 million. This lie is at the heart of the Recovery Fraud. To discharge the Court's order, Preziosi should explain how he reasonably intends to accomplish that result. This can be done without revealing work product or

other privileged communications. If Preziosi does not intend to accomplish that result or is not aware that the Helpers Group is telling investors that he will recover $700 million for those who help DaCorta, he should clearly state that potential fact. If Preziosi does not sufficiently discharge the Court's order, he should disgorge the amount he has received from victim-investors.[6] In any event, the Court should prohibit Preziosi from accepting any further funds from anyone who invested in the Oasis scheme.

## CONCLUSION

The Receiver asks that the Court enter an order to show cause why Respondents should not be held in civil contempt for violating the Consolidated Order and its predecessors, including the asset freeze provisions contained therein, through the Recovery Fraud, their interference with the exclusive jurisdiction of this Court, and their ongoing harassment and interference with the Receiver's ability to administer the Receivership.

The Receiver asks the Court to enter an order prohibiting Respondents – particularly Jason McKee and Greg Melick – from having any further communications with any claimants. This prohibition should extend to the Helpers' Group generally and any and all individuals in active concert or participation with McKee and Melick.

[6] Although the Receiver generally seeks disgorgement jointly and severally against Respondents, at this time, the Receiver believes Preziosi should only be required to disgorge the amount he actually received directly or indirectly from victim-claimants.

The Receiver asks the Court to enter an order prohibiting Respondents from soliciting or accepting any further funds from any investors in the Oasis scheme, regardless of whether those funds are characterized as donations or payments pursuant to the bogus contingency fee agreement.

The Receiver asks the Court to enter an order requiring each Respondent to produce an accounting of all funds they or any entity under their control (like the Trust) have received directly or indirectly from any Oasis investor.

The Receiver asks the Court to enter an order requiring Respondents to produce the gold coins and to disgorge, jointly and severally, to the Court's registry all funds received directly or indirectly from investors in the Oasis scheme with fines accruing at the rate of $500 per day after a brief grace period until all amounts are disgorged.

Last, the Receiver requests that the Court grant the reasonable fees and costs incurred by him and his professionals as a result of the conduct described herein, including additional administrative expenses caused by interference with the claims and distribution process and the costs of preparing this motion.

## VERIFICATION OF THE RECEIVER

I, Burton W. Wiand, Court-Appointed Receiver in the above-styled matter, hereby certify that the information contained in this motion is true and correct to the best of my knowledge and belief.

**s/ Burton W. Wiand**

Burton W. Wiand, Court-Appointed Receiver

## LOCAL RULE 3.01(g) CERTIFICATION

Local Rule 3.01(g) provides that "[b]efore filing a motion in a civil action, except a motion for a Rule 11 sanction, for injunctive relief, for judgment on the pleadings, for summary judgment, or to certify a class, the movant must confer with the opposing party in a good faith effort to resolve the motion." L.R. 3.01(g) (emphasis added). Because this civil contempt motion seeks sanctions and to enforce an injunction through additional injunctive relief, the Receiver has not conferred with Respondents. During the Court's status conference, the CFTC stated that it would join any motion for an order to show cause filed by the Receiver, and the United States stated that it would take no position.

In an abundance of caution, however, on April 2, 2023, the Receiver emailed the Respondents. The undersigned had a telephone conversation with Preziosi during which he denied any wrongdoing and subsequently emailed him a draft of the motion. The undersigned believes Preziosi will oppose the motion. The Receiver will update this certification if any other Respondents reply to the Receiver's communication.

Respectfully submitted,

**/s/Jared J. Perez**
Jared J. Perez, FBN 0085192
jared.perez@jaredperezlaw.com

JARED J. PEREZ P.A.
301 Druid Rd W
Clearwater, FL 33756-3852
Tel.: (727) 641-6562

Maya Lockwood, FBN 0175481
maya@burtonwwiandpa.com
BURTON W. WIAND PA
114 Turner Street
Clearwater, FL 33756-5211
Tel.: (813) 902-4147

*Attorneys for Burton W. Wiand, Receiver*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 3, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I also served each of the Respondents by email and/or US Mail as set forth below:

Stephen Preziosi, Esq.
Law Office of Stephen N. Preziosi P.C.
48 Wall Street, Eleventh Floor
New York, NY 10005
Email: appealslawfirm@gmail.com

Brent Allen Winters
5105 S. Hwy. 41, #218
Terre Haute, IN 47802
Email: winterslaw@nym.hush.com
swinters77@nym.hush.com
brentwinters@nym.hush.com

Jason McKee
P.O. Box 611
Elkville, IL 62932
Email: jmckee573@gmail.com
treasurer@oasisreplevin.net

Greg Melick
P.O. Box 165
Intervale, NH 03845-0165
Email: entheos@startmail.com
tradinggraces@use.startmail.com
oasishelpers@oasisreplevin.net

**/s/Jared J. Perez**
Jared J. Perez