FILED - USDC - FLMD - ORL
AUG 21 2026 AM10:47

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

Case No. 8:19-cv-00886-VMC-SPF

OASIS INTERNATIONAL GROUP LIMITED; OASIS MANAGEMENT, LLC;SATELLITE HOLDINGS COMPANY; MICHAEL J. DACORTA; JOSEPH S. ANILE, II; RAYMOND P. MONTIE, III; FRANCISCO "FRANK" L. DURAN; and JOHN J. HAAS,

Defendants,

and

MAINSTREAM FUND SERVICES, INC.; BOWLING GREEN CAPITAL MANAGEMENT LLC; LAGOON INVESTMENTS, INC.; ROAR OF THE LION FITNESS, LLC; 444 GULF OF MEXICO DRIVE, LLC; 4064 FOUNDERSCLUB DRIVE, LLC; 6922 LACANTERA CIRCLE, LLC; 13318 LOST KEY PLACE,LLC; and 4OAKS LLC,

Relief Defendants.

---

MICHAEL J. DACORTA'S POST-HEARING SUBMISSION REGARDING THE RECEIVER'S MOTION TO SHOW CAUSE

---

## PRELIMINARY STATEMENT

The Receiver's contempt theory rests on three distinct propositions that should remain analytically separate: (1) particular funds were Receivership Property subject to the asset freeze; (2) Michael J. DaCorta personally engaged in conduct that violated Paragraph 31.D or another clear command of Doc. 177; and (3) particular funds or property should now be returned, disgorged, accounted for, or otherwise recovered. Evidence bearing on one proposition does not itself establish the others.

The hearing record does not establish the threshold property nexus. Receiver's Exhibit L to the Receiver's declaration (Doc. 905-12) reflects $426,592.47 in lender payments to The Trust LLT through August 22, 2022, before any Receivership distribution. The $322,000 in challenged gold purchases and the first $100,000 paid to Ronald Kurpiers likewise predated the first distribution. Melissa Davis testified that she was not asked to trace where individual contributors obtained the money they contributed. The Attorney-Client Agreement and Trust documents do not identify DaCorta as an owner of those funds, a party entitled to direct them, or a person possessing transactional authority over The Trust LLT.

Nor does the record establish the separate respondent-specific violation required for contempt. Tim Devine testified that he had no factual knowledge whether DaCorta communicated with or through Melick concerning the challenged

conduct. When DaCorta asked Wiand what evidence made him a respondent, Wiand relied on emails reaching DaCorta, legal benefit, and attorney fees spent on his representation, rather than identifying a particular Trust transaction directed by him. Exhibits 58, 65, and 80 (Docs. 978-65, 978-72, 978-88, respectively) may support communication or possible awareness, but they do not establish control of The Trust LLT or direction of its challenged transactions. A permissible Fifth Amendment inference may supplement probative evidence; it cannot substitute for the evidence needed to satisfy the Receiver's burden of production.

The remaining allegations likewise must be measured against the underlying documents and testimony rather than the labels applied to them. This submission does not ask the Court to reopen prior rulings or decide issues committed to the Eleventh Circuit. It asks the Court to decide the contempt motion on the clear commands of the governing Orders and the evidence actually presented at the August 7 hearing. On that record, the Order to Show Cause should be discharged as to DaCorta and the requested contempt relief denied.

## I. THE RECEIVER FAILED TO ESTABLISH THE THRESHOLD ELEMENTS OF CIVIL CONTEMPT

### A. Civil Contempt Requires Clear and Convincing Proof of a Violation of a Specific, Preexisting Command.

Civil contempt enforces a valid judicial command that was sufficiently clear before the challenged conduct occurred. The party seeking contempt bears the initial burden of proving the violation by clear and convincing evidence. *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992). The Eleventh Circuit requires proof that "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Riccard v. Prudential Ins. Co. of Am.*, 307 F.3d 1277, 1296 (11th Cir. 2002) (citing *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000)).

Although an order is subject to reasonable interpretation, it "may not be expanded beyond the meaning of its terms absent notice and an opportunity to be heard." *Riccard*, 307 F.3d at 1296-97. Federal Rule of Civil Procedure 65(d)(1) likewise requires an injunction to state its terms specifically and describe in reasonable detail the acts restrained or required. And contempt asks whether the proved conduct violated the existing order; conduct that may be objectionable or actionable on another ground does not itself establish contempt if the order did not prohibit it. See *Riccard, 307 F.3d at 1296-97.*

The Receiver relies upon both the asset-freeze provisions of the Consolidated Receivership Order and Paragraph 31.D, which prohibits action that would "[i]nterfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates." (Doc. 177 ¶31.D.) Paragraph 31.D may support contempt when proved conduct clearly falls within it. But it does not itself say that a claimant's voluntary use of funds after a Court-authorized distribution constitutes interference; that a claimant may not contribute toward DaCorta's legal defense; that the Receiver retains a veto over a claimant's personal expenditures; or that any payment later made by a former Oasis claimant automatically becomes Receivership Property.

The Receiver's own Motion distinguishes the theories. It alleges that the challenged conduct interfered with or harassed the Receiver and this Court's jurisdiction, then separately asserts that the alleged "Recovery Fraud also violated the Court's asset freeze and calls for disgorgement." (Doc. 904 at 3.) Those propositions require separate proof. Evidence of interference does not itself establish that particular funds were frozen Receivership Property, and an asserted entitlement to recover property does not itself establish violation of a preexisting command.

**B. The Asset-Freeze, Interference, and Recovery Theories Require Distinct Findings, and Neither Distribution Order Created the Post-Distribution Restraint Now Asserted.**

The Receiver's presentation combines three questions: whether particular funds were Receivership Property subject to the freeze; whether identified conduct violated Paragraph 31.D; and whether funds or property should now be returned, disgorged, accounted for, or otherwise recovered. Each requires its own factual and legal foundation.

The Consolidated Receivership Order freezes "Receivership Property," defined to include Receivership Assets and Recoverable Assets. Recoverable Assets are described by specified connections to Defendants or Relief Defendants, including assets attributable to funds derived from pool participants, lenders, investors, or clients; property held in constructive trust for Defendants; property fraudulently transferred by Defendants; or property otherwise properly includable in their estates. (Doc. 177 ¶4; Doc. 927 at 8.) Before a transfer, receipt, expenditure, or disposition can violate the asset freeze, therefore, the Receiver must establish that the particular property involved satisfied the definition at the relevant time. The proof must also be respondent-specific. *McGregor* rejected contempt where defendants were effectively lumped together and the record did not establish that the particular alleged contemnor personally engaged in prohibited conduct. Association, receipt of money, or receipt of a benefit did not suffice. 206 F.3d at 1383-84. Thus, even if a lender's payment later financed work beneficial to

DaCorta, that fact does not itself establish that he directed, possessed, controlled, transferred, or otherwise dealt with the funds.

The June 10 Order to Show Cause did not finally decide that predicate. The Court stated that the Receiver had "alleged conduct that would violate the asset freeze" and had "sufficiently alleged that at least some" funds solicited by Winters and the Helpers Group were Recoverable Assets. (Doc. 927 at 9-10) (emphasis added). Those findings justified an evidentiary hearing; they did not constitute a post-hearing finding, under the clear-and-convincing standard, that each challenged Trust deposit, attorney payment, gold purchase, credit-card payment, or other transaction actually involved frozen property. Doc. 927 itself described the procedural progression: alleged conduct that would violate an injunction supports issuance of an order to show cause, after which the movant must prove the violation at the hearing. The August 7 hearing therefore did not begin with the property question as if already adjudicated in the Receiver's favor. The Receiver's own formulation makes the unresolved question explicit: "once the funds left the investors' respective accounts, they became subject to the asset freeze as after-acquired assets held for [Mr.] DaCorta's benefit." (Doc. 927 at 8-9, quoting Doc. 904.) That theory requires proof of the event by which money belonging to a contributor became property of DaCorta or property held for him.

Paragraph 31.D presents a different inquiry. The Receiver may contend that particular communications or conduct interfered with him or with this Court

even if the money involved was not Receivership Property. But for each alleged act, he must identify the conduct, the actor, the command violated, and why the conduct falls within that command. A voluntary contribution, criticism of the Receiver, communications among claimants, solicitation of financial assistance, disputed litigation statements, claim-form activity, and advice concerning the claims process are not factually identical and cannot be treated as interference merely by characterization.

Doc. 904 also seeks production of gold, an accounting, disgorgement into the Court registry, prohibitions on future funds, fines, and reimbursement of professional fees. To the extent those remedies depend on an assertion that property belongs to or is recoverable by the Receivership, the substantive property or recovery predicate must be established. If monetary relief is instead sought as compensation for a proven contempt violation, the amount must be tied to that violation and its legally compensable consequences. A possible recovery theory is not proof of a preexisting contempt violation.

The distribution orders do not supply the missing command. Doc. 730 authorized the first $10 million distribution and expressly prescribed consequences of negotiating a distribution check. Paragraph 2(e) provided that negotiation waived arguments made outside the Objection Procedure, constituted acceptance of Proof-of-Claim information, required a claimant who disagreed with the amount or process not to negotiate the check, and made

alteration or addition of conditions to the check a violation of the Order. Nothing in Doc. 730 states that, after negotiation, the proceeds remain frozen; that the recipient must obtain the Receiver's permission before spending them; that a recipient may not contribute toward another person's legal expenses; that any percentage remains under continuing Receivership administration; or that money later used for DaCorta's benefit automatically becomes his after-acquired asset. The significance of Paragraph 2(e) is not that negotiation immunized the proceeds from every conceivable later recovery claim. It is that the Court expressly addressed what negotiation meant and identified conduct concerning the checks that would violate the Order, yet did not impose the continuing expenditure restriction now asserted.

Doc. 810, authorizing the second $9 million distribution, contains even fewer restrictions. It contains no analogue to Doc. 730 ¶2(e), no stated condition on later use of negotiated proceeds, no repayment requirement based upon later expenditure, no requirement of Receiver approval for personal spending, and no defense-funding prohibition. DaCorta does not contend that this silence creates immunity from every later recovery theory. The narrower point is that neither distribution Order clearly informed a claimant that later use of distributed money to assist DaCorta's defense was itself forbidden. Under *Riccard*, an unstated prohibition cannot be supplied after the conduct occurred merely because a broader interpretation is later urged. 307 F.3d at 1296-97.

Nor does Paragraph 31.D transform that silence into a continuing financial restraint. The provision says nothing expressly about negotiated distribution proceeds, personal expenditures, voluntary payment of another person's attorney, or financial support for litigation challenging an existing judgment. Any alleged interference must therefore be proved independently under its language. Proof that funds were Receivership Property, proof of interference, and proof supporting turnover or disgorgement remain separate propositions. Collapsing them would permit a disputed property theory to prove interference and then use that supposed interference to prove the property theory itself.

**C. The Receiver's Own Evidence Establishes That $422,000 in Challenged Transactions Predated Any Receivership Distribution and Does Not Establish That Independently Supplied Lender Funds Became DaCorta's Property.**

The Receiver's exhibits establish a chronology incompatible with treating the initial Trust funding as Receivership distribution proceeds. Exhibit L records $426,592.47 in cumulative lender payments to The Trust LLT through August 22, 2022. (Doc. 905-12, Ex. L at 34.) The first interim distribution was authorized March 15, 2023 (Doc. 730), and the Receiver mailed the first checks April 6, 2023 (Doc. 747). Thus, every dollar reflected in the $426,592.47 total necessarily originated from another source.

The same exhibits show that The Trust LLT used those pre-distribution funds for transactions now challenged. IPM records document a $197,000 gold purchase in September 2021 and a $125,000 purchase in March 2022. The Trust LLT checks

show payments of $50,000 to Ronald Kurpiers on August 3 and November 2, 2022. (Docs. 905-14, 905-18, 905-19.) The $322,000 paid to IPM and first $100,000 paid to Kurpiers therefore could not have consisted of Receivership distribution proceeds. The Receiver must prevail, if at all, on the different proposition that independently supplied lender funds became Receivership Property upon payment under the Attorney-Client Agreements, deposit into The Trust LLT, or later use for legal services.

**1. The Attorney-Client Agreement does not transfer the lender-client's payment to DaCorta.**

The Attorney-Client Representation Agreement identifies the individual lender, not DaCorta, as the "Client." It is a contract between the Law Offices of Brent Allan Winters and that Client, describing services to the Client, compensation to Attorney, and the parties' obligations. Its scope includes proceedings affecting the Client or the Client's property in this action, appeals, and derivative proceedings. Section III states that services are not pro bono, establishes a Client Fund equal to 2.5 percent of the Client's claim, and characterizes payments as compensation for services rendered. Individual Client Funds are pooled into a Services Fund from which Attorney may draw litigation costs; if there is no recovery, the Client owes no recovery fee and is entitled to reimbursement of the remaining balance in the Client Fund.

Nothing in the Agreement makes DaCorta a party, owner of the Services Fund, assignee of a lender's payment, or person entitled to direct the Client's money. Nor does it give him any right to withdraw from or control the Client Fund or Services Fund. The later use of pooled funds for legal work that also benefited DaCorta does not, without additional proof, establish that he owned or controlled the money used to finance that litigation. Section VII also contemplates representation involving other attorneys and permits termination by either party. The structure therefore reflects legal-service obligations undertaken by individual Clients and administered through the Attorney and Services Fund, not a contractual transfer of the Clients' funds to DaCorta.

**2. Deposit into The Trust LLT did not make DaCorta an owner, trustee, beneficiary, or person with transactional authority.**

The Receiver's Exhibit K (Doc. 905-11), the Certification of Trust, identifies Susan Winters as Settlor; Jason McKee as Trustee; Greg Melick as Successor Trustee; and Melick, IPM Trust, McKee, and Perfect Estate Trust as beneficiaries. The Certification places authority to own, manage, invest, and transact with Trust property in the Trustee and specifically authorizes McKee to write checks and conduct transactions. Michael DaCorta is not identified as settlor, trustee, successor trustee, beneficiary, signatory, or person possessing authority over The Trust LLT. The Receiver's declaration and hearing testimony substantially confirmed the same structure. (Doc. 905 ¶13; Aug. 7 Hr'g Tr. at 71.) His own

Motion nevertheless asserted that the money was held in constructive trust - "indeed, in a literal trust" - for DaCorta. The parenthetical does not establish the proposition for which it was offered: the literal trust identified in the Receiver's own evidence names other beneficiaries and places transactional authority elsewhere.

Formal designation in an express trust instrument does not necessarily foreclose every possible equitable interest. But the instrument itself cannot prove the Receiver's assertion that the money was held "in constructive trust" -- "indeed, in a literal trust" -- "for the benefit of" DaCorta. (Doc. 904 at 18.) If the Receiver contends that DaCorta possessed an additional equitable interest, that interest required proof independent of the express Trust instrument.

**3. The constructive-trust theory required an identifiable property nexus that the Receiver did not establish.**

Florida law describes a constructive trust as an equitable relationship imposed to prevent unjust enrichment in circumstances such as fraud, undue influence, abuse of confidence, or mistake. *Wadlington v. Edwards*, 92 So. 2d 629, 631 (Fla. 1957). The Eleventh Circuit explains that a constructive trust restores an original interest in property wrongfully taken and may not be imposed on general assets without specific, identifiable property or property clearly traceable into the assets claimed. *Bender v. CenTrust Mortgage Corp.*, 51 F.3d 1027, 1029-30 (11th Cir. 1995), modified on reh'g, 60 F.3d 1507 (11th Cir. 1995).

The Receiver's forensic accountant, Melissa Davis, was asked: "Were you asked to trace where the individual investors got the money they contributed?" She answered: "No." (Aug. 7 Hr'g Tr. at 48.) Her analysis reconstructed deposits into and expenditures from The Trust LLT; it did not establish where each contributor obtained the funds before contributing them. The Receiver's opposition to Preziosi's reconsideration motion likewise acknowledged that "there is no evidence tracing the funds the other Affiants contributed to the money used to pay Preziosi." (Doc. 955 at 13.) Fungibility may complicate tracing after a qualifying property interest has been established; it does not itself establish whose property entered the account. Nor is it enough to trace a payment from an Oasis lender into The Trust LLT while leaving unproved the prior property interest that supposedly made the lender's money DaCorta's property or property held for him. The missing question is not merely where the dollars went after deposit; it is what legally cognizable property interest of DaCorta attached to them before the challenged expenditure.

The Receiver's *TemPay* authority illustrates the missing nexus. In *TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 929 F. Supp. 2d 1255 (M.D. Fla. 2013), the parties stipulated that all $601,500 deposited into the defendants' law-firm trust account consisted of money the plaintiff itself had paid to the defendants; the disputed attorney retainer came from those same funds. The court emphasized that the source was undisputed and traceable from the plaintiff to defendants

and then to counsel. Id. at 1257, 1261-63. It preserved the specifically traceable funds pending later determination whether a constructive trust was warranted; it did not hold that third-party funds become a defendant's property merely because they finance legal services benefiting him. *TemPay* also recognized that constructive-trust recovery against a third party depends upon tracing and may fail where the property cannot be traced or the recipient takes for value and in good faith. 929 F. Supp. 2d at 1262-63. Those limitations reinforce rather than cure the missing source-and-ownership nexus here.

Here, by contrast, the $322,000 IPM purchases and first $100,000 paid to Kurpiers occurred before any Receivership distribution, and Davis did not trace the contributors' antecedent sources. The Agreement gives DaCorta no property right in the funds, the Trust instrument gives him no title or transactional authority, and payment of legal expenses for his benefit does not retroactively establish ownership. The Receiver proved that lenders paid money, that money entered The Trust LLT, and that the Trust later financed legal work and other expenditures. He did not thereby prove the different proposition necessary for asset-freeze contempt: that those funds became property of DaCorta or property held in constructive trust for him before they were spent. None of the three proposed transformation points - payment under the Agreement, deposit into The Trust LLT, or later expenditure for legal services - supplies that missing transfer of ownership, possession, control, or equitable interest. The Receiver's

after-acquired-asset theory therefore lacks an established point at which independently supplied lender money became DaCorta's property.

## II. EVEN IF THE FUNDS COULD BE SUBJECT TO DOC. 177, THE RECEIVER FAILED TO PROVE THAT DACORTA VIOLATED THE ORDER

Even if the Court assumes that some or all challenged funds could constitute Receivership Property, the Receiver still must prove by clear and convincing evidence that DaCorta personally committed conduct violating a clear command. *McGregor* vacated contempt against an individual where defendants were effectively "lumped together" and association or benefit did not establish that she personally engaged in the prohibited conduct. 206 F.3d at 1383-84. Circumstantial evidence may be considered cumulatively, but it must still supply the respondent-specific connection. Rule 65(d)(2)'s reference to persons acting in "active concert or participation" does not alter that requirement. DaCorta was already a party bound by the injunction under Rule 65(d)(2)(A); the remaining question is not whether he was within the class of persons bound, but whether the Receiver proved that he personally violated an identifiable command.

### A. The Receiver Did Not Establish That DaCorta Controlled The Trust LLT or Directed the Challenged Transactions.

As shown above, the Trust instrument places formal authority in persons other than DaCorta. Nor did the Receiver's lender witness supply the missing connection. On redirect, Perez asked Tim Devine whether he had knowledge that DaCorta was communicating "with or through Mr. Melick." Devine answered: "I

do not have any factual knowledge, no." Asked whether he knew one way or another about DaCorta's involvement, he answered: "I do not." (Aug. 7 Hr'g Tr. at 45.)

When DaCorta asked Wiand what evidence made him a respondent, Wiand identified emails that had reached DaCorta, stated that the challenged activity was undertaken "for your legal benefit," and relied on the attorney fees spent on his representation. (Id. at 119-20.) He did not identify evidence that DaCorta owned or was an authorized user of The Trust LLT account, possessed withdrawal authority, directed the IPM purchases, directed the Kurpiers or Preziosi payments, possessed the gold, or authorized any particular Trust disbursement. Those facts may support awareness or benefit; they do not establish transactional control. The distinction is central because the Receiver's theory repeatedly moves from legal benefit to dominion over the source of funding. The evidence shows that attorneys performed work for DaCorta and that others administered the arrangements used to pay them. It does not thereby show that DaCorta selected the contributors, set their obligations, controlled the Trust account, chose its payees, or directed its disbursements.

**B. Perez's Questions Were Not Evidence, and the Permissible Fifth-Amendment Inference Cannot Supply Otherwise Missing Proof.**

The Court correctly recognized that an adverse inference may under appropriate circumstances be drawn from DaCorta's invocation of the Fifth Amendment in a

civil proceeding. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *United States v. Two Parcels of Real Property Located in Russell County, Alabama*, 92 F.3d 1123, 1129 (11th Cir. 1996). But a question is not evidence merely because the witness invokes the Fifth Amendment in response. The Eleventh Circuit stated the limitation expressly: "The negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production." *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991).

Several of Perez's questions embedded the conclusions the Receiver was required to prove: whether DaCorta "mislead hundreds of Oasis investors" into paying his attorneys; whether he directed Melick to raise money or send information; whether he had a history of working with Melick to violate the asset freeze; whether he participated in "obstruction of the receivership and court operations"; whether he knew what happened to the IPM gold; and whether he regularly communicated with Melick about Helpers activities. (Aug. 7 Hr'g Tr. at 129-31.) DaCorta invoked the Fifth Amendment in response to each question. The Court may draw an appropriate inference from those invocations when supported by probative evidence. But an unfavorable inference is not equivalent to proof of every factual and legal premise embedded in a compound question. *Avirgan* permits an inference to supplement evidence already produced; it does not allow the inference to become the evidence needed to meet the initial burden of production. The distinction is especially important where a question assumes

both a disputed fact and the legal conclusion - for example, that a particular solicitation constituted an attempt to violate the asset freeze or that communications amounted to obstruction. Where the independent record does not establish that DaCorta owned The Trust LLT account, possessed withdrawal authority, directed a disbursement, ordered an IPM purchase, possessed the gold, or controlled the persons who performed those acts, the adverse inference cannot by itself create all of those missing facts. *Avirgan*, 932 F.2d at 1580.

**C. Receipt of Legal Representation Does Not Establish Control of Its Funding.**

Wiand repeatedly relied on the fact that legal services benefited DaCorta and that attorneys representing him were paid from funds originating with lenders. But benefit and control are separate propositions. The Attorney-Client Agreements identify the lenders as Clients, establish their Client Funds and pooled Services Fund, and authorize counsel to apply those funds to litigation costs; the Trust instrument likewise gives DaCorta no transactional authority. Proof that Kurpiers or Preziosi represented DaCorta establishes a litigation benefit. It does not establish that DaCorta owned the money before payment, selected contributors, controlled the account, directed collection, or authorized disbursements. *McGregor*, 206 F.3d at 1383-84.

**D. The Emails Establish Some Communication and Possible Awareness, But Not Direction of the Challenged Transactions.**

Receiver's Exhibit 65 (Doc. 978-72) is an August 18, 2021 email from DaCorta to Melick and Michele Utter concerning a 2017 "Outlook." Wiand characterized it as DaCorta "absolutely telling him to put out bogus information." (Aug. 7 Hr'g Tr. at 122.) The exhibit is narrower. DaCorta asked Melick to reread the Outlook and whether, "if you feel it may be important," it should be resent to the group, concluding: "Let me know if you agree." Whatever may be concluded about the Outlook's substantive assertions, the email does not address The Trust LLT, direct collection of lender payments, authorize a Trust disbursement, direct the later IPM purchases, or instruct anyone to pay counsel.

Exhibit 58 (Doc. 978-65) presents an even greater attribution problem. It is a November 30, 2020 email authored by Melick and sent to Michele Utter asking her to circulate an "Urgent Appeal for Humanitarian Support." DaCorta is neither sender nor recipient. The attachment seeks modest monthly assistance for the DaCorta family's food, housing, and living expenses and directs payment to "Carolyn DaCorta or Cash," stating, "Mike cannot open a bank account, so don't send him anything." Nothing on its face identifies DaCorta as author, sender, or recipient or states that he requested, approved, or directed the solicitation. Perez nevertheless asked whether it showed DaCorta "working through his wife with Greg Melick to raise money for himself" and attempting to "circumvent the asset

freeze by using his wife's name." Wiand answered the latter proposition: "I can't tell you that one." (Id. at 123.) The exhibit therefore supports an inference that Melick solicited family assistance, but not that DaCorta directed the solicitation or used Carolyn as an instrument to evade the freeze.

Exhibit 80 (Doc. 978-88) is an April 14, 2022 email authored by Melick and sent to six recipients, including DaCorta, reporting that 98 persons had filed Notices and Objections and attaching a docket-derived list. It contains no response or statement authored by DaCorta. Wiand characterized it as showing that DaCorta "was aware" and "was being kept apprised." (Id. at 123-24.) Receipt of such a communication may support an inference of awareness, but the exhibit does not establish that DaCorta read it, agreed with it, directed the filing effort, participated in preparing the filings, or acted on the information. Awareness and direction remain different factual propositions.

Taken together, Exhibits 58, 65, and 80 provide circumstantial evidence of family assistance, communication, and possible awareness. They may be considered cumulatively with any properly limited adverse inference. But the Receiver still must bridge those facts to a particular prohibited act by DaCorta. The record does not show that Exhibit 58 was authored or authorized by him, that Exhibit 65 resulted in any challenged transaction, that he acted upon Exhibit 80, or that he controlled The Trust LLT or directed its payments.

### E. The Receiver Therefore Failed to Establish the Respondent-Specific Violation Necessary for Civil Contempt.

The Receiver's evidence may support findings of association, communication, possible awareness, and litigation benefit. It does not establish, by clear and convincing evidence, that DaCorta exercised dominion over The Trust LLT, controlled its trustees, directed collection or disbursements, purchased, received, possessed, or disposed of the gold, or personally performed another act clearly prohibited by Doc. 177. Cumulative evidence and a permissible adverse inference do not eliminate the respondent-specific nexus required by *McGregor* and *Avirgan*.

## III. THE "RECOVERY FRAUD" CHARACTERIZATION AND CFTC ADVISORY DO NOT ESTABLISH A VIOLATION OF DOC. 177.

The Receiver first characterized the Helpers Group's communications as bearing "all the hallmarks of a recovery fraud" in his April 2024 Supplemental Interim Report. (Doc. 811 at 8.) The cited CFTC consumer advisory describes recovery scams as a form of advance-fee fraud in which a victim is asked to pay money upfront for the chance to receive a much larger sum later. The advisory supplies consumer guidance; it is not a statute, regulation, judicial decision, or command of Doc. 177. Its description may provide an investigative comparison, but the label "recovery fraud" cannot replace proof of the actual transactions or of a clear-command violation.

The admitted documents also show materially different transactions. Doc. 978-14 states that "[a] balance remains due on your Attorney-Client contract," requests payment or arrangements with the Treasurer, and offers payment plans. Doc. 978-4 explains that the fifteen-percent recovery fee was calculated after two Receivership refunds had been received, with prior payments credited against the balance. It also describes earlier 2.5-percent contributions used to finance legal assistance before any Receivership distribution. Thus, not all challenged payments fit a single paradigm of an upfront fee paid merely for the chance of a future recovery.

The communications were strongly optimistic, but they also acknowledged contingency. Doc. 978-3 states that the case "may never reach a jury" and "might be settled," conditions contemplated compensation on "a favorable settlement or restoration," and describes a settlement from which lenders "**may** benefit." Doc. 978-4 describes the desired "100 percent" recovery but later identifies three possible appellate outcomes: dismissal (characterized as "highly unlikely"), remand for trial, or affirmation of the judgment. These statements may have encouraged expectations of further recovery; they do not establish that recovery was represented as assured.

The CFTC later advised the Court that it had reviewed the Receiver's filings and new evidence, conferred with him and his counsel, and contacted federal criminal law enforcement, but that the identified conduct appeared likely outside

the Commission's jurisdiction. (Doc. 896.) That does not establish lawfulness or nonfraudulence, and DaCorta does not offer agency inaction as an adjudication on the merits. The more limited point is that the agency whose advisory supplied the phrase did not convert the Receiver's characterization into a CFTC enforcement charge or determination after reviewing the material presented to it. Even if a particular Helpers communication were found misleading, contempt by DaCorta still requires proof that he personally authored, directed, approved, transmitted, or otherwise participated in conduct prohibited by a clear command of Doc. 177. The label cannot supply that missing respondent-specific connection.

## IV. THE GOLD AND CREDIT-CARD EVIDENCE DID NOT ESTABLISH RECEIVERSHIP PROPERTY, MISAPPROPRIATION, OR CONDUCT BY DACORTA.

As Section I establishes, the $322,000 in IPM purchases occurred in September 2021 and March 2022, before any Receivership distribution. IPM records and Davis's testimony establish that gold was purchased and delivered to "a representative of the trust." They do not establish that DaCorta purchased the gold, received it, possessed it, directed its purchase, controlled its disposition, knew of it, or knew its subsequent location.

Perez characterized the transaction as appearing to be "a straight theft" and said the coins had "simply disappeared out the back door." (Aug. 7 Hr'g Tr. at 12.) Those were characterizations, not additional evidence. The record establishes purchase and delivery to a representative of The Trust LLT and that the present

location was not established at the hearing. It does not establish theft or conversion by DaCorta. Nor does uncertainty about later disposition prove the antecedent proposition that the gold belonged to the Receivership. The Receiver's decision to investigate the gold and the procedural mechanisms used to obtain records may establish the seriousness of his inquiry; they do not themselves establish a property right in the asset being investigated.

The credit-card evidence has the same defect. The reconstruction identifies $158,883 paid to Discover and $27,459 to Bank of America. Davis testified that the records did not identify whose cards they were. Describing those payments as "unaccounted for" therefore reflects the limitation of the reconstruction, not proof that the expenditures were illegitimate. The same reconstruction identifies substantial legal and administrative expenditures for Westlaw, printing, CaseText, Cloud Carpenter, USPS, FedEx, and attorneys, demonstrating that The Trust LLT was making legal and litigation-related expenditures during the same period. Identification of a credit-card issuer as immediate payee does not establish the nature of the underlying goods or services. The Receiver introduced no evidence that DaCorta held either credit-card account, incurred or directed the charges, authorized payment, or received the goods or services purchased. An unexplained payment from The Trust LLT does not become a Receivership violation merely because the Receiver's reconstruction could not determine its purpose.

The Receiver cannot reverse the required order of proof by treating unexplained third-party transactions as evidence that the property must have belonged to the Receivership and then treating the resulting uncertainty as evidence that DaCorta violated Doc. 177.

## V. THE ATTORNEY-CLIENT AGREEMENTS AND COLLECTION NOTICES DO NOT ESTABLISH COERCION OR A VIOLATION OF DOC. 177.

Receiver's Exhibit 90 (Doc. 978-98) identifies the Law Offices of Brent Allan Winters as "Attorney" and the individual signatory as "Client." Its scope includes proceedings affecting the Client or the Client's property in this action, appeals, and derivative proceedings, rather than merely preparation of Proofs of Claim or creation of the Receiver's distribution fund. Section III states that the services are not pro bono, characterizes payments from the Client Fund as compensation for services, and establishes installment payments and a pooled Services Fund from which litigation costs may be drawn. Section IV authorizes litigation expenses considered reasonably necessary in counsel's professional judgment. Whatever dispute may exist over a particular balance or enforceability, the Agreement supplies the asserted contractual basis for payment; the documents do not support treating every request for payment as an attempt to collect money for which no contractual obligation had ever been undertaken.

The collection language introduced at the hearing was conditional. The Reynolds communication states that a balance remains due, asks the recipient to pay or make arrangements with the Treasurer, offers monthly payments "to fit your budget needs," and says default "may require placement with a collection agency." (Receiver's Ex. 1; Aug. 7 Hr'g Tr. at 37.) Devine testified that Reynolds feared being taken to collections and having her credit damaged, but the admitted communication contains no statement that her credit would be reported or damaged. It does not state that the account had been or would certainly be referred to collections or that collection proceedings had begun. Exhibits 11 and 12 (Doc. 978-13 and 978-14) likewise state that nonpayment "may result" in termination or collection procedures or "may require" placement with a collection agency. (Receiver's Exs. 11–12; Aug. 7 Hr'g Tr. at 69–70). Describing a possible consequence of default under a claimed contractual obligation is not, without additional proof, equivalent to coercion or extortion.

The Agreement also contains a section entitled "Termination and Withdrawal" providing that "either party may terminate this Agreement at any time" by written notice, while specifying financial consequences and substitute-counsel requirements where litigation is pending. Those provisions do not mean that termination extinguishes an accrued contractual obligation, but they do show that the representation itself was not drafted as irrevocable. Devine testified that he signed an Agreement, made payments, then stopped paying and "bowed

out." (Aug. 7 Hr'g Tr. at 29-33.) The Receiver identified no collection judgment or completed collection proceeding against Devine, Reynolds, Gullo, London, or any other party to the Agreement. The evidence therefore establishes asserted balances, efforts to obtain payment, warnings of possible consequences, and recipients who objected to or feared those efforts. It does not establish that a threatened collection consequence was actually imposed upon the identified lender-clients.

The Receiver's own financial evidence also shows substantial expenditures for the legal activities contemplated by the Agreements: $110,533 to Kurpiers, $75,450 to Preziosi, and additional amounts for Westlaw, printing, CaseText, Cloud Carpenter, USPS, and FedEx. (Receiver's Ex. 98, Ex. B.1.) The fact that the Receiver marshaled the money distributed through the Receivership does not establish that these separate legal services were fictitious.

Finally, the evidence did not connect collection activity to DaCorta. It did not show that he drafted the Agreement, determined a lender balance, prepared an invoice, instructed McKee to establish payment plans, placed an account in default, referred an account to collections, or directed a collection proceeding. Even an unduly aggressive communication by someone else would not itself establish contempt by DaCorta.

## VI. THE RECEIVER'S HISTORICAL "NO OBJECTION" NARRATIVE IS DEMONSTRABLY INCOMPLETE.

Wiand testified that, if anything was wrong with his claim determinations, "these purported lawyers" had "never made one objection" and that no objection had been made to the Court-approved net-loss treatment. (Aug. 7 Hr'g Tr. at 85-86, 101.) The docket establishes otherwise.

When the Receiver sought approval of his Claims Determination process in Doc. 439, DaCorta opposed it in Doc. 445, arguing that the Receiver had no right to compensate creditors using property attributed to DaCorta; the Receiver responded in Doc. 448. DaCorta then filed his pro se Motion to Dismiss Receiver (Doc. 447), directly challenging the Receiver's authority to seize and liquidate property. His December 2021 Motion to Dismiss the underlying action (Doc. 454) disputed the commodity-pool theory, lender classification, CFTC jurisdiction, insolvency, and the Ponzi characterization. A January 2022 sworn declaration addressed the circumstances surrounding his execution of the 2019 consent upon which the permanent Receivership was based. (Doc. 464-1.) After the stay was lifted, DaCorta, through Kurpiers, again challenged the action in the Second Motion to Dismiss (Doc. 663), again disputing insolvency, the Promissory Note and Loan Agreement structure, commodity-pool status, and CFTC jurisdiction. The Court rejected or denied those challenges, but their lack of success does not erase their existence.

The Receiver's own later filings also state that his December 2022 distribution motion sought to overrule "limited objections to certain claim determinations" and acknowledge objections to the recommendation approving the first interim distribution. His reports identify six claimants for whom Kurpiers filed objections: Casey Utter, Michelle Utter, Robert Parker Utter, Henry Fuksman, John Paniagua, and Lance Wren. Whether those objections were timely, persuasive, or correctly decided is not the present issue. The factual point is that objections existed. (Doc. 845 at 50; Doc. 800 at 14 n.7.)

An unsuccessful objection remains an objection. The Court should determine whether DaCorta personally violated Doc. 177 from the acts proved at the hearing, not from a historical premise that no contrary position had ever been asserted.

## VII. THE RECEIVER'S PONZI-SCHEME AND INSOLVENCY TESTIMONY DID NOT ESTABLISH THE PARTICULAR FINANCIAL PROPOSITION ASSERTED.

The Receiver relied in part on Helpers statements that Oasis was bona fide and solvent. Wiand testified that CFTC filings and reports from Davis and Kapila showed insolvency and referred generally to amounts raised, obligations, remaining assets, losses, and accruing interest. (Aug. 7 Hr'g Tr. at 99-100, 104-06.) When confronted with the proposition that balance sheets could demonstrate ability to meet obligations, however, he did not identify a balance sheet or

perform an asset-liability comparison; he reiterated that Oasis was insolvent and a scam.

That testimony states Wiand's conclusion, but does not identify the balance-sheet analysis establishing the particular financial proposition he was asked to refute.

The solvency position also was not invented as part of the later challenged fundraising. In August 2022, DaCorta, through Kurpiers, alleged in the Second Motion to Dismiss that Oasis was neither insolvent nor about to become insolvent and had not failed to meet a lawful financial obligation. (Doc. 663 ¶¶27, 80.) The filing also relied on Promissory Note and Loan Agreements and risk disclosures.

The Court need not decide solvency in this contempt proceeding. The narrower point is that later statements repeated a position previously placed openly before the Court, while the hearing testimony offered to establish its falsity did not identify the balance-sheet analysis necessary to resolve that particular proposition. Disagreement with a previously asserted litigation position does not, without more, establish that its later repetition was a knowingly false representation, an act of conspiracy, or conduct prohibited by Doc. 177.

## VIII. MATERIAL FACTUAL MISSTATEMENTS DURING THE HEARING SHOULD NOT BECOME FINDINGS OF FACT.

Several hearing descriptions are contradicted or materially qualified by the record and should not be incorporated into findings without correction.

First, Perez stated that Kurpiers "filed a motion to dismiss and a motion for summary judgment which is on appeal." (Aug. 7 Hr'g Tr. at 13.) In fact, the CFTC and DaCorta filed cross-motions for summary judgment on July 17, 2023. (Docs. 749, 750.) The Court granted the CFTC's motion and denied DaCorta's in Doc. 780. DaCorta appealed the adverse judgment; the Receiver's own later report states that "DaCorta appealed this Court's order granting the CFTC's motion for summary judgment against him." The distinction matters because findings in this contempt proceeding should not rest upon a description of Kurpiers's denied motion as though it were the operative judgment under review. (Doc. 889 at 5.) Second, Perez identified as alleged harassment or interference the representation that claimants could receive a full recovery associated with approximately $700 million in losses if they funded DaCorta's defense. (Aug. 7 Hr'g Tr. at 112.) But the approximately $700 million damages figure was not first devised in those later communications. DaCorta's December 16, 2021 filing (Doc. 454 ¶ 123 & Ex. D.) asserted aggregated losses of $702,624,141 and attached an "Aggregate Losses" exhibit itemizing the calculation. The correctness of that calculation and the accuracy of later representations about who might recover are separate questions. The filing history establishes only that the approximate figure had been publicly asserted in this case since 2021 and should not be treated as a later fabrication created for fundraising.

These corrections do not require reconsideration of earlier rulings. They require only that findings from this hearing distinguish the underlying record from descriptions of it in testimony or advocacy.

## IX. THE RECEIVER'S USE OF "INVESTOR" ASSUMES A DISPUTED CLASSIFICATION AT ISSUE IN DACORTA'S ELEVENTH CIRCUIT APPEAL.

The Receiver repeatedly described persons who supplied funds to Oasis as "investors" and later payments to The Trust LLT as "investor" money. The Oasis contractual documents in the record use materially different language. The Agreement and Risk Disclosures document describes a "Loan Account," calls the undersigned person "Lender," defines a "Short-Term Unsecured Loan," states that "Lender is loaning Oasis money," and provides that on insolvency the lender would be a general creditor. It repeatedly uses the terms principal, interest, loan, withdrawal, and Promissory Note and Loan Agreement. It also authorizes Oasis to "sell, pledge, rehypothecate, assign, invest, commingle and otherwise use any money loaned to it by Lender," reflecting broad company control over money supplied under the documents. (Doc. 911-1 at 30–32; see also Doc. 750-1 at 4–5.)

The classification issue is expressly presented in DaCorta's appeal, including whether the loan and risk-disclosure documents created an arrangement under which Oasis traded on its own behalf rather than on behalf of lenders, and whether Oasis constituted a commodity pool and DaCorta an associated person

of a commodity-pool operator. The appellate brief specifically challenges the district court and CFTC practice of referring to the lenders as "investors" notwithstanding the contractual loan terminology. (Doc. 911-1 at 27–32.) The issue here is not how the Eleventh Circuit will resolve those questions. It is that the Receiver's preferred terminology cannot itself become evidentiary proof. Calling contributors "investors," "victim-investors," or their later payments as "investor funds" does not establish that they were commodity-pool participants, that Oasis traded their funds on their behalf, nor that money they later independently supplied under Attorney-Client Agreements was property of DaCorta or the Receivership. This matters particularly where the terminology is then used to move from "investor money" to "victim money" and from there to an assumed property interest in later Trust payments. Findings can describe the proved acts - signing Oasis loan documents, submitting claims, receiving distributions, or later paying funds under Attorney-Client Agreements - without resolving disputed appellate classifications unnecessarily.

The Receiver cannot establish a disputed legal classification by nomenclature and then use that classification as a factual premise for contempt.

## X. PROPOSED FINDINGS OF FACT

DaCorta respectfully proposes the following findings of fact limited to matters material to the Receiver's request for civil contempt:

1. The Certification of Trust for The Trust LLT identifies Susan Winters as Settlor, Jason McKee as Trustee, Greg Melick as Successor Trustee, and Melick, IPM Trust, McKee, and Perfect Estate Trust as beneficiaries. DaCorta is not identified as settlor, trustee, successor trustee, beneficiary, signatory, or person possessing transactional authority over The Trust LLT. Mr. Wiand testified to substantially the same trust structure at the hearing.

2. The Attorney-Client Representation Agreement identifies the individual lender as the Client and the Law Offices of Brent Allan Winters as Attorney. It establishes individual Client Funds, pools those funds into a Services Fund, characterizes payments as compensation for legal services, and authorizes payment of litigation expenses from the Services Fund. The Agreement does not identify DaCorta as a party or give him authority to possess, withdraw, or direct disposition of those funds.

3. Receiver's Exhibit L reflects $426,592.47 in cumulative lender payments to The Trust LLT through August 22, 2022. The Court authorized the first interim Receivership distribution on March 15, 2023, and the Receiver mailed the first distribution checks on April 6, 2023.

4. The $322,000 used by The Trust LLT to purchase precious metals from IPM and the first $100,000 paid to Ronald Kurpiers were paid before the first Receivership distribution. The gold purchases occurred in September 2021 and March 2022; the first two $50,000 Kurpiers payments occurred in August and

November 2022. Those transactions therefore did not consist of Receivership distribution proceeds.

5. Melissa Davis was not asked to trace the sources from which individual contributors obtained the money they contributed to The Trust LLT. Asked whether she had been directed to perform that tracing, Davis answered, "No." (Aug. 7 Hr'g Tr. at 48.)

6. Davis's reconstruction identified payments of $322,000 to IPM, $110,533 to Kurpiers, $75,450 to Preziosi, $158,883 to Discover, and $27,459 to Bank of America, together with expenditures for Westlaw, printing, CaseText, Cloud Carpenter, postage, and other items. (Receiver's Ex. 98, Ex. B.1.)

7. IPM's records reflected that the precious metals were delivered to a representative of The Trust LLT. The hearing evidence did not identify DaCorta as that representative. Davis also testified that the records did not identify the owners of the Discover and Bank of America credit-card accounts. (Aug. 7 Hr'g Tr. at 54.)

8. The evidentiary record did not identify DaCorta as an owner or authorized user of The Trust LLT bank account; as possessing withdrawal authority; as a signatory on a Trust check; as having directed the IPM purchases; as the recipient or possessor of the gold; as the holder of either credit-card account; or as having authorized a particular Trust disbursement.

9. Tim Devine testified that he had no factual knowledge that DaCorta communicated with or through Melick concerning the challenged conduct and did not know one way or another about DaCorta's involvement. (Aug. 7 Hr'g Tr. at 45.)

10. When DaCorta asked Wiand what evidence made him a respondent, Wiand identified emails that had reached DaCorta, the legal benefit DaCorta received, and attorney fees expended for his representation. He did not identify in that answer a particular Trust transaction directed or authorized by DaCorta. (Aug. 7 Hr'g Tr. at 119-20.)

11. Receiver's Exhibits 58, 65, and 80 establish communications of materially different character. Exhibit 65 contains an August 2021 email from DaCorta asking Melick to consider whether a 2017 Outlook should be redistributed. Exhibit 58 was authored by Melick and sent to Michele Utter; DaCorta was neither sender nor recipient. Exhibit 80 was authored by Melick and included DaCorta among its recipients but contains no response or statement authored by him. None identifies a particular disbursement by The Trust LLT directed by DaCorta.

12. The collection communications introduced at the hearing described collection as a possible consequence of asserted contractual default. The pertinent language stated that default "may require placement with a collection agency." The

Receiver identified no completed collection proceeding or collection judgment against Devine, Reynolds, Gullo, London, or another party to the Agreement.

## XI. PROPOSED CONCLUSIONS OF LAW

1. A party seeking civil contempt bears the burden of proving by clear and convincing evidence that the alleged contemnor violated an outstanding court order. The proof must establish that the order was valid and lawful, that the pertinent command was clear and unambiguous, and that the alleged contemnor had the ability to comply. *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992); McGregor v. Chierico, 206 F.3d 1378, 1383 (11th Cir. 2000).

2. An order is subject to reasonable interpretation but may not be expanded beyond the meaning of its terms absent notice and an opportunity to be heard. *Riccard v. Prudential Ins. Co. of Am.*, 307 F.3d 1277, 1296-97 (11th Cir. 2002); *Georgia Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007).

3. The contempt inquiry is whether proved conduct violated a clear command of Doc. 177. Conduct that might be objectionable or actionable on an independent ground does not itself establish contempt if it was not prohibited by the Order. *Riccard, 307 F.3d at 1296-97.*

4. Paragraph 31.D therefore cannot support contempt merely because conduct was characterized as interference. The Receiver was required to prove both that

particular conduct fell within a clear prohibition and that DaCorta personally engaged in conduct violating it.

5. The Receiver did not establish by clear and convincing evidence that the independently supplied lender funds at issue were property of DaCorta or Receivership Property. The evidence did not establish that payment under an Attorney-Client Agreement, deposit into The Trust LLT, or later expenditure for legal services transferred to DaCorta an ownership, possessory, or beneficial interest in those funds.

6. Because the necessary property nexus was not established, the challenged pre-distribution payments for precious metals and legal services do not establish that DaCorta transferred, dissipated, concealed, or otherwise disposed of property subject to the asset freeze. The same deficiency applies to the credit-card payments whose owners and purposes were not established.

7. Civil contempt requires respondent-specific proof. Association with persons engaged in challenged conduct, awareness of communications, or receipt of a benefit from activity performed by others does not by itself establish that the respondent personally violated the Order. *McGregor*, 206 F.3d at 1383-84. The Receiver did not establish by clear and convincing evidence that DaCorta controlled The Trust LLT, directed a challenged disbursement or IPM purchase, possessed the gold, determined lender balances, prepared collection notices, or directed collection proceedings.

8. The Court may draw an appropriate adverse inference from DaCorta's invocation of the Fifth Amendment when his silence responds to probative evidence, but that inference does not substitute for evidence necessary to satisfy the Receiver's burden of production. *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991); see *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). The inference therefore cannot itself supply otherwise missing evidence that DaCorta owned or controlled The Trust LLT funds, directed particular transactions, or participated in acts alleged to violate Doc. 177.

9. Characterizing the conduct of multiple persons as coordinated, conspiratorial, or undertaken for DaCorta's benefit does not reduce the Receiver's burden to establish a clear-command violation by DaCorta himself. *McGregor* requires individualized proof connecting the alleged contemnor to prohibited conduct. 206 F.3d at 1383-84.

10. The labels "recovery fraud," "investor," "victim," or "interference" do not themselves establish an element of civil contempt. To the extent those terms depend upon disputed factual or legal propositions, the underlying facts necessary to establish a violation of Doc. 177 must be proved rather than assumed through nomenclature.

11. On the evidentiary record presented at the August 7, 2026 hearing, the Receiver did not prove by clear and convincing evidence that DaCorta violated a clear and unambiguous command of Doc. 177. The Order to Show Cause should

therefore be discharged as to DaCorta, and the request to hold him in civil contempt should be denied.

## XII. RELIEF REQUESTED

For the foregoing reasons, DaCorta respectfully requests that the Court:

1. Discharge the Order to Show Cause as to Michael J. DaCorta and deny the Receiver's request to hold him in civil contempt;

2. Deny as to DaCorta additional restrictions upon communications, solicitation, acceptance of funds, or other conduct not established to violate a clear and unambiguous command of Doc. 177;

3. Deny as to DaCorta requests for an accounting, production of property, disgorgement, coercive fines, fees, costs, or other monetary relief where the Receiver has not established either a contempt violation by DaCorta or the property nexus upon which the relief depends;

4. Refrain from making findings concerning lender-versus-investor status, commodity-pool status, CFTC statutory authority, or other issues presented in DaCorta's Eleventh Circuit appeal except to the extent indispensable to resolution of contempt; and

5. Grant such other relief as the Court deems just and appropriate.

Respectfully submitted,

/s/ Michael J. DaCorta
Michael J. DaCorta, pro se
BOP Register No. 73181-018
Currently confined at:
Pinellas County Jail
Clearwater, Florida
Date: August 21, 2026

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 21, 2026, a true and correct copy of the foregoing was served via electronic mail upon:

Jared J. Perez, Esq.
Counsel for the Court-Appointed Receiver
jared.perez@jaredperezlaw.com

/s/ Michael J. DaCorta
Michael J. DaCorta, pro se