**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

Case No. 8:19-cv-886-VMC-SPF

v.

OASIS INTERNATIONAL GROUP, LIMITED ET AL.,

Defendants.
____________________________________ /

# ORDER

This cause comes before the Court on the Receiver's Verified Motion for an Order to Show Cause Why Respondents Should Not Be Held in Contempt for Failure to Comply with the Court's Orders (Doc. 904) and the Court's Order to Show Cause (the "**Show Cause Order**") (Doc. 927), which required Michael DaCorta, Greg Melick, Jason McKee, and Brent Winters (collectively "**Respondents**")[1] to appear before the Court and show cause as to why they should not be held in contempt for violating the Consolidated Receivership Order entered July 11, 2019 (the "**Consolidated Order**") (Doc. 177).

[1] The Show Cause Order has since been discharged against former Respondent Stephen Preziosi. (Doc. 957).

None of the Respondents filed a response to the Receiver's Motion. On August 7, 2026, a show cause hearing was held at which the Receiver offered the testimony of Tim Devine, Melissa Davis, and Burton Wiand, as well as 98 exhibits. Respondent Michael DaCorta appeared at the hearing but did not present any evidence. Melick, McKee, and Winters did not attend the hearing. For the reasons that follow, Respondents are found in civil contempt for violation of the Consolidated Order.

## FINDINGS OF FACT

### I. THE OASIS HELPERS GROUP IS A COMMON ENTERPRISE FORMED BY RESPONDENTS WITH A SHARED GOAL

1. Respondents formed the Oasis Helpers Group (the "**Helpers Group**") in 2020, shortly after the collapse of the underlying scheme. Ex. 27 at 8:19-25 (Michele Utter testifying that, at the time Helpers Group was formed, Melick was the leader, and Winters and McKee were also involved); Tr. at 22:8-20 (Tim Devine testifying as to Melick's creation of the Helpers Group); Tr. at 129:14-129:5, 131:8-23 (DaCorta invoking the Fifth Amendment in response to questions about his involvement in the Helpers Group and as to whether he directed Melick to raise money from investors for DaCorta's legal fees). The initial purpose of the Helpers Group was to assist investors in Receivership

Entities[2] to gather information with the promised goal of recovering all of the investors' losses. Ex. 27 at 8:19-25; *see also* Tr. at 22:23-23:4 ("Well, basically it was put forth that, you know, the [R]eceiver and the Government came in and took down this company and it wasn't right, and that Mr. DaCorta had done nothing wrong, and that Oasis was a great company. And so that was what was portrayed to people that had money invested, and they organized themselves and wanted to march forward and overturn this thing.").

2. The purpose of the group "evolved" over time (Tr. 22:18-20), and today, it focuses on reversing the civil and criminal judgments against DaCorta on the false promise that accomplishing that end will force the "government" to pay DaCorta hundreds of millions of dollars in damages, which DaCorta promises to share with investors who financially support his efforts. *See* Tr. at 21:20-23 ("The Oasis Helpers Group is a group of people headed up by Greg Melick to essentially try to overturn the judgment against Mr. DaCorta with the hope that everybody that had money invested will be made whole."); Ex. 10 at 4 (July 19, 2024, email from Melick stating: "NOTICE: Some people are under the false assumption that if Michael wins the civil case that all lenders will be compensated as a result and for that reason, they haven't contributed anything to his defense. That's not how it works. As we've explained many

[2] The "**Receivership Entities**" consist of the corporate defendants and relief defendants. Doc. 177 at 3.

times, Michael DaCorta is the only defendant left contesting the Summary Judgment awarded to the CFTC last December, and only those with Attorney-Client Agreements have made possible a winning defense for him. . . . Consequently, the rewards of a win will justifiably belong to Michael DaCorta. Since the Court specifically stated that lenders have no standing in the case, Michael has agreed to compensate those like you who help him prevail.").

3. At its height, the Helpers Group had at least 400 members, the vast majority of whom were investors in the Oasis scheme. Ex. 27 at 14:1-10 ("We had 400 members involved in the group."); Ex. 30 at 3 (February 6, 2021, Lender Update describing "a closely networked group . . . with over 500 people in it"). Melick and the other Respondents told investors they needed to join the Helpers Group because they could not hope to recover anything on their own. *See* Tr. 34:23-35:5 ("[T]hroughout the time of . . . the Oasis Helpers Group, they had portrayed a message that you can't fight this alone. In other words, if you do not join us and you do try to fight it on your own, No. 1, you don't have the finances, you don't have the resources, and you're going to get squashed.").

4. Respondent **Greg Melick** is the leader of the Helpers Group. Ex. 27 at 9:19-25 ("Well, when it was first put together I would say that Greg Melick was the leader."); *see also* Tr. 22:2 (identifying Melick as a leader); Tr. 26:25-27:4 ("It was Greg. Greg spearheaded the Helpers Group. He was the one that hired Mr. Winters. He was the one that had recruited Jason McKee. He

was the one that brought in Abe Cofnas, the trading expert. He was the one that, you know, organized the emails and the phone calls and all that.").

5. He is also a beneficiary of the Trust, LLT (the "**Trust**") as well as its successor trustee. *See* Ex. 14 at p. 671 (Certificate of Trust). As described in Section III.B, the Trust was the primary mechanism by which Respondents raised more than $800,000 "derived from" investors. *See* Exs. 22, 98.

6. Melick did not personally invest in the Oasis scheme (Tr. 27:5-9), but his ex-girlfriend, Bonnie Remick, did. Ex. 27 at 11:4-13. She contributed to the Trust and also played a material role in retaining attorney Stephen Preziosi to represent DaCorta by writing the former a check for $80,000 as a "bridge loan." *See* Ex. 23 ¶¶ 5-6. The Trust repaid her at least $61,000. *See id.*; Ex. 21 at 1003, 1010, 1013; Ex. 22.

7. Melick drafts "Lender Updates" that are periodically distributed to the group's members. Ex. 27 at 15:5-11 ("Almost all of them were drafted by Greg Melick."); *see also id.* at 26:16-29:22 (describing Exhibits 28 through 48 as Lender Updates drafted by Melick sent to the 400 members of the Helpers Group); Tr. 42:23-24 (identifying Melick as the author of the Lender Updates). He set up the email address OasisHelpers@oasisreplevin.net "to communicate with the group and send updates and things like that." Ex. 27 at 32:15-21.

When Michelle Utter[3] left the Helpers Group, Melick continued to use her name on emails in an attempt to appropriate the trust she built with the community. Ex. 27 at 59:7-60:8; *see also* Ex. 85; Ex. 88 at 1 (March 16, 2024, email from Devine, stating: "Hey guys – Just got another email from Greg. Making it look like it's coming from Michele."); Tr. 30:14-31:5 ("Greg was sending out emails and not getting the responses he was looking for, so he used Michele's name because Michele had a ton of credibility with people and she is somebody that people respect."). As described herein, the Lender Updates are chock full of outrageous misrepresentations and falsehoods. *See infra* § IV.

8. Respondent **Jason McKee** is the Treasurer of the Helpers Group. Tr. 69:14. "He would talk to a lot of people on the phone and take phone calls about worried investors or lenders." Ex. 27 at 10:3-5. He sends invoices to members to collect amounts due under bogus Attorney-Client Representation Agreements. *See* Ex. 6 at 11:17-21; *see also* Exs. 10, 11. If they cannot or will not pay, he threatens them with collections. *See infra* § III.C. He is both the current trustee of the Trust and also a beneficiary along with Melick. *See* Ex. 14 at 671 (Certificate of Trust).

[3] *See* Tr. 77:4-8 ("Michele Utter is a woman who lived in New York State and she was the personal assistant for a gentleman named Raymond Montie who was one of the initial defendants in the civil case, and she was his personal assistant and arranged all of his contacts with people.").

9. Respondent **Brent Winters** is an attorney and a convicted felon. Doc. 934-5 at 4. He markets himself as "The Common Lawyer." Members of the Helpers Group initially paid Winters $60,000 to submit their claims as their "Power of Attorney." *See infra* ¶¶ 21, 22.

10. Winters subsequently required members of the Helpers Group to execute Attorney-Client Retainer Agreements. *See, e.g.,* Ex. 90; Ex. 60 (March 9, 2021, email to investors, stating: "[A]ttorneys can't work for free so it's time to officially retain Brent to legally represent you in court . . . if you want his help in recovering your funds."). Respondents misled investors by suggesting that Winters could recover their funds through a class action lawsuit or "a RICO case against those who have offended investors' interests" (Ex. 50 at 1) and made numerous misrepresentations about DaCorta, Oasis, the CFTC, and the Receiver. *See infra* § IV. Despite filing no lawsuits and recovering no money, Winters is using the Attorney-Client Retainer Agreements to collect 15% of the money the Receiver distributed to investors through the claims process. *See infra* § III.B.

11. Winters also represents Michael DaCorta. *See, e.g.,* Ex. 24 at 8. In other words, he simultaneously represents both DaCorta and the investors DaCorta has been criminally convicted of defrauding. Finally, Winters has conducted business through his wife, Susan Winters, who is the settlor of the

Trust. *See* Ex. 14 at 671 (Certificate of Trust); Ex. 27 at 12:2-12 ("So I think she did paperwork and recordkeeping. Anything Brent would need her to do.").

12. Winters purportedly used Melick as his paralegal, despite Melick having no known formal training in that field. *See* Ex. 27 at 60:12-61:9; Ex. 85 at 1 (April 24, 2022, email signed by Melick as a "paralegal for Attorney Brent Allan Winters"); Ex. 23 at 26-35 (Preziosi privilege log identifying Melick as a paralegal).

13. Respondent **Michael DaCorta** knowingly and willingly accepted the fruits of the other Respondent's recovery fraud. *See, e.g.*, Ex. 58 (November 30, 2020, email from Melick asking Utter to circulate a plea soliciting funds to pay for DaCorta's legal fees and to send the money to DaCorta's wife due to the asset freeze); Tr. 123:8-11 ("This to me just confirms what the obvious is, that he was a beneficiary of all of this conduct and that through the court filings, the emails and everything he was aware of what these co-conspirators were doing."). DaCorta allowed Winters, Preziosi, and Kurpiers to represent him, but he never paid any of those lawyers a dime of his own money. *See infra* § III.E (establishing independent funding sources for lawyers); *see also* Tr. 127:24-129:22 (DaCorta invoking the Fifth Amendment in response to questions about if he paid Winters, Kurpiers, and Preziosi with his own funds or if he instead relied on Melick and the Helpers Group to raise money from Oasis investors). In fact, DaCorta has both criminal and civil judgments or

restitution orders against him exceeding $50 million each. *See* Doc. 781; *United States v. Michael J. DaCorta*, Case No. 8:19-cr-605-VMC-CPT at Doc. 234.

14. DaCorta communicated with members of the Helpers Group through Melick and also used Melick to circumvent the Court's asset freeze. *See* Ex. 27 at 19:5-24 ("I know that Greg communicated with him. . . . He had mentioned it before. I don't know how they communicated it if it was through email or phone, but I did hear him mention before that he had spoken to Mike DaCorta."); *id.* at 49:14-50:2 (testifying it "became apparent" Melick and DaCorta were communicating); Tr. 122:7-9 ("He's absolutely telling him to put out bogus information about what he had done to these people so that they could be deceived."); Ex. 58 at 3 (attempting to circumvent the asset freeze by asking investors to send money to DaCorta's wife); Ex. 65 at 1 (August 18, 2021, email from DaCorta asking Melick to send a document DaCorta drafted "to the group to remind them we were on the correct course"); Ex. 71 (March 19, 2022, email from Melick updating DaCorta about the progress of the website); Ex. 76 (April 11, 2022, email from Melick to DaCorta with links to the template "Notice & Objection" documents); Ex. 80 (April 14, 2022, email from Melick to DaCorta about imagined impact of "Notice & Objection" documents on Clerk's office); Ex. 87 (December 22, 2023, email asking Utter to circulate DaCorta's autobiography and to invite investors to "read it with his consent"); Tr. 129:23-130:5 (DaCorta invoking the Fifth Amendment with

respect to questions: (1) "And you knew that Greg Melick was in touch with a group of Oasis investors, right?" and (2) "And you directed Greg Melick to send information to those investors on your behalf, did you not?"); Tr. 131:8-23 (same regarding membership in Helpers Group, knowledge of Court filings, and regular communication "with Greg Melick regarding the Oasis Helpers group and its activities").

## II. RESPONDENTS HAD ACTUAL NOTICE OF THE COURT ORDERS THEY VIOLATED

15. To make people aware of the Court's orders, the Receiver maintains a website located at www.oasisreceivership.com. Respondents regularly scrutinize that website. *See, e.g.,* Ex. 68 (December 17, 2021, email from Melick to members of the Helpers Group, stating: "The Receiver is now posting more of the [C]ourt filings on the Oasis Receivership website.")

16. The provisions the Respondents are accused of violating are contained in the Court's statutory restraining order (the "**SRO**"), preliminary injunctions, and Consolidated Order. *See* Docs. 7, 44, 177.

17. Respondents had actual notice of these documents. *See, e.g.,* Ex. 8 at 26:15-21 (Transcript of YouTube video in which Winters and Melick discuss the Consolidated Order); Ex. 44 at 4 (Autumn 2023 Lender Update discussing SRO and preliminary injunctions); Tr. 63:9-64:5 ("I think they have websites where they placed up orders and court documents regularly, it's very clear from

all this stuff they sent out that they had regular actual notice of everything in the court file.").

## III. RESPONDENTS VIOLATED THE ASSET FREEZE

18. Respondents violated the asset freeze in three primary ways. First, they raised money "derived from" Oasis investors for Michael's DaCorta's benefit – specifically, to pay his legal fees. Second, Winters imposed a private levy of 15% of the distributions the Receiver made to the investors pursuant to a bogus Attorney-Client Representation Agreement. Third, they misappropriated more than $500,000 of the money "derived from" investors by using it to buy gold coins and to pay exorbitant credit card bills.

### A. Respondents' First Two Attempts to Raise Money from Investors for Abe Cofnas and the Claims Process

19. Shortly after the collapse of the Oasis scheme, Melick raised money from investors to hire a purported foreign exchange trader named Abe Cofnas. *See* Tr. 22:10-17 ("Greg had organized someone that was a trader in the same field of currency, Abe Cofnas, a friend of his, to sort of figure out what happened here."). Through two campaigns, the Helpers Group raised approximately $27,000 "derived from" many investors for Cofnas. *See* Ex. 52 at 1.

20. One of his tasks was to determine whether an account purportedly containing $113 million existed in the United Kingdon, but that account was

yet another of Melick's false promises. *See* Tr. 24:17-25:10 ("I mean, that money didn't exist and that was — that was a misunderstanding of what Greg had thought he understood[.]"); *id.* at 58:4-12 ("[H]e had the idea that there was $113 million in the accounts of the [R]eceivership, when, indeed, in actuality that was a balance in the account that was not an asset and that it was subject to a margin requirement, and the total assets in the account were a couple million dollars."). Despite his funding, Cofnas does not appear to have actually accomplished anything beneficial to investors-claimants, and he quickly faded from the case.

21. Next, Melick and the other Respondents began trying to raise $60,000 to retain Winters. Ex. 50 at 1. According to Melick, that money was intended "to fund Brent's initial efforts," which included corresponding with the Receiver, getting admitted *pro hac vice* in the Middle District of Florida, familiarizing himself with the facts of this matter, exploring a class action lawsuit, and researching "a RICO case against those who have offended investors' interests." *See id.* Investors' payments were to be made directly to Winters. *Id.* at 2. According to Melick, "If [Winters] is unable to gain admission to the Florida court, can find no other venue open to him, and discovers that neither a Class Action suit, nor a RICO case is feasible, he will refund the majority of your retainer, less reasonable expenses for work already completed

on your behalf." *Id.* at 1. Of course, none of that materialized – especially the refunds. *See also* Exs. 52-55 (emails reporting status of fundraising efforts).

22. Instead of bringing RICO cases and class actions, Winters used the $60,000 the Helpers Group "derived from" investors to botch the claims process. As part of his efforts, Winters required investors who paid him to sign a Power of Attorney ("**POA**") Agreement and a Non-Disclosure Agreement ("**NDA**"). *See* Exs. 56 (templates) & 57 (instructions). He then used the POA Agreements to submit more than 400 altered claims to the Receiver. Although not relevant to this immediate issue, Winters's interference in the claims process cost the Receivership Estate significant time and resources. *See infra* § IV.C.

### B. Respondents' Third Attempt to Raise Money from Investors: The Trust and the Attorney-Client Representation Agreements

23. After burning through the initial $60,000 Winters and the other Respondents found themselves again in need of money. As such, they created the Trust on July 16, 2021. *See* Ex. 14 at 671 (Certificate of Trust). McKee is the trustee of the Trust, and Melick is the successor trustee. *Id.* McKee and Melick are also the Trust's nominal (if not constructive) beneficiaries. *Id.* Susan Winters, the wife of Winters, is the settlor of the Trust. *Id.* Respondents never explained why they decided to create the Trust instead of simply using

a regular bank account or other more transparent means. *See* Ex. 27 at 23:6-13.

24. By mid-July 2021 (Ex. 6 at 7:3-10), the Helpers Group had tired of relying on piecemeal contributions and thus resolved to launch a broader and more ambitious scheme. To that end, they terminated the POA Agreements and required clients to sign bogus Attorney-Client Representation Agreements (the "**ACR Agreements**"). *See* Ex. 90 (template ACR Agreement); *see also* Tr. 30:1-12 (authentication by Devine); Ex. 60 at 1-2 (July 7, 2021, email from the "Oasis Team" stating, "[w]ith or without a sponsor, attorneys can't work for free so it's time to officially retain Brent to legally represent you in court (which he can't do under Power of Attorney) if you want his help in recovering your funds" and directing investors to send their signed ACR Agreements to Melick). Of course, Winters has never appeared in this or any other Court on behalf of any claimant.

25. In the "Behind the Eight Ball" video[4] (Ex. 5), McKee explained the difference between the POA Agreements and the ACR Agreements as follows:

> HOPE: Could you explain what the difference is between the power of attorney agreement, the so called POA, that Attorney Brent Winters had with everyone who filed a claim through him back in 2020, and the attorney/client agreement he still has with most, but not all, of those same people? What's the difference?

[4] This video was hosted on a YouTube channel owned by Greg Melick. Tr. 61:8-19.

> JASON MCKEE: Yes. This seems to be a very confusing question for a lot of people. In the very beginning, we had power of attorney agreements to — for the claims process, and that was for the attorneys to be able to get in touch with the [R]eceiver and, that way, we had one point of contact with the [R]eceiver for hundreds and hundreds of people. So Mr. Winters, who is also an attorney, agreed to be our power of attorney, and from that, many of us signed power of attorney agreements, and that was, specifically, only for the claims process. Well, then, also, later on, Mr. Winters then made an attorney/client agreement with us where we've seen that there was a lot of problems with what was being submitted in the courts, and we felt like we might need a presence in the courtroom one day. So many, many, many of us — hundreds of us filed attorney/client agreements with Mr. Winters, and that's what we still have to this day.

Ex. 6 at 3:8-4:7; *see also id.* at 4:10-5:2 (explaining (1) the POA Agreements were terminated because the claims process is purportedly over, which is incorrect; (2) "the people who only had a power of attorney agreement or POA, their relationship with Mr. Winters is over;" and (3) "I highly consider [*sic*] everyone signing an attorney/client agreement with Mr. Winters"); Tr. 39:18-40:13 (identification of McKee by Devine and admission of video and transcript into evidence).

26. The "Scope of Representation" under the ACR Agreements is described as follows:

> Client hereby retains Attorney's legal representation to commence, prosecute, discontinue, or defend all actions or other legal proceedings touching upon Client's property, real or personal, or any part thereof, or related to any matter in which Client or Client's property, real or personal, may in any way be concerned with legal actions in *Commodity Futures Trading Commission v. Oasis International Group, LTD*; Oasis Management, LLC,

> Satellite Holdings Company; Michael J. DaCorta; Joseph S. Anile, II; Raymond P. Montie III; Francisco "Frank" L. Duran; John J. Haas; Defendants and/or Relief Defendants pursuant to Case Number 8:19-cv-00886-VMC-SPF in the United States District Court for Middle District of Florida, Tampa Division and to any appeal that may arise therefrom in any United States Circuit Court of Appeals or in the Supreme Court of the United States.

Ex. 90 at 1. This makes no sense because none of the investors are parties to this action. With minor exceptions not involving Winters, none of their claims have been litigated in this Court or on appeal. *See, e.g.,* Tr. 41:18-21. The scope of ACR Agreements does not include Michael DaCorta's summary judgment appeal or his *habeas corpus* petition. As a result, the bogus ACR Agreements represent nothing more than a dishonest bait-and-switch.

27. Compensation under the ACR Agreements consists of two components. First, there is a "Client Fund," which, in relevant part, equals 2.5% of each investor's claim amount, including principal and interest – *i.e.*, the amount the investor requested from the Receiver on his or her Proof of Claim Form during the Court-approved claims process. Ex. 90 at 3; *see also* Tr. 31:14-18 ("They calculated that based on the money that we had invested and the money we would have made. So, in other words, it was a fictitious amount because it was based on we had all that money in there, and had we earned all that, we had supposedly earned, it was a percentage of that figure."). This amount was collected in four installments. *See* Ex. 15 at 1 (bank statement

noting "1/4 retainer"); Ex. 38 (invoice for third of four payments due under 2.5% Client Fund); Ex. 88 (invoice for balance due).

28. In the "Behind the Eight Ball" video, McKee explained the Client Fund as follows:

> HOPE: How do the terms of the agreement dictate how much each client would have to pay under that contract with Mr. Winters?
>
> JASON MCKEE: This agreement . . . covered the need for legal funding in different two parts. In the beginning, everyone understood we needed a little bit more working capital up front, so we would have a little bit to get the ball rolling. So, collectively, our group agreed that we would pay two and a half percent of our entire claims amount, and our claim amount is the amount we originally invested plus interest earned up to the point of April of 2019. This was a totally voluntary contribution everybody made up front. Some people paid the whole two and a half percent up front. Some people paid a little part of it. And some couldn't donate anything. So with those donations, Mr. Winters paid for the legal assistance we needed to get things moving along.

Ex. 6 at 8:10-9:3; *see also* Ex. 61 (FAQ explaining difference between Client Fund and Recovery Fee). In truth, the Client Fund was not voluntary; it was required by the ACR Agreements. *See* Ex. 90; *see also* Ex. 94 (invoice for $10,839,12 due on 2.5% charge of $17,118.83).

29. Second, there is a "Recovery Fee" of "10% of the entire recovery (or 15% in the event of arbitration or appeal)." Ex. 90 at 3. Importantly, the "entire recovery" refers to the amounts the Receiver distributed to claimants through the claims process – not to any amounts independently collected or distributed by Winters and the Helpers Group. In addition, Winters and the Helpers Group

charged claimants 15% because DaCorta appealed this Court's grant of summary judgment against him to the Eleventh Circuit. That appeal has nothing to do with the claimants or their rights, but Winters and the Helpers Group invoked it to raise the Recovery Fee from 10% to 15%.

30. In the "Behind the Eight Ball" video, McKee explained the Recovery Fee as follows:

> The second part of the agreement provided for the funds to be paid for the monies that were recovered later. Because the case went to the appeal – there's a clause in the contract that if the it goes to appeal, the second part stated that there was [to] be 15 — 15 percent of the funds received would be owed. After we've received two refunds now, I sent out our first invoice — I think it was July of last year — based on the 15 percent because it went to appeal, and the amount of the refund with any earlier contributions was subtracted from that amount.

Ex. 6 at 9:4-15. Amounts paid under the Client Fund formula were deducted from the 15% due under the Recovery Fee formula such that claimants were only required to pay a maximum of 15% of the money distributed by the Receiver. *See id.* at 10:5-11:8 (providing sample calculations); *see also* Ex. 19 at 757 (bank statements showing "15 payment"); Ex. 27 at 41:18-42:19 ("[W]e would send a percentage of whatever was sent or collected from the receiver and disbursed, we would send a percentage of that to the Oasis Helpers Group.").

31. As the Receiver testified, the Recovery Fee represents an impermissible levy on Receivership distributions and, because the levied

money was diverted to fund DaCorta's defense, also a violation of the Court's asset freeze. Tr. 57:8-19 ("[T]here was an ongoing scheme that was utilized to try to intercept those assets or those distributions from the [R]eceivership, from the individual victims, and in doing so, I think that that impacted what the [R]eceivership was intended to do and bled off assets that were supposed to go to victims.").

### C. Respondents Sent Misleading Invoices and Threatened Claimants With Collections

32. After the Receiver began making distributions to claimants, Winters, McKee, and the Helpers Group began sending invoices demanding their 15% cut under the ACR Agreements. Ex. 6 at 12:11-16 ("HOPE: Why does a lender need to pay the invoiced amount? JASON MCKEE: Well, that's what they agreed to pay. At the very beginning, when we signed the attorney/client agreement, that's what the contract stated that we would pay, at that point.").

33. As Treasurer for the Helpers Group, McKee sent a first round of invoices on or about July 18, 2024. *See, e.g.,* Ex. 10. He sent a second round of invoices "on behalf of Mr. Winters" on September 8, 2025. *See* Ex. 6 at 11:17-21; *see also* Ex. 11. In fact, McKee, Winters, and the other Respondents are still attempting to collect from claimants to this day. *See* Ex. 92 (December 7, 2025, email to claimant requiring payment by July 1, 2026); Ex. 27 at 54:8-16 ("Q. Are they still trying to collect money from people to this day? A. Yes. Q. How

do you know that? A. I know because my stepmom-in-law received an email. Well, her sister. The money was in her sister's name. They received an email a few months ago and she was very freaked out because they didn't want to send any money to the group.").

34. To induce payment, these invoices contained many of the Respondents' most important and misleading representations:

> NOTICE: Some people are under the false assumption that if Michael wins the civil case that all lenders will be compensated as a result and for that reason, they haven't contributed anything to his defense. That's not how it works.
>
> As we've explained many times, Michael DaCorta is the only defendant left contesting the Summary Judgment awarded to the CFTC last December, and only those with Attorney-Client Agreements have made possible a winning defense for him. All the other named defendants signed off last year and surrendered their right to contest the settlements they agreed to. Consequently, the rewards of a win will justifiably belong to Michael DaCorta. Since the Court specifically stated that lenders have no standing in the case, Michael has agreed to compensate those like you who help him prevail.

Ex. 10 at 4 (requesting $42,461.07); *see also infra* § IV.J; Tr. 67:8-23 (Receiver's testimony about falsity of claims).

> In other words, the government was aware when it tried Michael that it was already potentially liable to return over $700 million in damages if they lost the case against him. Is it any wonder that he lost the criminal trial when he was defended by public defenders working for the same government that practically had to convict him? This explains why we're so happy you helped get the case moved to the Appeals Court where it's being handled by a skilled attorney who specializes in appeals, who doesn't work in the

> Tampa District Court, and has NO TIES TO THE GOVERNMENT!

Ex. 10 at 5; *see also infra* § IV.H; Tr. 68:18 ("It's not only untrue, but it's outrageous.").

35. If claimants refused to relinquish 15% of the distributions they obtained from the Receiver for DaCorta's benefit, Respondents – led by McKee, Melick, and Winters – threatened them with collections and other adverse consequences. *See* Tr. 29:9-12 ("[A]s this evolved, it was portrayed that if you didn't participate, they were going to take you to collections and go after you."); *see also* Ex. 1 at 2 (Invoice to investor Betty Reynolds for $42,461.07: "Failure to do so [*i.e.*, pay or create a payment plan with McKee] will result in your account falling into default, which may require placement with a collection agency. Please don't make that necessary!); Ex. 11 at 1 (similar email to another investor); Ex. 12 at 2 (same); Ex. 92 at 2 (same); Ex. 88 at 1 (March 14, 2024, email to investors stating: "It is with sadness that we must again ask you to honor the financial commitment you made on 15-Jul-21 when you signed a legally enforceable notarized Attorney-Client Representation Agreement with Attorney Brent Winters.").

36. Claimants found these communications extremely distressing. As investor Tim Devine testified with respect to his friend, Betty Reynolds:

> And, you know, that was one of the things that really kind of got me was when they were brave enough to start saying that, I just

> — I was really ticked — ticked off and, you know, I had enough, and especially when they did that to Betty. You know, here's a lady, a single mom who is retired and had her entire nest egg stolen from her from the Oasis deal and so, you know, they are after Betty for 42 grand. If you don't pay, not only are you not going to get your money back, but we're going to take you to collections and ruin your credit.

Tr. 29:13-22; *see also* Ex. 1 at 1 ("I am very concerned about this email……. Did you get one telling you how much money you owed! They say I owe over 42,000! I'm dieing [*sic*] here! After losing over 1,000,000… I can't do this! They already took everything I had….. and they will report me to the credit bureau if I don't pay it. Please advise!"); Ex. 10 at 1 ("This is the email from Greg…. I don't know if I am being forced to pay money in or not.); Ex. 88 at 1 ("Hey guys – just got another email from Greg. Making it look like it's coming from Michele. Wanted you to be aware. He's out of his mind – we never signed anything with a notary regarding an agreement."); Tr. 34:8-11 ("[T]here's some of these people that are so vulnerable, because a lot of them lost their life savings, and so they're hanging on the hope that maybe this is real. And I think the Oasis Helpers Group took full advantage of that."); Ex. 27 at 53:5-7 ("I know people that were hurting or had put so much money into Oasis that they just couldn't make their payment."); Ex. 27 at 62:13-24 (describing a " nasty letter from Greg" to Devine).

## D. More Than $800,000 "Derived From" Victims Was Deposited Into the Trust

37. Largely due to the ACR Agreements, Respondents raised $863,378 through end of June 2026 "derived from" 356 total depositors. *See* Ex. 22. Of those 356 total depositors, 344 were claimants who contributed $819,615, and 313 were claimants with approved claims who contributed $767,081. *Id.; see also* Ex. 98 at 6 (Melissa Davis Expert Report).

38. As explained in the following subsections, Respondents disbursed $787,495 of the $863,378 raised – some for lawyers but mostly for gold coins and unidentified credit cards. Ex. 98 at 8. According to Michelle Utter, Melick and McKee never disclosed to investors or even other members of the Helpers Group how they were using the money in the Trust. Ex. 27 at 21:6-13; *see also id.* at 21:25-22:17 ("It was vague. It was just that it would go to help those in the group."). In total, more than $500,000 of the funds "derived from" victims are unaccounted for and appear to have been stolen. *See* Tr. 54:7-22 (testimony from Davis indicating that gold coins worth $322,000 were "delivered to a representative of the [T]rust" and $186,000 is also essentially unaccounted for because it was used to pay two unknown credit cards).

### E. Respondents Violated the Asset Freeze by Using the Money "Derived From" Investors Under the ACR Agreements to Pay DaCorta's Legal Expenses

39. On July 29, 2022, Winters hired Ronald Kurpiers, II as his "Co-Counsel"[5] to (1) represent DaCorta in this action, (2) represent clawback defendants in *Wiand v. Arduini*, Case No. 8:20-cv-862 (M.D. Fla.), and (3) sponsor Winters to appear *pro hac vice* in the Middle District of Florida. Ex. 24 at 8 (Attorney Retainer Agreement). In exchange for that work, the Trust paid Kurpiers $100,000. *Id.* at 11-12. Kurpiers filed a second motion to dismiss (Doc. 663) and a motion for summary judgment (Doc. 750) in this action, but he never appeared in the clawback case, and he never sponsored Winters for *pro hac vice* admission in any action.

40. On February 10, 2023, Winters again retained Kurpiers for $10,000 to litigate matters with respect to seven individuals whose claims were denied. *See* Ex. 24 at 4-7 (Attorney Retainer Agreement and check). Kurpiers filed substantively identical baseless objections to the Magistrate Judge's report and recommendation regarding the Receiver's first interim distribution, thereby delaying all claimants' recovery of funds. *See* Docs. 718-723. The

[5] Neither Winters nor the other Respondents, including DaCorta, ever disclosed to the Helpers Group that Winters was simultaneously representing both the investors who signed ACR Agreements and DaCorta. Ex. 27 at 25:8-21; 26:2-5.

objections were ultimately overruled. *See* Doc. 730. In total, the Trust paid Kurpiers $110,533. Ex. 98 at 8.

41. On January 11, 2024, DaCorta retained Stephen Preziosi "1) to file an appellate brief on the civil case . . . in the 11th Circuit Court of Appeals; 2) to write a habeas corpus/2255 petition to the U.S. District Court in the Middle District of Florida; and 3) to argue the appeal should the appellate court grant oral argument." *See* Ex. 23 at 18-21 (Retainer Agreement). "Both the civil appeal and the 2255 petition are inextricably intertwined and the retainer agreement must include both phases as an overall strategy for Mr. DaCorta." *Id.* at 18. For these services, claimant-investors paid Preziosi $155,450 "due before any work can start." *Id.* at 18-19.

42. Specifically, McKee paid Preziosi $75,450 via wire transfer directly from the Trust. *See id.* at 22-23; *see also* Ex. 21 at 1009. Claimant Bonnie Remick wrote a check to Preziosi in the form of an $80,000 "bridge loan." Ex. 23 at 17. She is Melick's ex-girlfriend. Ex. 27 at 11:4-13. The Trust then reimbursed Remick at least $61,000. *See* Ex. 21 at 1003, 1010, 1013; *see also* Ex. 23 ¶ 6.

43. Preziosi received at least $136,450 directly or indirectly from the Trust, but he claims that Respondents misled him and concealed the source of the money. Ex. 23 ¶ 5 ("I spoke with Remick, and she told me that she wanted to pay a portion of DaCorta's legal expenses because they are friends. She

stated that she has a successful real estate business and that the money she sent me constituted personal funds derived from that business."); *id.* at ¶ 6 ("Remick . . . never told me that she was, in fact, reimbursed at least $61,000 from the Trust."); *id.* at ¶ 7 ("I spoke with McKee at that time, and he also told me that he wanted to pay a portion of DaCorta's legal fees because they are friends. He stated that he is engaged in certain business ventures and that the money he sent me constituted personal funds derived from those ventures."); *id.* at ¶ 8 ("McKee never told me that the money he sent originated from the Trust or that the Trust was funded by hundreds of people who invested in Receivership Entities.").

44. Such misdirection is indicative of Respondents' improper purposes.

### F. Respondents Misappropriated the Majority of the Trust - More Than $500,000

45. On September 11, 2021, the Trust bought 104 gold coins from Intermountain Precious Metals ("**IPM**") for a total of $197,000. *See* Ex. 26 at 9 (sales order) & 10 (check); *see also* Ex. 17 at 5.

46. On March 4 and 5, 2022, the Trust bought an additional 66 gold coins from IPM for a total of $125,000. *See* Ex. 26 at 11 (sales order) & 12 (check); *see also* Ex. 17 at 7. This second check to IPM appears to have been signed by McKee. Ex. 27 at 68:3-10.

47. In total, IPM received $322,000 from the Trust and was thus its largest beneficiary. *See* Ex. 98 at 8; *see also* Tr. 54:8-9 ("The single largest use of the funds were two payments that totaled $332,000 to Intermountain Precious Metals.").

48. According to IPM, the gold coins were "hand delivered to agent for Trust." Ex. 26 at 8; *see also* Tr. 54:10-13 ("Q. Do IPM's records indicate what happened to the gold coins that were purchased? A. It said that they were delivered to a representative of the [T]rust.") & Tr. 130:25-131:7 (DaCorta invoking Fifth Amendment as to location of coins and as to whether they were delivered to Winters).

49. Today, the gold coins would be worth approximately $752,000. *See* Tr. 75:2-3 (Receiver's testimony based on spot price). There is no evidence that Respondents ever disclosed to other members of the Helpers Group that their money was being used to purchase gold coins. Ex. 27 at 24:7-20.

50. In addition to the gold coins, the Trust paid $186,342 to two unknown credit cards. *See* Ex. 22; *see also* Ex. 98 at 8; Tr. 54:15-17 ("There was approximately $186,000 paid to two different credit cards. There were payments to discover for $158,883, and there were payments to Bank of America for $27,459."). Available records do not show who owns the credit cards, and the funds are thus unaccounted. *See* Tr. 54:18-22.

51. Between the gold coins and the credit cards, Respondents misappropriated more than $500,000, or almost 60% of the Trust.

## IV. RESPONDENTS VIOLATED THE ANTI-HARASSMENT AND ANTI-INTERFERENCE PROVISIONS

Pages 11 and 12 of the Show Cause Order identify 11 types of harassment of the Receiver or interference with the Receivership.

### A. Misrepresenting the Court's Orders and the Receiver's Authority and Purpose to Claimants

52. Melick and the other Respondents misrepresented the Court's orders by claiming that investors lacked standing to challenge the Receiver's actions or the Court's decisions. They claimed that the investors could only act through Winters and DaCorta.

> Between April 11th and April 15th, 2022, over 150 notices and objections were filed in the civil case by lenders in this group representing themselves as presumptive beneficiaries [of] the receivership estate. They asked the judge to suspend the receiver's activities until an opportunity for a hearing, discovery, or final judgment was given. The Court ruled against them. Judge Covington struck all those notices from the record and made it clear in her ruling that no lender has standing in her court. Even if lenders had been investors, which they clearly were not, they do not have standing to bring any kind of action in her court.

Ex. 4 at 3:3-14; *see also* Ex. 6 at 20:19-21:1 ("That's because the judge in the case made it very clear that the lenders don't have standing in the Court. That means they don't have no rights to bring a lawsuit in this Court. The — the only parties that can do that are the named defendants, and the only one of them that's still able to do that – that's still trying to prove his innocence is

Mike DaCorta."); Ex. 6 at 22:8-15 ("[W]ithout Mike DaCorta, no lender has standing to present to the Courts. So we've – we've got to use Mike DaCorta because he's our only avenue to the Courts.").

53. In truth, the investors could have used the Court-approved objection procedure (*see* Docs. 439, 482), but due to the Helpers Group's misleading advice, none of the relevant investors filed proper objections to their claim determinations. *See* Doc. 638 at 9 (striking objections filed in the docket and stating, "To the extent the Notice Claimants object to the Receiver's determination of their claim allowance or amount, they must use the established objection procedure.").

54. Melick and the other Respondents also misrepresented the Receiver's authority and purpose by denigrating the Receiver's character and claiming that his interests are adverse to the investors' interests.

> We are dealing with evil people who don't care who they put in prison or whose money they take, as long as they get it all. They are operating a distinctly corrupt business model designed to steal as much as they can from you and others like you under cover of law. Shut down companies seize all cash and assets. Make sure no one can afford to defend themselves and make the steal stick through misdirection, misrepresentations of evidence, falsifications, suppression of discovery, and other court operations. It's really easy to see if you follow the money and where the majority ends up when the smoke clears. I promise it won't be in our pockets.

Ex. 45 at 2 (December 15, 2023, Lender Update); *see also id.* at 6 ("The Receivership, those who worked for it, and the U.S. DOJ, all made millions off

this case and are already looking for the next one."); Ex. 29 at 5 (August 8, 2020, Lender Update, stating: "While the Receiver seems solely interested in finding money, and not in helping anyone get to the truth, it must be understood that that's his mandate."); Ex. 31 at 2 (February 11, 2021, Lender Update, stating: "Please do not ask when you will get your money back. The Receiver's apparent desire is to take as much of it as legally possible."); Ex. 32 at 2 (April 9, 2021, Lender Update, stating: "They have almost unlimited resources – yours – to work with, and they're more than happy to pilfer the liquidated assets of the Company for as long as they can."); Ex. 35 at 3 (March 9, 2022, Lender Update, stating that the Court "ruled on that [motion to dismiss] today in order to allow the Receiver to proceed with his merry banditry!").

55. As investor Tim Devine testified during the evidentiary hearing, "they really painted a picture that he was, he was a demonic man." Tr. 26:3-13. "[T]he bottom line was he was portrayed to be a really bad person, and so — and at the time, again, I didn't know what to believe, so I really didn't have an opinion on that, but after meeting Mr. Wiand, and it's been a pleasure getting to know him, and he seems like a really good guy." *Id.*

56. As the Receiver testified during the evidentiary hearing, the Helpers Group's representations regarding the Court's orders and the Receiver's authority and purpose were false. *See id.* at 81:7-84:6 (describing

allegations as "grossly false or designed to mislead these investors," "absolutely false," and "just fantasy").

57. In addition, these activities interfered with the administration of the Receivership by increasing costs and imposing delays. *See id.* at 59:15-21 (Allegations of "impropriety by me, the CFTC and the Court leading some sort of conspiracy and even suggesting that we were guilty of racketeering [were] certainly impeding the effective dealing with these people and getting the money back to them, which could have happened much cheaper — much more cheaper and much more quickly if this had not been going on.").

### B. Discouraging Communications With the Receiver by Requiring Victims to Sign Nondisclosure Agreements and Claiming That the Receiver Will Bring Criminal Charges Against Victims Who Contact Him

58. Melick and the other Respondents discouraged communications with the Receiver by requiring investors to sign a nondisclosure agreement and by instructing investors to hang up on the Receiver and his professionals. *See* Tr. 26:14-16 (testifying that Helpers Group required Devine to sign an NDA); *id.* at 45:13-15 ("They basically told us not to discuss anything, not to have any communication with anybody outside of the Helpers Group regarding this matter."); Ex. 53 at 2 (April 7, 2020, "Investor update" email from Melick, stating: "I will encourage Brent to provide those who have retained him to provide them with a Retainer Agreement and Non-Disclosure form that must

be signed if they are to continue receiving information from us."); Ex. 56 (NDA template with instructions); Ex. 35 at 1 ("If you're accidentally caught out, refer him to your attorney, Brent Winters, and hang up."); Ex. 63 at 1 (August 7, 2021, "RETAINER RECEIVED" email from McKee, stating: "YOU HAVE HIRED AN ATTORNEY. DO NOT TALK TO ANYONE ABOUT THE CASE except YOUR OASIS SUPPORT TEAM. (If anyone tries to ask questions, simply tell them you have legal counsel and will not talk about the case and then you can refer them to the support team.)"); Ex. 63 at 1 ("YOU ARE UNDER A NON–DISCLOSURE AGREEMENT WITH YOUR ATTORNEY. (That means all that goes on in this group is ONLY for the GROUP.)"); Ex. 89 at 1 (April 13, 2022, text message from Melick to Utter, stating: "Please put out a message to everyone tonight on this ONE subject: Do not speak with the Receiver. If he catches you on the phone because you pick up his call accidentally, just hang up immediately!"); Ex. 57 at 1 (April 18, 2020, email, stating: "Until we have your Non-Disclosure Agreement (NDA) signed and returned (see below), it would be unwise to explain how our attorney plans to rebuff the Receiver's clawback efforts, so get your NDA signed and returned asap. After that, we'll be able to share more comforting information."); Ex. 77 (April 11, 2022, email from Melick directing a claimant not to respond to Receiver's counsel); Ex. 79 (April 12, 2022, email from Melick to Utter, stating: "Michele, Add this to the message... If you receive a call from the Receiver, do

NOT respond. If he catches you unawares, tell him to contact your attorney, Brent Winters."); Ex. 83 at 1 (August 22, 2022, email from Melick congratulating investor for hanging up on Receiver's professional, stating: "Well done, George. You did precisely the right thing."); Ex. 27 at 44:5-25 ("[Melick] didn't want anyone to speak with the [R]eceiver or if the [R]eceiver's office called not to accept the phone call or to basically hang up."); Ex. 59 at 1 (February 10, 2021, email from Melick to Utter, stating: "We simply can't afford to give out any information as to what we're doing because even one leak to the Deceiver could ruin the entire thing. No one is obligated to respond to the Receiver's REQUESTS for information.").

59. Melick and the other Respondents also discouraged communications with the Receiver by telling investors that the Receiver would bring criminal charges against them. *See* Ex. 31 at 3 ("Submitting claims as was done protected . . . lenders from potential criminal charges that might have been brought against them as a consequence of filing a claim."); Ex. 35 at 1 ("DO NOT SPEAK WITH OR CORRESPOND with him or you may be drawn into his jurisdiction and become subject to criminal charges."); Ex. 70 (same); Ex. 59 at 1 ("It kept . . . each claimant safe from any potential criminal complaint that might have been made against them as a consequence of their filing a claim."); Ex. 62 at 1 (July 12, 2021, email from Melick to two claimants, stating: "The donations for Brent were used to file your claim with the Receiver

in such a way that he could not a) bring any claimant into a criminal investigation . . . ."); Ex. 67 (November 10, 2021,"Notice to Lenders" email from Melick, stating that if claimants withdraw from their Attorney-Client Representation Agreements with Winters, "you will be free to settle directly with the Receiver, but he will require that you agree to be within his jurisdiction (which you are not currently under) and doing so could potentially make you liable for criminal charges.").

60. As the Receiver testified during the evidentiary hearing, the Helpers Group's representations regarding communicating with the Receiver and facing criminal charges were false and misleading. *See* Tr. 84:9-91:10 ("With respect to the protected lenders from potential criminal charges that might have been brought against them as a consequence of filing a claim, I can't even conceive what that's talking about. No criminal charges in, you know, the number of years that I have been doing this, no criminal charges has ever been brought against a claimant, and I don't know what it would be brought for, so it's just something to try to scare these people.").

61. In addition, this interfered with the administration of the Receivership and resulted in demonstrable, negative consequences for investors. *See id.* at 59:4-7 ("So, in having a claims process, if I can't — there were hundreds of people in this, not being able to talk to them, and when we'd call them, they'd hang up, it was, it made things very much more difficult.");

*id.* at 88:7-12 ("There's no question that made — it made it quite difficult to deal with it, for a number reasons. One of them, we couldn't oftentimes get in touch with these people. When we would get in touch with these people, they were very unsophisticated. They were scared. They didn't know what was going on and they would hang up, and whatever.").

### C. Actively and Consistently Interfering With the Court-Ordered Claims Process by Disseminating False Information to Claimants, Obstructing Communications, and Manipulating Claim-Related Submissions

62. Melick and Winters materially altered almost every Court-approved claim form the Receiver distributed. *See* Ex. 95A (original Proof of Claim Form); Ex. 95B (altered Proof of Claim Form deleting, among other things, penalty of perjury language); *see also* Ex. 29 (letter from Winters admitting alterations); Ex. 96A (original Personal Verification Form); Ex. 96B (altered Personal Verification Form deleting, among other things, Florida law provisions and including nonsensical declaration); Ex. 97A (original Address Confirmation Form); Ex. 97B (heavily altered Address Confirmation Form); *see also* Tr. 92:12-95:18 (Receiver's testimony about the purpose of the forms and the Helpers Group's alterations).

63. Melick and Winters advised investors to file their claims through Winters in this manner for several misguided or fabricated reasons. First, "[i]t kept each claimant out of the Court's jurisdiction because the paperwork was

process[ed] under Power of Attorney and NOT by legal representation." Ex. 59 at 1. Second, "[i]t kept . . . each claimant safe from any potential criminal complaint that might have been made against them as a consequence of their filing a claim." *Id.* Third, "[i]t prevented the Deceiver and his minions from sorting through all their paperwork and starting controversies with them about their claims in order to run up even more billable hours." *Id.* (calculating purported savings of $800,000 because "the Receiver's work is unmonitored by the Court"). Fourth, "[i]t preserved each person's claim for the ENTIRE amount of their investment, principal and interest, until such time as the CFTC can prove their illegitimate claim that Oasis was insolvent – it wasn't and we have accumulated nearly all the evidence needed to prove it." *Id.*

64. As the Receiver testified during the evidentiary hearing, these reasons are "nonsense" and "a sham and a scam on these people with this power of attorney." Tr. 96:6-22. "The idea that this protected these people from anything is just not true." *Id.* at 97:7-8. In addition, the idea that the Receiver's spending is unmonitored is "grossly false" because "[t]he CFTC goes through our bills and the Court would also go through our bills." *Id.* at 98:25-99:1.

65. Melick and Winters not only altered the Personal Verification Forms, but they also discouraged investors from completing them. *See* Ex. 37B at 3 (May 11, 2022, Lender Update, stating: "We can discern absolutely no need for the Receiver's demand for further verification of your claim. . . . This recent

exercise seems like just another way for the Receiver to bill for unnecessary work at $350-450/hour against the Receivership Estate, aka liquidated lender funds."). Because of this incompetent advice, 16 investors failed to execute their Personal Verification Forms and thus lost the opportunity to recover approximately $752,265.15. *See* Doc. 694 at 17-20; Docs. 694-3, 730. Melick and Winters promised to help these investors, but their promises were empty. *See* Ex. 85 at 1 ("In actuality, there was never a need for him to demand a[] new Personal Verification Form from you or anyone else in our group. . . . We'll make the appropriate arguments in court if it becomes necessary to do so in order to recover what is due you.").

66. In one Lender Update, Melick told investors that the Receiver used secret claim numbers to obscure the determinations of their claims. *See* Ex. 46 at 1 ("The Receiver was supposed to use each lender's IB number, or their Oasis Account number. Instead, he assigned a secret claim number for each claimant. Why? To hide information from the lenders and from their Power of Attorney, Brent Winters. The Receiver's assigned secret claim numbers stopped lenders from knowing what the proposed distributions were going to be so they could not make timely objection(s) in the Court record. The secret claim numbers also guaranteed The Receiver and his crew more billings for unnecessary correspondences that resulted from his secretive operations."). In truth, claim numbers are used to protect investor privacy and to combat recovery fraud like

the conduct at issue here. Tr. 101:5-23. The Receiver sent each claimant correspondence containing his or her claim number(s). *Id.* at 88:25-89:7.

67. At Melick's urging, hundreds of claimants filed identical "Notices and Objections" to the continued operation of the Receivership, which the Court struck *sua sponte* and described as a "scheme . . . to disrupt the orderly administration of this Receivership case." Doc. 938 at 7; *see* Docs. 489-586, 588-636; Ex. 76 (template Notice & Objection forms); Ex. 78 at 1 ("To be sure that you recover everything owed to you, you **must** file the Notice & Objection."). Indeed, in an email to McKee, DaCorta, and others, Melick gloated over the confusion he imagined in the Clerk's office. *See* Ex. 80 at 1 ("This is GREAT! The Clerks must be running around like one-armed paper hangers having to type up every Docket entry and add the Docket numbers to every page of every document. Next week they'll start receiving all the Verification forms.").

68. After repeatedly accusing the Receiver of trying to steal money from claimants, Melick and the Respondents even tried to obstruct the first interim distribution. *See* Ex. 75 at 1 ("The court is trying to prematurely distribute funds that the Receiver has collected BEFORE the Court has looked at any evidence or held a trial to determine whether or not Oasis did anything wrong."). This was exceptionally egregious and dishonest. Its only purpose was to attempt to benefit DaCorta at the expense his victims.

69. These activities interfered with the administration of the Receivership and complicated the claims process. *See* Tr. 59:8-14 ("Then they took it and changed the forms that they submitted. They submitted forms that the people didn't swear to, that they didn't recognize the jurisdiction of the court and various other things, so the claims forms were all defective. And everything they did for these people . . . just caused more and more work, especially on the part of my staff, and that was — that was incredibly difficult."); *id.* at 97:24-98:2 ("[T]hey impacted with expense the receivership by a large amount of money with respect to the claims team who was trying to work with people who were just irrational.").

### D. Directly Interfering With Court-Ordered Distributions by Soliciting and Coercing Claimants Into Paying Monies, Including a Purported 15% "Contingency Fee" of Their Approved Distributions From the Receivership

70. After receiving $60,000 to botch the claims process, Winters terminated the POA Agreements and began requiring investors to sign the ACR Agreements. *See* Ex. 90 (template ACR Agreement). This issue is largely discussed above in Section III.B.

71. These activities interfered with the administration of the Receivership because the Recovery Fee represents an impermissible levy on Receivership distributions and, because the levied money was diverted to fund DaCorta's defense, also a violation of the Court's asset freeze. Tr. 57:8-19

("[T]here was an ongoing scheme that was utilized to try to intercept those assets or those distributions from the [R]eceivership, from the individual victims, and in doing so, I think that that impacted what the [R]eceivership was intended to do and bled off assets that were supposed to go to victims.").

**E. Falsely Representing to Victims of the Oasis Ponzi Scheme That Michael DaCorta Did Nothing Wrong and That Oasis Was a Bona Fide Business as Part of Their Scheme to Impede the Receiver's Activities and Garner Funds for Themselves and DaCorta**

72. Melick and the other Respondents interfered with the administration of the Receivership by telling investors that Oasis was a bona fide business. As investor Tim Devine testified during the evidentiary hearing,

> Q. What did the Helpers Group tell you about whether Oasis was a Ponzi scheme?
>
> A. Well, they said it wasn't obviously based on, you know, all the other information we're talking about. They said it absolutely wasn't a Ponzi scheme, and that notion was talked about quite a bit. And at the time, again, to be honest, I believed him. I was hook, line and sinker, so.
>
> Q. What did the Helpers Group tell you about whether Oasis was solvent?
>
> A. Yeah. Yeah. They said they were solvent and they were healthy and there was plenty of assets and money there and that they really never had any issues. That was clearly portrayed to us, that nothing ever went wrong and this was all a big mistake.

Tr. at 27:10-23.

73. Melick and the other Respondents made similar representations in writing. Ex. 42 at 5 (Autumn 2023 Lender Update, stating: "Undisputed

Facts: 1. Oasis Management and Oasis International Group were solvent at the moment their operations were interrupted by the government. 2. Oasis did not operate a Ponzi scheme as alleged. 3. Oasis did not make 'Ponzi-like' payments as alleged. 4. There appears to be no legal foundation for the clawback cases under Florida law."); Ex. 54 at 2 (April 10, 2020, email from McKee, stating: "Remember, not a single scrap of evidence has been presented in the courtroom regarding this case. Everything they have done up to this point has been done on assumptions and speculation only — NO EVIDENCE!"); Ex. 29 at 6 ("It's the most astonishing aspect of this entire sad affair that NO SUCH MATERIAL EVIDENCE has ever been entered into the record to support claims to the effect that specific amounts were lost, or that all the money was lost, or that OIG was a Ponzi scheme, or that there's only $2M left at ATC."); Ex. 30 at 1 ("[T]here was (and still is) NO certified evidence that Oasis was other than a solvent, diversified company, operating legally as describe in everyone's Disclosure Statement. Due to a professionally qualified volunteer analysis of the Company's trading and financial records, it will become clear at trial that Oasis did nothing wrong. Everyone should be restored their full investment as claimed, but we have a way to go before we can put that evidence into court."); Ex. 30 at 4 ("Oasis's operations were NOT the reason your investment was taken out of circulation. The government's Civil Asset Forfeiture operations are the reason that happened."); Ex. 31 at 2

("[T]here is NO certified evidence that Oasis was ever [anything] other than a solvent, diversified company, operating legally as described in your Disclosure Statement."); Ex. 32 at 1 ("As you read the Brief, you'll discover that there's no evidence Oasis was anything other than a solvent, bona fide business doing exactly what it promised to do in your Promissory Note & Agreement. It certainly wasn't operating a Ponzi scheme."); Ex. 27 at 47:3-11 (testifying Melick often said Oasis was not a Ponzi scheme and was solvent).

74. Melick and the other Respondents also interfered with the administration of the Receivership by telling investors that DaCorta did nothing wrong. As investor Tim Devine testified,

> Q. What did the Helpers Group tell you about Michael DaCorta's guilt or innocence?
>
> A. Well, basically they were convinced and were to convince us that Mike was completely innocent[,] and they had done nothing wrong.

Tr. 26:17-21; *see also* Ex. 27 at 46:12-18 ("Q. Did Greg Melick [routinely] tell investors and members of the Oasis Helpers Group that Mike was innocent? A. · Oh, yes. That's where I started having problems.").

75. Melick and the other Respondents made similar representations in numerous Lender Updates and other written communications. *See* Ex. 40 at 8 (November 1, 2022, Lender Update, stating: "Mike didn't defraud you."); Ex. 37B at 4 (claiming that DaCorta's concealment of losses in the Oasis trading account was an "executive decision" and that he had "no legal obligation" to

disclose them to investors); Ex. 58 at 2 ("Every day more evidence appears to show that Michael DaCorta is NOT guilty of the charges filed against him. . . . By all accounts, by reason of careful reviews of his many emails, and through witness testimony to his practices in Oasis Management, Oasis International Group, and Oasis Global FX, Mike performed admirably well in accordance with his stated purposes to preserve, diversify, and protect the funds you entrusted to them."); Ex. 70 at 2 (March 7, 2022, email, stating: "Mike's filing last week drilled down to the bedrock bottom of the laws that the CFTC alleged Oasis violated. As they say, the Devil's in the details and that's certainly the case here. If you find, read, and understand the definitions of the alleged violations, you'll see that the laws allegedly violated weren't – so the case should be dismissed. No crime: no case.").

76. As the Receiver testified during the evidentiary hearing, the representations by Melick and the other Respondents about the purported innocence of DaCorta and Oasis were false. Tr. 105:5-20 ("It was absolutely clear this was a Ponzi scheme, and it was — the evidence of it was more than that of the other schemes that I have handled."); *id.* at 106:22-107:2 ("Michael DaCorta did defraud these people. He was a serial fraudster. This was, you know, the evidence that we gathered indicated he had done any number of fraudulent schemes. He was barred from being able to trade forex, and the idea that he didn't defraud these people is absolutely false.").

77. Respondents' activities interfered with the administration of the Receivership. *See id.* at 60:17-61:7 ("[T]hey impeded the receivership by telling these people that Michael DaCorta after he had been convicted and after summary judgment was granted against him because he couldn't come up with any facts to test CFTC's allegations, that this was all bogus and that they were going to win the appeal, get Michael out of jail on a habeas corpus, and that he was going to be entitled to $700 million from me and the CFTC and somehow assets that Oasis had would be turned over to him.").

**F. Falsely Advising the Victims That the Receiver Was Acting Improperly and That There Was No Basis for the CFTC's Action Against Oasis and DaCorta or Evidence of Their Wrongdoing**

78. Melick and the other Respondents interfered with the administration of the Receivership by falsely advising the victims that the Receiver was acting improperly and that there was no basis for the CFTC's action against Oasis and DaCorta or evidence of their wrongdoing. As investor Tim Devine testified during the evidentiary hearing,

> the picture was painted that, you know, the federal government is evil and they do this all the time. You know, they'll go in and find companies similar to Oasis and they have a strategy, and they can — you know, they've got the law behind them and nobody can really fight them. And, so, you know, that was — that was portrayed to us. . . .
>
> So that was portrayed to us, that this was a Government takedown. The FBI came in, raided Oasis, took all the assets and was going to have their way with the money there and kind of take it all.

Tr. 25:11-26:2.

79. According to a Lender Update from 2024, the beliefs and goals that drive Respondents and the broader Helpers Group are as follows:

> We believe that the CFTC, the Receiver, and their employees are motivated to achieve veiled self-serving goals by presenting fabricated allegations to the public that have little or no factual evidence to support them.
>
> We believe that Oasis-case Plaintiffs, the CFTC and the Receiver, pose false public goals and insincerely pious assertions that mask their real objectives.
>
> We believe the falsehood of the allegations they present as "facts" and the results of all their efforts reveal their true goal, which is to extract for themselves as much money from innocent Oasis defendants and investors as possible, NOT to help anyone fully recover their losses.
>
> We believe that every Oasis case was designed as a make-work project for the benefit of those working to obstruct, oppose, or prevent full recovery of Lender losses.
>
> We believe that the Receivership Estate is the "pool" of funds that Plaintiff attorneys and those who work with them draw their weekly earnings from, even while supplementing that income with undeserved Paycheck Protection Program (PPP) loans that were meant to serve Americans in need of financial assistance in order to keep their businesses alive during the COVID-19 shutdowns.
>
> We believe that until the Receivership Estate is completely drained, and the Receiver can no longer fabricate another target to attack to replenish it, or until the original case is defeated or dismissed, their raids upon that pool will not stop.

Ex. 48 at 3.

80. Respondents communicated these and similar beliefs to investors on numerous occasions. *See* Ex. 60 at 1 ("Keep in mind that whatever the

Receiver or his hirelings do, they bill for their time at $350-450/hour AGAINST YOUR FUNDS, which have been accumulated into the 'Receivership Estate' by the systematic liquidation of Oasis' assets – without proof that Oasis ever operated a Ponzi scheme, as claimed. Think of it this way – the liquidated asset funds are pooled into a kind of pirates' treasure chest out of which the Receiver's lawyers, experts, and other functionaries draw pay at will, without serious oversight or interruption. The more make-work they can create, the more they can draw from the account."); Ex. 61 at 6 ("Think of the Receivership Estate as like a treasure chest filled by pirates. The pirates raided every town and village they could and plundered everything they could lay hands on. Now what? They sit down and spend a few years divvying up the spoils. Right? All they have to do is file billable hours into the court to get a share of the treasure they collected, your treasure that is."); Ex. 29 at 6 ("While the Receiver seems solely interested in finding money, and not in helping anyone get to the truth, it must be understood that that's his mandate."); Ex. 35 at 3 ("But the case was also stayed when the Motion to Dismiss the Receiver was filed, yet she ruled on that today in order to allow the Receiver to proceed with his merry banditry!"); Ex. 39 at 2 ("Almost nothing the Receiver says should be taken at face value."); Ex. 43 at 3 (Autumn 2023 Lender Update describing a detailed "business plan" pursuant to which the CFTC, receivers, and courts purportedly conspire to steal the assets of innocent companies); Ex. 45 at 2 ("We are dealing

with evil people who don't care who they put in prison or whose money they take, as long as they get it all."); Ex. 47 at 1-2 (describing the CFTC's "game plan" in this case); Ex. 52 at 1 ("April 4, 2020, email from Melick, stating: "I continue to believe, ever more strongly, that the government helped initiate this scam perpetrated by the CFTC."); Ex. 59 at 1-2 ("That's the pot of gold that [the Receiver] and his minions wish to keep as much of for themselves as possible. It was always his goal and the reason he left another practice 13 years ago to form his current firm. Receivership is a grand larceny level license to steal, legally."); Ex. 69 (collecting testimonials to use against the Receiver).

81. As the Receiver testified during the evidentiary hearing, Respondents' representations about Receiver and the CFTC were false. *See* Tr. 107:10-110:11 (describing statements made by Helpers Group as "false," "offensive," "untrue," and "an outright lie").

82. These activities interfered with the administration of the Receivership because investors refused to cooperate with the Receiver in reliance on Respondents' misrepresentations. *See, e.g., id.* at 59:4-7, 88:7-12.

### G. Causing Numerous False Accusations to Be Submitted to the Florida Bar That the Receiver Was Acting Improperly

83. Melick and the other Respondents interfered with the administration of the Receivership by causing numerous false accusations to be submitted to the Florida Bar and the Florida Attorney General that the

Receiver was acting improperly. Melick and Winters began this effort by holding a two hour Zoom call with dozens of investors to instruct them how to file complaints against the Receiver. *See* Ex. 7 (the "Substance of a Complaint" video); Ex. 8 (the "Substance of a Complaint" transcript); *see also* Ex. 62 ("The purpose of the webinar . . . is to clarify all the details surrounding these events in order for you to write a complaint to the Florida Bar Association because what the Receiver did is a serious violation of Bar ethics and its Code of Conduct."). The video was accompanied by a lengthy PowerPoint presentation and detailed instructions. *See* Ex. 66 (presentation); Ex. 64 (instructions).

84. During the video, Melick and Winters made numerous misrepresentations about Oasis, the Court, and the Receiver, including:

> So as you all know, the CFTC filed a Complaint against Oasis claiming that it was operating a Ponzi scheme, which has not been and cannot be proven because it wasn't. Ex. 8 at 3:10-13.
>
> Oasis was, in fact, operating a legitimate business and doing several things, including investing in real estate, precious metals, other businesses, and so forth, as a legitimate business. *Id.* at 3:24-4:3.
>
> I'm concerned about what the receiver's doing. He doesn't seem to be operating with authority. He's taking people's money. He's withholding funds. He's liquidating assets, and he doesn't seem to have the authority to do any of those things, whatsoever. There's your foundation. Go into those documents, read some more, and you can write up your Complaint. *Id.* at 27:8-15.
>
> This is the rogue lawlessness of Courts in America. Rogue lawlessness. Acting outside of jurisdiction, and then along with that, jurisdiction is the holy of holies of our common law tradition. What do I mean when I say that? What I mean is this: If a Court

claims a jurisdiction that it doesn't . . . have and it's later shown — later shown that it never had jurisdiction, then everything is off. The case is reversed. And that's an important point in this situation. *Id.* at 42:4-13.

You may have noticed that Courts, they don't like this attention. They don't want lights — when somebody's doing bad acts, the last thing they want is light to be shown on what they're doing. They're, like, a bunch of cockroaches when you turn on the kitchen light and you move the cereal boxes and, boom, they're running all over the place, okay? *Id.* at 49:15-21.

Let's just say it. Receiverships, in the Federal Courts and State Courts, are rackets. And lawyers get in, and then they hire other lawyers. Their buddies come help them. They find a big pile of money, millions of dollars some place. They want to get a receivership over it, and that's how they build their wealth. It's called stealing. Stealing, that's all. *Id.* at 55:14-21.

Why is it that we have to fight so hard to get such evil just to get what God has rightfully given to us? And the evil empire steals it, and then we got to fight to get it back. And the fight is an uphill battle. That's what's going on here. *Id.* at 58:6-10.

The lawyers can stand to be disbarred forever, never practice law again. They could stand to be suspended from the practice of law if they've done something. Depends upon what the Bar wants to do in Florida, to this fella. Suspended, or he could be reprimanded — a letter of reprimand. Of course, that goes into his file. That's an ugly thing to have in your file. And those are the possible consequences. *Id.* at 60:25-61:7.

In receiverships — see, there's no jury here, as you know. It could come to that later, but with a receivership, as Greg pointed out in the presentation, the receiver is an arm of the Court and he owes his allegiance to the Court. He owes his allegiance. Well, what that means, in practical terms is, the Court doesn't know what to do, doesn't have time to do it, doesn't want the burden of doing it, so the Court appoints an attorney to do whatever he wants, and then the Court supports the attorney — the receiver, now, and the receiver, then, has allegiance to the Court, and if the receiver doesn't protect the Court in all this — and who knows what else is

> going on behind the scenes. I don't know. Of course, I don't know. But this is all – it's you rub my back, I rub yours kind of situation with receiverships. *Id.* at 67:3-18.
>
> But we've got a team here that's gonna go and put Complaints in. Everybody on this call is committed to doing it. There are more people that couldn't make it today for family obligations, but all together, there's close to 80 people here. *Id.* at 85:14-18.

85. As a result of Respondents' efforts, only nine individuals filed bar complaints against the Receiver. *See* Exs. 9a-9e. The Florida Bar did not take any action in response to the unfounded allegations against the Receiver. *See* Tr. 65:9-10 (testifying to falsity of allegations); Ex. 9a at 4 (letter from the Florida Bar declining to take action in response to a complaint); Ex. 9b at 4 (same); Ex. 9c at 9 (same); Ex. 9d at 9 (same); Ex. 9e at 9 (same).

86. Displeased with that outcome, Melick and the other Respondents tried again to land the Receiver in legal trouble:

> Both the Florida Bar Association and the Attorney General for the State of Florida have replied to several of the complaints about the Receiver's activities that were sent to them. The A.G.'s reply boils down to – "That's not our concern. You need to address your complaint to the Florida Bar Association." The Florida Bar Association's reply boils down to – "The Receiver's activity is the responsibility of the court that appointed him. You need to address your complaint to that court."
>
> Complaints to the Florida Bar need to refocus on what the Receiver has done or is doing in violation of the Florida Bar's Professional Standards AS A FLORIDA BAR-LICENSED ATTORNEY, not in his capacity as a court receiver. We'll help you rework your complaint as soon as more pressing issues are taken care of.

Ex. 34 at 3 (January 24, 2022, Lender Update).

87. These activities were a significant distraction to the Receiver and undermined his ability to administer the Receivership. Tr. 62:3-22 ("The things that Winters is saying [in Ex. 7] is frankly outrageous, and this is the kind of thing that was going out to these individuals. This is I think on a website that was put up for them, and it really made it difficult trying to deal with the victims and the claimants in the receivership when this kind of thing is being told. I mean it's just grossly false."); *see also id.* at 65:11-16 ("It certainly deferred the attention of me and some of the folks working for me in connection with the receivership from doing the tasks that would actually benefit the victims of the receivership and claims.").

### H. Falsely Representing That Claimants Will Receive a Full Recovery Exceeding $700 Million of All Losses Plus Interest That Would Have Been Earned to Date If They Fund DaCorta's Legal Defense

88. Melick and the other Respondents interfered with the administration of the Receivership by telling investors that the Helpers Group has a secret strategy to recover all of their losses. As investor Tim Devine testified during the show cause hearing:

> Q. What did the Helpers Group tell you about the potential to recover your losses?
>
> A. The potential was huge. I mean, you know, for myself having lost my life savings, you're very vulnerable. You want to think that — No. 1, you want to think that this didn't happen and that hopefully you can get your money back, and we had hope. Like, we

> had hope that what Greg was saying — Greg is a very intelligent man. He's very well-spoken, and so he's easy to believe.
>
> And so, you know, the majority of us that were investors were devastated. And so when you're in that state of mind, you're grasping and hoping that, you know, jeez, maybe, maybe this was a mistake. Maybe there's nothing wrong. Maybe we are going to get all our money back. So, it's just really easy to be deceived, and so I think that's where a lot of people were and are.

Tr. 23:6-21; *see also id.* at 24:6-16 ("They hired different attorneys and had different strategies that they thought were going to be effective, and here we are six years later. You know, they claimed, and very confidently, that they were going to turn this over and we were all going to get our money back. And so that strategy changed over time because they had different things they were pursuing, but ultimately they were very convincing in telling us that we were — you know, just hang in there, support this cause, and you're going to get your money back."); Ex. 6 at 13:10-15 ("We're in Court of Appeals right now, so we are actually to the point where we've been fighting the good fight and — so would you would like to just keep 33 percent, or do you want 100 percent of all your money plus all the interest you've earned over these years? I want the latter, so that's why I continue to fight.").

89. There are many other documented examples of similar misrepresentations. *See* Ex. 36 at 2 (April 2, 2022, memo to claimants, stating: "When Mike is found not guilty and/or the civil case is dismissed, the government will need to restore Oasis to all of its holdings."); *Id.* at 4 ("When

Oasis is restored as a consequence of Mike's pending trial and a successful adjudication of the original Complaint, we anticipate the full recovery of your principal and earnings, plus accrued damages."); Ex. 30 at 6 (February 6, 2021, Lender Update, stating: "There is a strategy in place to recover all of your money (including attorney fees), but it will be disclosed only by its commencement and not beforehand. Please stop asking when you'll get your money back. No one can answer that question yet."); Ex. 32 at 3 (April 9, 2021, Lender Update, stating: "As it has been from the start, our goal is to recover all of your money, including principle, earnings and interest, not just the 10–25% the Receiver would prefer to give up. Accomplishing that goal has never looked better than it does now."); Ex. 39 at 1 (September 19, 2022, Lender Update, stating: "If granted by the Court, [DaCorta's motion to dismiss] could close the case and more quickly put us on track to pursue full restitution of funds, assets, lost opportunity costs, and other harms."); Ex. 75 at 1 (April 9, 2022, email from Melick, stating: "Based on the considerable evidence we have seen, much of which will soon come out in Mike DaCorta's trial, we firmly believe in Mike's and Oasis' innocence which, if true, means that the funds should go back to Oasis and then you can claim everything that's owed to you (principal and profits) directly from Oasis.").

90. According to the Helpers Group, when DaCorta prevails on his summary judgment appeal and/or *habeas corpus* petition, the government will

be required to pay him approximately $700 million in damages. *See* Ex. 36 at 3 (estimating "accumulated losses accrued from the interruption of property and business asset appreciations, lost opportunity costs, etc. . . . at $662,494,515 and still running"); Ex. 73 at 1 (March 30, 2022, email from Melick to a claimant, stating: If "Mike is found not guilty, then after the civil case is adjudicated in line with Mike's exoneration, the government will be obligated to restore the full value of seized assets to Oasis, plus damages."); Ex. 27 at 36:23-38:7 (Melick "would come up with these figures and put them in the emails," and "it was just an unbelievable amount of money.").

91. DaCorta will only share those damages with investors who fund his legal defense. *See infra* § IV.J; *see also* Tr. 28:7-14 ("We had a few friends that we had introduced this to and we felt really bad, so at the time there was the threat that if you hadn't participated, if there was a victory for the Oasis Helpers Group, that you wouldn't get your money back, so, you know, we had a few people that we felt, you know, just really bad for and felt obligated to try to help them."); Tr. 29:5-8 ("Well, basically the threat was that if you don't participate and contribute, that you were going to lose out. And so, you know, that was made very clear through emails and different communications."); Tr. 41:8-14 ("Well, basically they are cut out. Their verbiage was that if you didn't pay that money, if there was a victory, you wouldn't receive any of your money.).

92. As the Receiver testified, Respondents' theory of recovering $700 million in damages from the government is "nonsense." Tr. 113:23. "[I]f the absurd happened and Mr. DaCorta was successful in getting out of jail and winning his civil suit, there wouldn't be anything in Oasis for him to receive. And the Government or the [R]eceiver would have no liability in that because in this situation everything they have done has been fully appropriate." *Id.* at 114:1-6. "It's silly. It's not a reasonable evaluation, and it's just made up stuff." *Id.* at 114:18-19. "[T]his is just a fraudulent statement to investors that they could give them some hope of recovery if they continue to give money to the Helpers. That's what it is. It's blatantly false." *Id.* at 115:6-9.

93. These activities interfered with the administration of the Receivership because certain investors filed or served numerous declarations, notices, objections, and similar documents on the mistaken belief that they will recover all of their money plus damages. *See, e.g.,* Ex. 96B; *see also* Docs. 489-586, 588-636.

## I. Falsely Representing That Winters and the Helpers Group Were Entitled to a Percentage of Recoveries and Distributions When They Did Nothing to Create the Fund nor Provided Any Legitimate Assistance in Connection With the Claims Process

94. Melick and the other Respondents interfered with the administration of the Receivership by falsely representing that Winters and the Helpers Group were entitled to a percentage of recoveries and distributions

when they have done nothing to create the fund nor provided any legitimate assistance in connection with the claims process. As the Receiver testified:

> Q. Did Winters or the Helpers Group assist you in any way to collect the money you distributed through the claims process?
>
> A. Quite to the contrary. They provided, if any information, false information, and with respect to giving any assistance, they clearly did not do that with all the stuff that they did. I mean, I think it's very interesting that with all the concern that Mr. Melick had and the others have expressed, I never received a phone call or communication from any of them.
>
> Q. Did Winters and the Helpers Group collect or otherwise turn over any funds to you to distribute to the claims process?
>
> A. They did not. And I think that that indicates that this idea of the contingency fee agreement is just another fraud, because with respect to a contingency fee agreement, a lawyer is entitled to often a percentage of the fund that he creates. These people created no fund. They filed no lawsuit. They appealed no lawsuit on behalf of these people.

Tr. 115:22-116:15; *see also* Ex. 27 at 67:8-14 ("Q. Do you know if Greg Melick, Brent Winters or any of the other members of the Helpers Group ever provided any funds or other assistance to the [R]eceiver regarding the [R]eceiver's efforts to gather assets for distribution? A. No. That wouldn't have been something that he would have done."); Tr. 41:15-17 ("Q. Has the Helpers Group ever recovered any money on your behalf? A. Not a dime."); Tr. 32:13-16 ("I mean, here we are six years later, Oasis Helpers Group has not gotten one dime for these people that had contributed all this money, so it's like when are we going to figure this out, so I was fortunate to figure it out early on.").

95. Respondents admit that their purported entitlement to money is entirely derivative of the Receiver's efforts. *See, e.g.,* Ex. 6 at 15:20-22 ("Because refunds were received by all the clients of Mr. Winters, therefore, the contingency was fulfilled and — so then they were invoiced."). Importantly, "the retainer agreement and the documents around that state specifically that the contingency fee agreement is not for activities relating to filing a claim." Tr. 98:5-10.

96. These activities interfered with the administration of the Receivership and increased costs thus depleting the Receivership Estate. *See, e.g., id.* at 116:16-23.

**J. Falsely Representing That Claimants Will Receive No Further Recovery Unless They Fund DaCorta's Legal Defense**

97. Melick and the other Respondents interfered with the administration of the Receivership by falsely representing that claimants will receive no further recovery unless they fund DaCorta's legal defense. According to the "Notice to Lenders" video hosted on a YouTube channel owned by Melick (Tr. 61:8-14):

> Some lenders believe they can avoid contributing to the work that needs to be done and still benefit from restitution that may result from Michael DaCorta defending himself in the civil case. While it's true that a jury may award him compensation for losses that he and Oasis suffered, it's not true that those who remain on the sidelines, unwilling to help him, will receive anything from that reparation. . . .

Since Michael is the only party left in the civil case with standing in court to defend against the CFTC's charges. Only by having a current attorney/client agreement with Michael's lawyer, Mr. Winters, may lenders hope to receive further meaningful recovery of their loans. If lenders fail to honor their contractual obligations, it will become impossible to direct funding to additional legal work needed for Michael to recover those funds. . . .

Consequently, only Michael DaCorta remains with standing to make a defense that could result in restitution of losses. Michael is the last man standing.

To make this as simple and clear as possible, if you're not honoring your attorney/client agreement, you're not supporting Michael. Moreover, since the Court says you have no standing, you cannot hire another attorney to represent your interests. . . .

This reenforces that only Michael DaCorta retains standing, and any future negotiation will occur solely through him and his designated counsel. Because your loans legally became Oasis' assets and all other name[d] defendants surrendered their claims for defense in this suit, any restitution awarded in a settlement or judgment will belong to Michael DaCorta, the only remaining defendant, not to the other defendants and not to individual lenders. . . .

Lenders who refuse to honor their attorney/client agreement with Mr. Winters are only spectators and not parties to the process, nor to the outcome. If the case is remanded and tried and Michael prevails, any restitution awarded will go to him. Neither Michael nor his counsel will have a legal duty, moral obligation, or incentive to share that restitution with those that did not assist in funding Mike's defense.

In short, no contribution, no participation. No participation, no further claim. Those who help may be helped. Most lenders supported Michael's defense by funding the trust through their contingency agreements with Attorney Winters.

If a favorable settlement or restoration occurs, Michael intends to compensate those who helped him. Such a good will gesture,

> however, is not enforceable in law, except through Mr. DaCorta's written agreement with Mr. Winters. . . .
>
> Conclusion, lenders who have withheld participation must understand this reality: Winning the case will not, by itself, restore your money. Only a funded and coordinated legal team, which your support will enable Attorney Winters to sustain, can secure a settlement from which you may benefit. Refusing to honor your attorney/client agreement ensures exclusion from any recovery beyond what the receiver provides.
>
> In short, if you wish to share in this success and your future restitution, you must stand with the defense now.

Ex. 4 (transcript) at 1:20-10, 1:19-2:2, 4:11-19, 5:17-25, 6:11-7:4, 8:6-16; *see also* Ex. 3 ("Notice to Lenders" video).

98. DaCorta's own appellate attorney has affirmed that these statements are nonsense. *See* Ex. 23 ¶ 12 ("I do not know that success on the appeal will result in the recovery of any money from the government or anyone else by DaCorta, the Receivership Entities, or any of the investors in the Receivership Entities. I have never made any representations to anyone that success on the appeal or the habeas action would result in DaCorta or anyone else receiving hundreds of millions of dollars."); *id.* at ¶ 14 ("I do not believe that the appellate court has the authority to order the recovery of any money or that DaCorta be reimbursed any money. The only thing the appellate court would have the authority to do is to remand the case to the trial court for further proceedings. There is no mechanism in a habeas corpus proceeding or section 2255 proceeding that would result in the recovery of any funds. The

habeas court has jurisdiction only over the criminal proceedings and has no authority to dictate or order the recovery of funds in the civil matter.").

99. While the "Notice to Lenders" video is the worst culprit, Respondents provide many additional examples of their deceit. *See* Ex. 47 at 3 (Autumn/Winter 2023-24 Lender Update stating: "Mike DaCorta is the only Defendant left standing to defend against the CFTC's civil case allegations. His ability to do so is the only thing making it possible for you to recover your Oasis losses through his appeal to the 11th Circuit Court of Appeals. Without your financial support no appeal would be possible – the case would be over, without recourse. You would become subject to recover only what the Receiver felt like giving you and nothing more."); Ex. 36 at 8 (April 2, 2022, memo stating that members of the Helpers Group will receive no further services from Winters if they cooperate with the Receiver: "Even if Oasis is fully restored and/or you become otherwise capable of receiving full restitution for losses arising from Oasis, if you choose to accept the terms of a settlement with the Receiver, any litigation needed to pursue your rightful claims to any additional funds would not be engaged by Mr. Winters on your behalf.").

100. As the Receiver testified during the hearing, DaCorta has no ability to recovery or refund investors' money. Tr. 118:6-10 ("It's astounding that anyone would assert that they would — a legal representative should represent the crook who cheated them all and relying upon him to get their

money back, especially in a situation where an individual of Mr. DaCorta's nature is involved.").

101. These activities interfered with the administration of the Receivership because investors did, in fact, fund DaCorta's legal strategy, and DaCorta's lawyers then used that money to obstruct the Receiver's activities by, for example, delaying the first interim distribution. *See supra* ¶ 40.

**K. Using Fabricated Judicial Imagery, Including an AI-Generated Depiction of This Court, to Lend False Authority to These Lies**

102. Melick and the other Respondents interfered with the administration of the Receivership by using fabricated judicial imagery, including an AI-generated depiction of this Court, to lend false authority to these lies. *See* Ex. 3 ("Notice to Lenders" video); Ex 4 at 3:16-23 ("It appears to the Court that the noticed claimants or creditors or investors in the Oasis Ponzi scheme who are concerned about depletion of the accumulated assets. To the extent that the notice claimants are seeking injunctive relief from the Court, none of them are named parties to this action and, as such, they do not have standing to request an injunction or any other relief.").

103. These activities interfered with the administration of the Receivership by confusing investors and discouraging them from using the Court-approved objection procedure.

## CONCLUSIONS OF LAW

## V. THE COURT HAS JURISDICTION OVER RESPONDENTS

104. "Courts can assert jurisdiction over non-parties to an injunction or order in contempt proceedings where it is alleged that the non-party violated an order in active concert or participation with a named party." *Blanco GmbH±Co. KG v. Vlanco Indus., LLC*, 992 F. Supp. 2d 1225, 1248 (S.D. Fla. 2014), *on reconsideration in part* (May 21, 2014), *aff'd sub nom. Blanco GmbH %8F Co. KG v. Laera*, 620 F. App'x 718 (11th Cir. 2015); *see also F.T.C. v. Leshin*, 618 F.3d 1221, 1236 (11th Cir. 2010) ("*Leshin I*") ("The district court did not abuse its discretion by holding that the [nonparty] acted in concert [with the defendants] and was bound by the injunction.").

105. The Consolidated Order and its predecessors bind DaCorta under Federal Rule of Civil Procedure 65(d)(2)(A) because he is a party to this action and because he consented to their entry (aside from the SRO). *See* Docs. 35-3 & 172. They bind Winters under Rule 65(d)(2)(B) because he is DaCorta's attorney. *See supra* ¶ 11. They bind McKee and Melick because they are DaCorta's agents under Rule 65(d)(2)(B), and they are also "in active concert or participation with" DaCorta and Winters under Rule 65(d)(2)(C). *See supra* ¶¶ 4-8, 14. Finally, Melick claims to work as a paralegal for Winters, which also makes him an employee or agent of both Winters and DaCorta. *See supra* ¶ 12. Jurisdiction under Rule 65 even extends to "a nonparty who aids or abets

a nonparty in privity with an enjoined party." *United States of Am. v. Robinson*, 83 F.4th 868, 881 (11th Cir. 2023) (vacating criminal contempt conviction on unrelated grounds). These principles are broad enough to encompass each and every Respondent.

## VI. RESPONDENTS RECEIVED NOTICE OF THE HEARING AND AN OPPORTUNITY TO BE HEARD, WHICH SATISFIES DUE PROCESS REQUIREMENTS

106. "At most, due process requires only 'skeletal' protections in civil contempt proceedings." *In re McLean*, 794 F.3d 1313, 1324 (11th Cir. 2015). "It is by now well-settled law that due process is satisfied when a civil contempt defendant receives notice and an opportunity to be heard." *F.T.C. v. Leshin*, 719 F.3d 1227, 1235 (11th Cir. 2013) ("*Leshin II*") (citing *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 827 (1994) and *Shillitani v. United States,* 384 U.S. 364, 365 (1966)).

107. The Court ordered the Receiver to serve Winters, Melick, and McKee with a copy of the Show Cause Order under Federal Rule of Civil Procedure 4. *See* Doc. 927. Given their evasiveness, the Receiver served all three of them under Florida law by substituted service on the Florida Secretary of State. *See* Docs. 950, 953. The Receiver also served Winters under Indiana law and McKee under Illinois law to ensure Respondents had notice of the hearing. *See* Doc. 942.

## VII. RESPONDENTS HAD ACTUAL NOTICE OF THE ORDERS

108. "[I]n order to hold a non-party to an order in civil contempt for a violation thereof, the nonparty must have actual notice of the enjoined acts." *Blanco GmbH±Co. KG*, 992 F. Supp. 2d at 1248.

109. The unrebutted evidence establishes that Respondents had actual notice of the SRO, preliminary injunctions, and Consolidated Order. *See supra* § II. In addition, DaCorta is a party to this enforcement proceeding. He was served with the SRO, and he agreed to the entry of both the Consent Preliminary Injunction and the Consolidated Order. *See* Docs. 35-3, 172.

## VIII. THE RECEIVER CARRIED HIS BURDEN AT THE SHOW CAUSE HEARING; RESPONDENTS OFFERED NO DEFENSE

110. "Courts have inherent power to enforce compliance with their lawful orders through civil contempt." *CitronelleMobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991); *see also Shillitani*, 384 U.S. at 370; *S.E.C. v. Pension Fund of America, L.C.*, 2006 WL 1104768, *7 (S.D. Fla. 2006). This inherent power is in addition to the Court's broad authority to supervise an equity receivership and to determine the appropriate actions to be taken in the administration of the receivership. *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992).

111. Civil contempt is a remedial "sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by

reason of noncompliance." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). A sanction is considered "civil" and "remedial" if it either coerces the contemnor into compliance with a court order or compensates the complainant for losses sustained. *Bagwell,* 512 U.S. at 829. "This power is essential to the proper conduct of the judicial function and without it a court would be unable to preserve decorum or assert its authority by order or decree." *In re Williams*, 306 F. Supp. 617, 618 (D.D.C. 1969). "Without the power to punish noncompliance with its orders, this Court's authority to issue judgments would be nothing more than a mere mockery." *S.E.C. v. Yun*, 208 F. Supp. 2d 1279, 1288 (M.D. Fla. 2002) (internal quotation marks and citation omitted).

112. Contempt is committed when a person "violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order." *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987) (citing *S.E.C. v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir. 1981)). In a civil contempt proceeding, the movant has the burden of establishing by clear and convincing evidence that: (1) a court order was in effect; (2) the order required certain conduct by the respondent; and (3) the respondent failed to comply with the court's order. *Petroleos Mexicanos v. Crawford Enterprises. Inc.*, 826 F.2d 392, 401 (5th Cir. 1987). Contempt is established where there is clear and convincing evidence

that the "violated order was valid and lawful; . . . the order was clear and unambiguous; and the . . . alleged violator had the ability to comply." *Leshin I*, 618 F.3d at 1232 (internal quotation marks omitted); *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000). This question does not focus on the subjective belief or intent of the alleged contemnor, but rather simply whether or not they complied with the order at issue. *S.E.C. v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla. 2010) *aff'd*, 396 F. App'x 635 (11th Cir. 2010); *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990).

113. "At the hearing, if the plaintiff proves what he has alleged in his motion for an order to show cause, the court hears from the defendant. At the end of the day, the court determines whether the defendant has complied with the injunctive provision at issue and, if not, the sanction(s) necessary to ensure compliance." *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000).

114. The Receiver carried his burden at the evidentiary hearing by presenting clear and convincing witness testimony and almost 100 exhibits detailing how Respondents violated the asset freeze (*see supra* § III & *infra* § IX) and how Respondents harassed the Receiver or otherwise interfered with the administration of the Receivership (*see supra* § IV & *infra* § X).

115. Only DaCorta appeared at the hearing (involuntarily), and he did not offer any evidence in his defense, instead choosing to invoke the Fifth Amendment in response to questioning by the Receiver's counsel.

## IX. RESPONDENTS VIOLATED THE ASSET FREEZE BY RAISING AND SPENDING MONEY "DERIVED FROM" INVESTORS WITHOUT LEAVE OF COURT

116. The Court implemented the asset freeze on April 15, 2019, through the SRO. *See* Doc. 7 ¶ 8 ("[T]here is good cause for the Court to freeze assets owned, controlled, managed or held by Defendants . . . **or in which they have any beneficial interest**." (emphasis added)); *see also id.* at ¶ 20 (implementing asset freeze) & *id.* at ¶ 23 ("The assets affected by this Order shall include existing assets and **assets acquired after the effective date of this Order**." (emphasis added)).

117. On April 30, 2019, the Court continued the asset freeze with respect to DaCorta through the Consent Order of Preliminary Injunction. *See* Doc. 43 ¶ 9 ("Any . . . person that holds, controls, or maintains custody of any account or asset titled in the name of, **held for the benefit of**, or otherwise under the control of Defendants . . . who receives notice of this Order by personal service or otherwise, is hereby notified that this Order prohibits Defendants . . . from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling, or otherwise disposing of Defendants' . . . assets, except as directed by further order of the Court." (emphasis added)); *see also id.* at ¶ 8 ("This Order shall apply to any of Defendants' . . . assets derived from or otherwise related to the activities alleged in the Complaint, **regardless of when the asset is obtained**."

(emphasis added)) & Doc. 44 ¶ 4 (continuing asset freeze). DaCorta consented to these provisions and to the preliminary injunction generally. *See* Doc. 35-3.

118. On July 11, 2019, the Court entered the Consolidated Order, which provides that "all Receivership Property remains frozen until further order of this Court." Doc. 177 ¶ 4. "Accordingly, all persons and entities with direct or indirect control over any Receivership Property, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets." *Id.* The Consolidated Order defines "Receivership Property" as "Receivership Assets" and "Recoverable Assets." *Id.* at 2. "Receivership Assets" are "all assets (real, personal, intangible, or otherwise) of the Defendants." *Id.* "Recoverable Assets" are "assets of any **other entities or individuals** that: (a) are attributable to funds **derived from pool participants, lenders, investors, or clients** of the Defendants. . .; (b) are held in constructive trust for the Defendants. . .; (c) were fraudulently transferred by the Defendants. . .; and/or (d) may otherwise be includable as assets of the estates of the Defendants." *Id.* (emphasis added).[6]

[6] In his fifth proposed conclusion of law, DaCorta claims that "[t]he Receiver did not establish by clear and convincing evidence that the independently supplied lender funds at issue were property of DaCorta or Receivership Property." Doc. 984 at 38 ¶ 5. DaCorta is wrong because he misapplies the standard: the money need only be "derived from" investors, and the evidence of that fact is both indisputable and undisputed. This also renders DaCorta's sixth proposed conclusion of law irrelevant. DaCorta cites no cases in support of either of his incorrect positions.

119. DaCorta consented to the entry of the Consolidated Order. *See* Doc. 172 at 5; *see also S.E.C. v. Collector's Coffee Inc.*, 602 F. Supp. 3d 488, 494-95 (S.D.N.Y. 2022) (holding defendant consented to freeze of "untainted" assets from wrongful death lawsuit by consenting to freeze of "all" assets); *S.E.C. v. Lauer*, 445 F. Supp. 2d 1362, 1370 (S.D. Fla. 2006) ("By consenting to the blanket asset freeze, Lauer agreed that this standard was met and he cannot complain about it now.").

120. Once the funds left the investors' respective accounts, they became subject to the asset freeze as after-acquired assets held for DaCorta's benefit. *Cf. TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 929 F. Supp. 2d 1255, 1263 (M.D. Fla. 2013) (applying prejudgment asset freeze pending disgorgement to retainer held by law firm that did not properly inquire into source of funds); *S.E.C. v. Credit Bancorp, Ltd.*, 109 F. Supp. 2d 142, 144 (S.D.N.Y. 2000) ("Generally speaking, funds held in an escrow account, such as an attorney trust account, are considered to be funds owned by the client and held by the attorney in a fiduciary capacity."); *C.F.T.C. v. Wilson*, 2011 WL 6398933, at *3 (S.D. Cal. Dec. 20, 2011) (applying asset freeze to funds in attorney trust account because "[w]hen funds are linked directly to the fraud, it would frustrate the purpose of the regulation to allow the defendant to use funds for attorney fees"); *F.T.C. v. Assail, Inc.*, 410 F.3d 256, 263 (5th Cir. 2005) (affirming district court's finding that attorneys' fees paid by companies acting

in concert with the named defendants "were paid with funds subject to the asset freeze order").

121. Given the foregoing, Respondents violated the asset freeze in three primary ways. First, they raised money "derived from" Oasis investors for Michael's DaCorta's benefit – specifically, to pay his legal fees. *See supra* § III.E. Second, Winters imposed a private levy of 15% of the distributions the Receiver made to the investors pursuant to bogus ACR Agreements. *See supra* § III.B. Third, they misappropriated more than $500,000 of the money "derived from" investors by using it to buy gold coins and to pay exorbitant credit card bills. *See supra* § III.F. All of these activities involve the misuse of money "<u>derived from</u>" investors and thus implicate the asset freeze provisions. Doc. 177 at 2, 4.

### A. DaCorta Misconstrues the Definition of Receivership Property

122. In his post-hearing submission, DaCorta argues that the money funneled through the Trust does not constitute Receivership Property because it did not originate from the Receivership – *i.e.*, some of the money was raised before the Receiver made any distributions to investors. Doc. 984 at 9-10. Under the plain language of the Consolidated Order, however, "Receivership Property" is not "derived from" the Receivership. That argument is circular. Instead, it is derived from "pool participants, lenders, investors, or clients of the Defendants." Doc. 177 at 2.

123. Put simply, as it is undisputed that the Court had the authority to freeze the proceeds from DaCorta's first attempt to defraud Oasis investors, the Court can also freeze the proceeds from his second attempt to defraud those exact same people. As quoted above, the plain language of the asset freeze expressly applies to after-acquired assets.[7] *See, e.g., F.T.C. v. Para-Link Int'l, Inc.*, 2001 WL 34107045, at *3 (M.D. Fla. May 30, 2001) (refusing to lift asset freeze as to "after-acquired assets" to pay attorneys' fees for failure to comply with court-ordered procedures).

## X. THE CONSOLIDATED ORDER AND ITS PREDECESSORS FORBID THE HARASSMENT OF THE RECEIVER OR INTERFERENCE WITH THE RECEIVERSHIP

124. To ensure that the Receiver would be able to fulfill his mandate, the Court included a provision in the Consolidated Order (and its predecessors) enjoining any interference with the Receiver or Receivership:

[7] The Court has previously addressed this issue. Defendants Raymond P. Montie and John J. Haas initially had all of their assets frozen. In negotiation with the CFTC, they explained that they both had independent jobs with a company called Ambit Energy. The CFTC agreed to exempt those after-acquired funds from the asset freeze and to establish income accounts for both defendants from which they could pay their attorneys' fees and living expenses. *See* Doc. 175 at 9-11; Doc. 176 at 9-12. The Receiver monitored those accounts and reported their balances to the Court in his quarterly interim reports *See, e.g.,* Doc. 642-2. In contrast, DaCorta and the Helpers Group set up a private Trust outside the Court's supervision and filled that Trust with almost $900,000 from approximately 360 of the very same depositors underlying the Ponzi scheme. Ex. 98. Had DaCorta found another job before being sent to prison or had he directed his commissary funds his attorneys, the question before the Court might be different, but that is not what happened. The funds at issue are traceable to the fraud because they were "derived from" victims, solicited by Respondents, and held in trust for DaCorta's benefit, violating the plain language of the asset freeze. This is the essence of a recovery scam.

**VII. Injunction Against Interference with Receiver**

> 31. The Receivership Defendants . . . and **all persons** receiving notice of this Order by personal service, facsimile **or otherwise**, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:
>
> D. Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

Doc. 177 at 15-16 (emphasis added); *see also* Doc. 7 § VIII; Doc. 44 § VII.

125. Respondents violated these provisions in at least 11 different ways, as described above in Section IV. *See, e.g., Citronelle-Mobile Gathering*, 943 F.2d at 1304 ("Because [respondent] clearly and convincingly violated the district court's TRO and the Receiver appointment order without explanation, the district court properly found him in contempt. In fact, such a finding was virtually compelled."); *Detroit Mem'l Partners, LLC*, 2016 WL 3951336 at *9 (awarding fees because attorney's "conduct was harassing in nature, and hindered and interfered with the Receiver's performance of his duties and responsibilities to the receivership estate"); *United States v. Maragas*, 390 F.2d 88, 91 (6th Cir. 1968) (holding that negative "publicity" interfered with receiver, and "[s]uch interference with a receiver constitutes contempt of court").

## XI. THE RECEIVER IS ENTITLED TO ADVERSE INFERENCES AGAINST DACORTA AND THE OTHER RESPONDENTS

126. "Silence is often evidence of the most persuasive character." *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153-54 (1923). "[T]he trier of fact may take an adverse inference against the parties to a civil action refusing to testify on Fifth Amendment grounds." *United States v. Two Parcels of Real Prop. Located in Russell Cnty., Ala.*, 92 F.3d 1123, 1129 (11th Cir. 1996).

127. "[D]istrict courts possess wide discretion in response to a party's invocation of the Fifth Amendment." *S.E.C. v. Monterosso*, 746 F. Supp. 2d 1253, 1262 (S.D. Fla. 2010).

128. Courts may impose an adverse inference against a conspirator due to a co-conspirator's invocation of the Fifth Amendment. *See, e.g., Lighthouse List Co., LLC v. Cross Hatch Ventures Corp.*, 2014 WL 11531638, at *2 (S.D. Fla. July 15, 2014) ("Judge Snow did not abuse her discretion in imputing an adverse interest to [conspirator] from [co-conspirator's] exercise of the Fifth Amendment right against self-incrimination" because "[a]s co-conspirators, they assumed responsibility for the other's actions."); *F.T.C. v. Life Mgmt. Servs. of Orange Cnty., LLC*, 350 F. Supp. 3d 1246, 1260 (M.D. Fla. 2018), *aff'd,* 2022 WL 703939 (11th Cir. Mar. 9, 2022) (making adverse inference to hold defendant "individually liable for the common enterprise's violations").

129. DaCorta invoked his Fifth Amendment right to remain silent in response to questions regarding (1) how DaCorta was able to retain three attorneys, including Winters, to represent him, (2) if DaCorta misled hundreds of Oasis lenders to pay the attorneys on his behalf, (3) if DaCorta directed Melick to raise money from Oasis lenders to pay for the attorneys, (4) if DaCorta knew Melick was in touch with a group of Oasis investors, (5) if DaCorta directed Melick to send information to these investors on DaCorta's behalf, (6) if DaCorta had a history of working with Melick to violate the asset freeze, (7) if the government would pay DaCorta any money if he succeeds on his appeal and on his *habeas corpus* petition; (8) if DaCorta participated in the obstruction of the Receivership, specifically regarding the filing of the notices and objections, (9) if DaCorta knew what happened to the gold coins purchased by the Trust and if such coins were delivered to Winters, (10) if DaCorta was a member of the Helpers Group, (11) if DaCorta benefitted from the Helpers Group's efforts, (12) if DaCorta was aware of the filings in this action, and (13) if DaCorta regularly communicated with Melick regarding the Helpers Group's activities. Tr. at 128:12-131:23. Accordingly, the Court draws adverse inferences against him on all such matters and disregards DaCorta's post-hearing argument that the Receiver failed to establish that DaCorta violated the Consolidated Order. Doc. 984 at 15-21; *see, e.g., S.E.C. v. Royal Bengal Logistics, Inc.*, 2026 WL 1740870, at *14 (S.D. Fla. May 21, 2026) ("Because

[defendant] invoked her Fifth Amendment protection on all material issues, this Court draws the adverse inferences allowed and disregards her affidavit entirely.”).

130. Given DaCorta's invocation of his Fifth Amendment right to remain silent in response to above-mentioned specific questions, the Court draws the following adverse inferences against DaCorta:

- DaCorta never paid Winters, Preziosi, Kurpiers or any other attorney with his own money.
- Instead, DaCorta directed Melick to raise money derived from Oasis investors to pay his legal expenses.
- DaCorta knew that Melick was communicating with the Helpers Group, and DaCorta directed his activities, including by sending Melick information to distribute to the group.
- In fact, DaCorta was a member of the Helpers Group and directly benefitted from its activities.
- If DaCorta wins his appeal and/or *habeas corpus* petition, the government will not actually be required to pay DaCorta hundreds of millions of dollars in damages.
- DaCorta and Melick have a history of working together to circumvent the asset freeze.
- DaCorta was aware of the filings made in this case, including the 150 “Notices & Objections” the Court struck as a scheme to undermine the Receivership.
- DaCorta knows the location of the misappropriated gold coins.

131. As required by governing law, these adverse inferences are not the sole bases for DaCorta's liability but are supported by independent evidence demonstrating that DaCorta acted in concert with the other Respondents in

perpetuating the recovery fraud. *See supra* ¶¶ 14, 39-44, 67, 89-94. Accordingly, the Court rejects DaCorta's contention that there is insufficient evidence outside of the adverse inferences to support a finding that he violated the Consolidated Order's asset freeze and prohibition of interfering with the Receiver. *See* Doc. 984 at 16-18.

## XII. THE COURT CAN HOLD DACORTA IN CONTEMPT BASED ON ACTS COMMITTED BY HIS AGENTS FOR HIS BENEFIT

132. DaCorta's primary defense is that he did not personally violate the Court's orders, primarily because he was incarcerated.[8] Injunctions, however, apply to (A) "the parties," (B) "the parties' officers, agents, servants, employees, and attorneys," and (C) "other persons who are in active concert or participation" with the parties or their agents. Fed. R. Civ. P. 65(d)(2). "The injunction not only binds the parties but also those identified with them in

[8] DaCorta relies on *McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000), to argue that the Receiver "lumped" him together with the other Respondents and thus failed to introduce particularized evidence of DaCorta's wrongdoing. *See* Doc. 984 at 38 ¶ 7. In *McGregor*, "the FTC acknowledge[d] that it presented minimal evidence at the First Contempt Hearing relating to Teri Chierico," the wife of the principal defendant. *Id.* at 1383. "The FTC only produced evidence that she occasionally visited her husband's telemarketing office with their children and 'that's it'." *Id.* DaCorta is not Teri Chierico. The Receiver presented evidence, including both numerous exhibits and deposition testimony from Michele Utter, demonstrating that DaCorta coordinated with Melick to circumvent the asset freeze and to raise money from the Helpers Group for DaCorta's benefit. *See supra* ¶ 14 & § III.E. When asked about these matters, DaCorta invoked the Fifth Amendment. *See* Tr. 127:21-131:23. Unlike Teri Chierico, DaCorta was a member of the Respondents' conspiracy, and all their actions in furtherance of the conspiracy are imputable to him. *See* § XII.

interest, in privity with them, represented by them[,] or subject to their control." *Leshin I*, 618 F.3d at 1235 (internal quotation marks omitted).

133. Importantly, "defendants may not nullify [the injunction] by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Id.*[9] "A party does not escape a finding of contempt simply because a non-party actually carried out the violative acts." *Diamond Resorts Int'l, Inc. v. US Consumer Att'ys, P.A.*, 2021 WL 9596129, at *3 (S.D. Fla. Apr. 9, 2021). "A defendant may also be found in contempt where the evidence gives rise to an inference that a defendant and a non-party are acting in concert to violate a consent judgment." *Id.* (internal quotation marks omitted); *see also Life Mgmt. Servs. of Orange Cnty.,* 350 F. Supp. 3d at 1260 (holding defendant "individually liable for the common enterprise's violations"); *Chanel, Inc. v. Krispin*, No. 08-23439-CIV, 2010 WL 4822737, at *4 (S.D. Fla. Oct. 18, 2010), *report and recommendation adopted*, No. 08-23439-CIV, 2010 WL 4825489 (S.D. Fla. Nov. 22, 2010) (finding Defendants "in civil contempt for violating the Permanent Injunction" as the "unrefuted evidence of record establishes that Defendants, their agents, and/or persons operating in concert with Defendants operate and control the New Domains and that

[9] DaCorta asks this Court to conclude that "[t]he Receiver was required to prove both that particular conduct fell within a clear prohibition and that DaCorta personally engaged in conduct violating it" (Doc. 984 at 37-38 ¶ 4), but under governing Eleventh Circuit precedent and for the reasons discussed above, DaCorta is wrong.

Plaintiffs' Marks are being used on websites associated with the New Domains").

134. At all relevant times, DaCorta's attorneys, Winters, Preziosi, and Kurpiers, were DaCorta's agents. *See supra* ¶¶ 11, 39-44; *Viera v. City of Lake Worth, Fla.*, No. 19-80158-CIV, 2020 WL 13644556, at *5 (S.D. Fla. Mar. 31, 2020) ("Under Florida law, an attorney-client relationship is an agency relationship."). Melick, Winters's paralegal, not only was Winters's agent, but also acted in concert with DaCorta and the other Respondents in perpetuating the recovery fraud. *Paramount Disaster Recovery LLC v. Amica Mut. Ins. Co.*, No. 16-14566-CIV, 2017 WL 5705996, at *3 (S.D. Fla. Aug. 22, 2017 (Paralegals "are agents of and act on behalf of their law firms."); *see supra* ¶¶ 4, 12, 14. As the Treasurer of the Helpers Group, McKee raised the money used to pay the lawyers and is thus in "active concert or participation" with DaCorta. *See supra* ¶¶ 8, 32-36.

135. In addition, unrebutted evidence and permissible adverse inferences establish that (1) DaCorta directed Melick to raise money for him through the Helpers Group and (2) DaCorta and Melick have a history of conspiring to evade the asset freeze. *See supra* ¶ 14; § XI. As a matter of law and undisputed fact, the actions of Winters, Melick, and McKee are all attributable and imputable to DaCorta.

## XIII. RESPONDENTS' STATEMENTS ARE ADMISSABLE AGAINST EACH OTHER BECAUSE THE HELPERS GROUP OPERATED AS A COMMON ENTERPRISE WITH A SHARED GOAL

136. Although the Court has already admitted the Receiver's exhibits into evidence, it is worth emphasizing that a statement made by one Respondent is substantive evidence against each and every other Respondent in light of DaCorta's argument that he did not personally participate in the demonstrated misconduct. Under Federal Rule of Evidence 801(d)(2)(E), a statement is not hearsay if it is offered against an opposing party and was made by the party's co-conspirator during the course and in furtherance of the conspiracy. To admit a statement under this rule, the offering party must establish by a preponderance of the evidence that: (1) a conspiracy, joint venture, or common enterprise existed; (2) the declarant and the defendant were members of that venture; and (3) the statement was made during the course and in furtherance of the venture. *See, e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

137. Importantly, the Eleventh Circuit clarifies that Rule 801(d)(2)(E) applies equally to civil actions and does not require that the conspiracy be illegal or fraudulent; it applies to any shared joint venture or common enterprise. *United States v. Holland*, 117 F.4th 1352, 1356 (11th Cir. 2024) ("The word 'conspiracy' as used in the rule can refer to either (1) an agreement to do something unlawful or (2) the act of working together toward a shared

goal (i.e., a joint venture).”); *see also United States v. Postal*, 589 F.2d 862, 886 n.41 (5th Cir. 1979) (binding precedent holding that the conspiracy need not be unlawful to trigger the rule).

138. “The failure of a document to identify the declarant is not fatal to admissibility under Rule 801(d)(2)(E) . . . if the facts and circumstances surrounding the making of the statement indicate that the speaker is a member of the conspiracy or joint venture.” *United States v. El-Mezain*, 664 F.3d 467, 505 (5th Cir. 2011), as revised (Dec. 27, 2011) (collecting cases and noting “[o]ur conclusions . . . are consistent with those of our sister circuits, which have also held that anonymous statements may be admissible under Rule 801(d)(2)(E) if sufficient evidence is presented to connect the declarant with the conspiracy at issue”); *Postal*, 589 F.2d at 886 n.41 (“Although it is not clear who authored the logbook (it appears to have been kept by more than one of those on board the La Rosa)[,] we think it inescapable that one of the crew of the La Rosa did so.”); *United States v. Dynalectric Co.*, 859 F.2d 1559, 1582 (11th Cir. 1988) (affirming admission of phone call despite “relative anonymity of the caller”).

139. The Eleventh Circuit applies a “liberal standard” when determining whether a statement was in furtherance of a conspiracy. *U.S. v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988). Courts hold that “[t]he statement need not be necessary to the conspiracy, but must only further the

interests of the conspiracy in some way." *U.S. v. Turner*, 871 F.2d 1574, 1582 (11th Cir. 1989); *see also U.S. v. Caraza*, 843 F.2d 432, 436 (11th Cir. 1988). For instance, "[s]tatements made to solicit membership or participation in the conspiracy . . . or statements explaining the conspiracy to a new member are made in furtherance of the conspiracy." *Turner,* 871 F.2d at 1582 (internal citations omitted); *see also United States v. Hill*, 745 F. App'x 806, 809-10, 813 (11th Cir. 2018) (affirming admissibility of "motivational" text messages sent by a coconspirator "to encourage . . . sales efforts," send updates on the team's progress, "and hand out individual instructions").

140. Put simply, all of Melick's misrepresentations in the Lender Updates are substantive evidence against DaCorta (and Winters and McKee) because they all participated in the common enterprise known as the Helpers Group. *See supra* § I.

## XIV. WINTERS IS NOT ENTITLED TO ANY PERCENTAGE OF THE MONEY DISTRIBUTED BY THE RECEIVER

141. As a matter of law, a lawyer cannot obtain a contingency interest in a fund the lawyer did not create. *See, e.g., In re Boesky Sec. Litig.*, 888 F. Supp. 551, 558 (S.D.N.Y. 1995) ("No private counsel played any significant role in the disgorgements which the SEC obtained . . . ; those funds having been created solely through the efforts of the SEC. Accordingly, there is no compensation to be paid on account of the creation of those funds."). "Allowing

private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund." *U.S. ex rel. Bogart v. King Pharmaceuticals*, 493 F.3d 323, 330 (3rd Cir. 2007) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 337 (3d Cir.1998)) (rejecting counsel's attempt to recover fees from settlements negotiated independently by states who were not parties to the litigation).

142. As explained above in Section III.B, Winters misappropriates 15% of the Receiver's distributions under the ACR Agreements even though he and the Helpers Group did nothing to help the Receiver gather those funds. This is impermissible as a matter of law and equity and constitutes interference with the administration of the Receivership.

## XV. APPROPRIATE REMEDIES FOR CIVIL CONTEMPT

143. In his motion for an order to show cause, the Receiver requested an order (1) prohibiting Respondents – particularly McKee and Melick – from having any further communications with any claimants; (2) prohibiting Respondents from soliciting or accepting any further funds from any investors in the Oasis scheme, regardless of whether those funds are characterized as donations or payments pursuant to the ACR Agreements; (3) requiring each Respondent to produce an accounting of all funds they or any entity under their control (like the Trust) have received directly or indirectly from any Oasis

investor; (4) requiring Respondents to produce the gold coins and to disgorge, jointly and severally, to the Court's registry all funds received directly or indirectly from investors in the Oasis scheme with fines accruing at the rate of $500 per day after a brief grace period until all amounts are disgorged; and (5) granting the reasonable fees and costs incurred by the Receiver and his professionals as a result of the conduct described herein, including additional administrative expenses caused by interference with the claims and distribution process. Doc. 904 at 24-25.

144. In civil contempt cases, courts have "extremely broad and flexible powers." *Leshin II*, 719 F. 3d at 1231. "District courts are afforded wide discretion in fashioning an equitable remedy for civil contempt." *McGregor*, 206 F.3d at 1385 n. 5. "The sanctions may serve to either (1) coerce the contemnor to comply with a court order, or (2) compensate a party for losses suffered as a result of the contemnor's act." *Id.* District Courts have "numerous options, among them: a coercive daily fine, a compensatory fine, attorney's fees and expenses to the Receiver, and coercive incarceration." *Citronelle-Mobile Gathering, Inc.*, 943 F.2d at 1304.

145. Most significantly, the Eleventh Circuit has endorsed joint and several disgorgement as an appropriate remedy when contemnors obtain money in violation of a Court order. "Where . . . parties join together to evade a judgment, they become jointly and severally liable for the amount of damages

resulting from the contumacious conduct." *Leshin I*, 618 F.3d at 1236-37 (internal quotation marks omitted)*; see also id.* at 1239 ("The order to disgorge all fees collected in violation of the injunction is a civil sanction for contempt.").

146. To the extent Respondents seek injunctive relief, this is not an appropriate civil contempt remedy here as its purpose would not be to "to coerce the defendant into compliance with the court's order" or "to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947). However, the Receiver may file a motion pursuant to Federal Rule of Procedure 60(b) to modify the Consolidated Order to include provisions explicitly prohibiting Respondents from communicating with, soliciting, or accepting any further funds from investors in the Oasis scheme. *See Fed. Trade Comm'n v. Leshin*, No. 06-61851-CIV, 2009 WL 10667856, at *20 (S.D. Fla. Apr. 7, 2009), *aff'd sub nom. Leshin I*, 618 F.3d 1221 ("The Contempt Defendants' demonstrated failure to comply with the Final Order constitutes appropriate changed circumstances warranting a modification of that order pursuant to Rule 60(b)."). In any event, Respondents are warned that any further communications with or solicitation of funds from the claimants could warrant a further finding of contempt and the imposition of additional sanctions.

147. In light of the Court's finding that Respondents have acted in concert to perpetuate the recovery fraud in violation of the Consolidated Order,

disgorgement is an appropriate remedy as it will appropriately compensate the investors for Respondents' contemptuous conduct. "[F]ailure to comply with this order for disgorgement may be punished by" further contempt sanctions, including coercive incarceration. *Id.* at *19. At this point, the Court does not find that the imposition of a coercive fine is warranted.

148. The Court further finds that granting the Receiver an award of reasonable fees and costs incurred in enforcement of the Consolidated Order is an appropriate sanction here. *See In re Ocean Warrior, Inc.*, 835 F.3d 1310, 1320 (11th Cir. 2016) (explaining that a court may award fees as a civil contempt sanction "in an amount necessary to compensate the complainant . . . for losses and expenses . . . incurred because of the contemptuous act [or to] coerce the contemnor into complying with the court order." (internal quotation marks omitted)).

## XVI. CONCLUSION

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Respondents Michael DaCorta, Greg Melick, Jason McKee, and Brent Winters are found to be in **CIVIL CONTEMPT** for violating the Consolidated Order entered July 11, 2019.

(2) The Receiver is entitled to recover his reasonable attorneys' fees and costs incurred in prosecuting Respondents' violations of the Consolidated Order. Respondents, jointly and severally, shall pay to the Receiver the attorneys' fees and costs reasonably and necessarily incurred in prosecuting Respondents' violations of the Consolidated Order. The

Receiver shall file a motion for this award of attorneys' fees and costs within 30 days of this order.

(3) Respondents must produce an accounting of all funds they or any entity under their control, such as the Trust, has received directly or indirectly from any Oasis investor since entry of the Consolidated Order and shall disgorge such funds, within 30 days of this order. Respondents are jointly and severally liable for the disgorgement. Each Respondent must file a certificate of compliance with this provision within 30 days of this order.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 4th day of September, 2026.

Virginia M. Hernandez Covington

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE